ANNE JOHNSON PALMER (SBN 302235)
*Anne.JohnsonPalmer@ropesgray.com*
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315-6337

DOUGLAS HALLWARD-DRIEMEIER*
*Douglas.Hallward-Driemeier@ropesgray.com*
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Telephone: (202) 508-4776

KIRSTEN MAYER*
*Kirsten.Mayer@ropesgray.com*
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7753

JENNIFER C. PIZER (SBN 152327)
*jpizer@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, California 90010
Telephone: (213) 590-5903

CAMILLA B. TAYLOR*
*ctaylor@lambdalegal.org*
SCOTT A. SCHOETTES*
*sschoettes@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
65 E. Wacker Place, Suite 2000
Chicago, Illinois 60601
Telephone: (312) 663-4413

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

---------------------------------------------------------------- x

SANTA CRUZ LESBIAN AND GAY COMMUNITY
CENTER d/b/a THE DIVERSITY CENTER OF
SANTA CRUZ; LOS ANGELES LGBT CENTER;
AIDS FOUNDATION OF CHICAGO; B. BROWN
CONSULTING, LLC; BRADBURY-SULLIVAN
LGBT COMMUNITY CENTER; NO/AIDS TASK
FORCE d/b/a CRESCENTCARE; SERVICES AND
ADVOCACY FOR GLBT ELDERS; DR. WARD
CARPENTER,

                          *Plaintiffs*,

      v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S. DEPARTMENT
OF LABOR; EUGENE SCALIA, in his official

      :   Case No._____

      :   **COMPLAINT**

      :   Demand for Jury Trial

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

capacity as Secretary of Labor; CRAIG E. LEEN, in :
his official capacity as Director of the Office of :
Federal Contract Compliance Programs; OFFICE OF :
MANAGEMENT AND BUDGET; RUSSELL :
VOUGHT, in his official capacity as Director of the :
Office of Management and Budget; U.S. :
DEPARTMENT OF HEALTH AND HUMAN :
SERVICES; ALEX M. AZAR II, in his official :
capacity as Secretary of Health and Human Services; :
U.S. DEPARTMENT OF JUSTICE; WILLIAM :
PELHAM BARR, in his official capacity as United :
States Attorney General; U.S. DEPARTMENT OF :
HOUSING AND URBAN DEVELOPMENT; :
BENJAMIN SOLOMON CARSON, SR., in his :
official capacity as Secretary of Housing and Urban :
Development; U.S. DEPARTMENT OF VETERANS :
AFFAIRS; ROBERT WILKIE, in his official capacity :
as Secretary of Veterans Affairs; NATIONAL :
ENDOWMENT FOR THE HUMANITIES; JON :
PARRISH PEEDE, in his official capacity as :
Chairman of the National Endowment for the :
Humanities; NATIONAL ENDOWMENT FOR THE :
ARTS; MARY ANNE CARTER, in her official :
capacity as Chairman of the National Endowment for :
the Arts, :
                                              :
                                *Defendants.* :
------------------------------------------------------------------- X

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.  Plaintiffs are organizations and individuals who specialize in the delivery of high-quality health care and other critical services to members of the lesbian, gay, bisexual, and transgender ("LGBT") community; support successful aging for LGBT people; and train law enforcement and corrections officials and other government agencies on how to avoid inflicting discrimination and harm within the juvenile and criminal justice systems. Plaintiffs bring this suit for declaratory and injunctive relief with respect to Executive Order 13950, titled Executive Order on Combating Race and Sex Stereotyping, as violating the First and Fifth Amendments to the United States Constitution.

## **INTRODUCTION**

2.  Plaintiffs Los Angeles LGBT Center ("LA LGBT Center"), NO/AIDS Task Force d/b/a/ CrescentCare ("CrescentCare"), and Dr. Ward Carpenter are mission-driven health care providers of last resort, serving disproportionately low-income LGBT patients who frequently experience discrimination from other providers on the basis of race, sex, and LGBT status. Plaintiff health care providers receive federal funding in the form of grants and/or contracts and specialize in offering quality health care services free of discrimination, including to patients with life-threatening conditions. These health care providers have worked throughout the COVID-19 epidemic to protect and care for patients and the public health, and they confront on a daily basis COVID-19's disproportionate impact on Black and Brown people, who are more likely to get sick and more likely to die.

3.  Plaintiffs AIDS Foundation of Chicago and CrescentCare provide HIV prevention and treatment to clients living with HIV/AIDS or who are at risk of contracting HIV. These service providers, who receive federal grants, are dedicated to ending the HIV epidemic. They confront and combat HIV-related health disparities among gay and bisexual men, transgender women,

1

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

cisgender women, Black people, Latinx people, and, in particular, people residing at the intersections of these identities.

4. Plaintiffs LA LGBT Center, Santa Cruz Lesbian And Gay Community Center d/b/a The Diversity Center of Santa Cruz ("The Diversity Center"), and Bradbury-Sullivan LGBT Community Center ("Bradbury-Sullivan Center") provide critical services to members of the LGBT community, including support for transgender and young people at high risk of homelessness and suicide, and provide trainings to agencies in order to address systemic barriers and bias in health care, education, and housing, among other contexts, based on race, sex, and LGBT status. These Plaintiffs receive federal funding in the form of contracts, subcontracts, grants, and/or sub-grants, including pass-through federal funding from state or local governments.

5. Plaintiff Services and Advocacy for GLBT Elders ("SAGE") advocates for and provides critical services to vulnerable LGBT seniors who face particular challenges as a result of current discrimination, as well as a lifetime of accumulated stigmas, systemic discrimination, and social isolation. The COVID-19 epidemic has not only posed particular threats to the health and lives of seniors, but has heightened the social isolation of LGBT seniors in particular. Plaintiff SAGE receives federal grants.

6. Plaintiff B. Brown Consulting, LLC ("Brown Consulting") confronts and combats a different kind of epidemic—the epidemic of violence perpetrated upon Black and Brown people in this country by members of law enforcement and the victimization of LGBT, intersex, and gender nonconforming youth and adults in correctional facilities. Ms. Brown trains state and local corrections officers, law enforcement, and government agencies about best practices and how to prevent exacerbating disparities based on race, sex, and LGBT status within the juvenile and criminal justice systems. She also is a federal contractor.

7. The work that all Plaintiffs do saves lives. To continue to do that life-saving work, and do it effectively, they must continue to provide trainings—of their own staff, and/or the staff of other entities that receive federal funds. Plaintiffs' trainings provide information that staff members and officials need in order to prevent and address discrimination against the populations they serve, including information about how systemic racism and implicit bias contribute to health disparities, mortality, and disproportionate criminalization. To combat these harms, Plaintiffs train their staff to recognize the many forms of systemic discrimination that the people they serve face through an intersectional lens as part of a data-driven approach to building trust among patients of color. These trainings are essential for Plaintiffs to be able to serve these communities effectively for public health purposes, including particularly during epidemics.

8. However, for reasons of ideology and partisan advantage, President Donald J. Trump and others in his Administration have labeled trainings and grant-funded work that incorporate such concepts "offensive" and "un-American" for calling attention to the lamentable extent to which the Nation still fails to live up to its ideals. The President has declared by fiat that that the country is not racist or sexist, and has sought to silence speech calling out these failings. Through Executive Order 13950 (the "Executive Order"), the President purports to outlaw any training, whether of federal employees, or by or for government contractors or grant recipients, that uses a list of "divisive concepts" with which the President disagrees. Seeking to leverage the federal government's vast reach throughout the economy to control private thought and speech, the President has instructed federal agencies to condition federal contracts and grants— including those completely unrelated to the trainings at issue—on parties' commitment to silence themselves regarding these concepts.

9. The First Amendment to the United States Constitution provides the most fundamental guarantees to a free society, including that the government "shall make no law . . . abridging the freedom of speech." This right of free expression lies at the core of our National experiment—the ability to speak freely without fear of being silenced by our government, including to criticize the government itself. Throughout our history, this freedom of expression has ensured the ability of critics of the status quo to call out where the country has failed to live up to its professed values. Such speech inevitably makes those in power uncomfortable, but the First Amendment protects the right to speak it nonetheless. By attempting to silence such criticism, characterizing it as "un-American," Executive Order 13950 violates the most fundamental safeguards of the Constitution. Plaintiffs refuse to be silenced, however. They ask this Court to declare Executive Order 13950 unconstitutional and to enjoin its implementation.

10. Notably, the rights and privileges enshrined in the Constitution, including the First and Fifth Amendments, were not initially afforded to all, but were instead reserved for a select class of White men. That original Constitution endorsed the enslavement of Black Americans, and women were excluded from most rights of citizenship. Nevertheless, the First Amendment ensured that these racist and sexist features of our polity could be challenged and changed. Over the course of generations, the scope of who is afforded certain core Constitutional rights has expanded to include women, racial and ethnic minorities—including indigenous peoples and the descendants of enslaved Africans—and, finally, over the last decade, Americans of differing sexual orientations and gender identities.

11. The path of progress has involved critical reflection and reconsideration of prevailing understandings of race, gender, and sexual orientation. Though often contentious, our society has engaged in the challenging process of naming and grappling with the harsh realities faced by members of marginalized communities, people striving to make their voices heard. This is

4

equally true of the Civil Rights, Women's Rights, and LGBT Rights Movements of the last century. Each has had to overcome forms of intimidation and social coercion trying to silence their criticism. During the height of the HIV/AIDS epidemic in the late 1980s and early 1990s, protesters took to the streets, explicitly declaring that "SILENCE=DEATH," urging those in power to acknowledge and address the disease disproportionately plaguing the LGBT community. And in turn, through each of these movements, interpretation of the Constitution has evolved to accept the very personhood of those it previously did not protect.

12. But this process is not, and may never be, complete. Plaintiffs work every day to combat the systemic barriers to equality that continue to exist in health care, education, housing, social services, and the juvenile and criminal justice systems. To do this, they deploy a variety of training tools—including the discussion of historic and current systemic racism, sexism, anti-LGBT bias, implicit bias, intersectionality, and cultural humility. These tools are grounded in fact, widely accepted, tested, and embraced in the fields of public health and criminal justice as effective in overcoming these systemic barriers. The President wants to suppress this speech, no matter how effective it is, or how crucial it is to protecting vulnerable people from harm, because acknowledging these systemic barriers that threaten the lives of some people can make others uncomfortable.

13. The Executive Order plainly discriminates against speech on the basis of the content and viewpoint expressed by Plaintiffs, and constitutes a clear violation of the First Amendment. Our government may not suppress expression merely because public officials oppose the speaker's view. As a result of this unconstitutional action by the President and those implementing his directive, organizations and individuals that rely on federal funding to provide important social services to marginalized communities are forced to choose between funding that is critical to their clients, and the trainings that are necessary to enable Plaintiffs

5

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

to serve those clients effectively. And Plaintiffs that provide such trainings to third parties face the loss of their clientele, who otherwise risk their government funding. The Executive Order has thus had an immediate chilling effect on speech simply because the government disfavors the speakers' viewpoint regarding issues of race, gender, and sexuality that are at the center of our public discourse and of these organizations' work.

14. This is a quintessential instance of the government impermissibly burdening speech because it disapproves of the ideas expressed. Through the Executive Order, Defendants compel Plaintiffs to silence themselves, eliminating entirely from their advocacy and trainings any statements that might, in the Defendants' subjective judgment, implicate the Executive Order.

15. And as was the case in the AIDS epidemic, this silence will equal death. Plaintiffs provide vital health care and social services that benefit minority, marginalized, and intersectional communities, such as Black transgender women, who face stunning health disparities with respect to HIV/AIDS, or gender nonconforming girls of color in the criminal justice system. This work can succeed only when those providing these services are taught how racism and bias affect the communities they serve; the way those communities historically have been treated by medical researchers, health care providers, or law enforcement; and how all of this can affect interactions between members of these communities and those who claim to be helping them. Moreover, the constituencies that Plaintiffs and their clients serve are among those who have been, and will continue to be, most affected by the COVID-19 pandemic, and often the most isolated from life-saving health care and social services. Without Plaintiffs' intentional and explicit efforts to combat systemic racism, sexism, and anti-LGBT bias during the pandemic, more people will fall out of care, become homeless, fail to get tested, decline to take a vaccine when one becomes available, sicken, and even die.

16. The Executive Order will suppress an especially broad swath of protected speech precisely because it is so vaguely worded. The government's inartfully drafted Executive Order creates a regime in which the line between allowable and prohibited speech is so murky, enforcement poses a danger of arbitrary and discriminatory application, a danger that has already become real for Plaintiffs.

17. Plaintiffs ask the Court to uphold the constitutional right of marginalized communities, and of the organizations and individuals who work diligently to support them, to name the ways in which those communities are marginalized. The Court should issue a judgment declaring Executive Order 13950 unconstitutional and enjoin its implementation.

## **PARTIES**

**A.     Plaintiffs**

18. Plaintiff **AIDS Foundation of Chicago** ("AFC") is a not-for-profit 501(c)(3) organization based in Chicago, Illinois that mobilizes communities to create equity and justice for people living with and vulnerable to the human immunodeficiency virus ("HIV") or chronic conditions.

19. Plaintiff **Brown Consulting** is a Bloomfield Hills, Michigan-based company launched by its sole proprietor—a former public defender and LGBT advocate—Bernadette Brown, in 2018. Brown Consulting works with state and local government agencies, organizations, and institutions, such as juvenile justice and correctional facilities, and nonprofits in the juvenile and criminal justice arenas to enhance their understanding of social inequities that can lead to a person's involvement in the juvenile or criminal justice system, and to prevent and remedy these inequities.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

20. Plaintiff **Bradbury-Sullivan Center** is a 501(c)(3) nonprofit organization based in Allentown, Pennsylvania that was founded in 2014. It is dedicated to securing the health and well-being of LGBT people of the Greater Lehigh Valley. Bradbury-Sullivan Center's programs and services for the LGBT community include arts and culture, health promotion, youth programs, pride programs, and critical supportive services, in addition to a Training Institute.

21. Plaintiff **CrescentCare** is a nonprofit 501(c)(3) organization located in New Orleans, Louisiana that provides health care, social services, housing, and legal services. It was founded in 1983 and became a Federally Qualified Health Center ("FQHC") in 2013. CrescentCare's mission is to offer comprehensive health and wellness services to the community, to advocate empowerment, to safeguard the rights and dignity of individuals, and to provide for an enlightened public.

22. Plaintiff **SAGE** is a New York-based 501(c)(3) non-profit organization that was founded in 1978. Through its senior centers and affiliated chapters, SAGE provides programming for and services to LGBT older adults in New York City and across the country. SAGE is also a leader in advocacy for LGBT elders at the national, state, and local levels, educating policymakers on LGBT and HIV aging issues and leading coalitions to ensure participation of diverse elders in policy conversations.

23. Plaintiff **The Diversity Center** is a 501(c)(3) non-profit organization located in Santa Cruz, California and serves the lesbian, gay, bisexual, transgender, queer, and questioning ("LGBTQ+") community of Santa Cruz County. It was founded in 1989. The Diversity Center is the chief agency in the county promoting social justice, enhancing the health and well-being, and building a sense of community for LGBTQ+ people. While its services are directed at Santa Cruz County residents, people from all over Northern California benefit from its services

and attend its events. Staff members work with nearly 250 volunteers to produce community programs and events.

24. Plaintiff **LA LGBT Center** is a not-for-profit 501(c)(3) organization based in Los Angeles, California that was founded in 1969. Its mission is to build a world in which LGBT people thrive as healthy, equal, and complete members of society. LA LGBT Center offers programs, services, and advocacy spanning four broad categories: health, social services and housing, culture and education, and leadership and advocacy.

25. Plaintiff **Dr. Ward Carpenter** is a nationally recognized expert in the field of transgender medicine and the Co-Director of Health Services at LA LGBT Center. In his role as Co-Director of Health Services, Dr. Carpenter oversees the health care of over 32,000 current patients who come to LA LGBT Center, and he personally treats 200 patients. All of Dr. Carpenter's patients identify as LGBT, and approximately 30% of them are people living with HIV.

## B.    Defendants

26. Defendant **Donald J. Trump** ("President Trump") is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Executive Order challenged in this suit.

27. Defendant **U.S. Department of Labor** ("DOL") is directed in the Executive Order to, in various ways, effect its implementation, which DOL has proceeded to do.

28. Defendant **Eugene Scalia** ("Secretary Scalia") is the United States Secretary of Labor. He is sued in his official capacity. In the Executive Order, the Secretary and the Department of Labor are directed, in various ways, to implement the Executive Order, which Secretary Scalia has proceeded to do.

29. Defendant **Craig E. Leen** ("Director Leen") is the Director of the Office of Federal Contract Compliance Programs ("OFCCP"), within the Department of Labor. He is sued in his official capacity. In the Executive Order, the Director and OFCCP are directed, in various ways, to implement the Executive Order, which Director Leen has proceeded to do.

30. Defendant **Office of Management and Budget** ("OMB") is directed in the Executive Order to, in various ways, effect its implementation, which OMB has proceeded to do.

31. Defendant **Russell Vought** ("Director Vought") is the Director of the Office of Management and Budget. He is sued in his official capacity. In the Executive Order, the Director and the Office of Management and Budget are directed, in various ways, to implement the Executive Order, which Director Vought has proceeded to do.

32. Defendant **U.S. Department of Health and Human Services** ("HHS"), upon information and belief, administers federal funds provided directly or indirectly to at least one of the Plaintiffs through contracts and/or grants.

33. Defendant **Alex M. Azar II** ("Secretary Azar") is the United States Secretary of Health and Human Services. He is sued in his official capacity. Upon information and belief, Secretary Azar and the Department of Health and Human Services administer federal funds provided directly or indirectly to at least one of the Plaintiffs through contracts and/or grants.

34. Defendant **U.S. Department of Justice** ("DOJ"), upon information and belief, administers federal funds provided directly or indirectly to at least one of the Plaintiffs through contracts and/or grants.

35. Defendant **William Pelham Barr** ("Attorney General Barr") is the United States Attorney General. He is sued in his official capacity. Upon information and belief, Attorney General Barr and the Department of Justice administer federal funds provided directly or indirectly to at least one of the Plaintiffs through contracts and/or grants.

36. Defendant **U.S. Department of Housing and Urban Development** ("HUD"), upon information and belief, administers federal funds provided directly or indirectly to at least one of the Plaintiffs through contracts and/or grants.

37. Defendant **Benjamin Solomon Carson, Sr.** ("Secretary Carson") is the United States Secretary of Housing and Urban Development. He is sued in his official capacity. Upon information and belief, Secretary Carson and the Department of Housing and Urban Development administer federal funds provided directly or indirectly to at least one of the Plaintiffs through contracts and/or grants.

38. Defendant **U.S. Department of Veterans Affairs** ("VA"), upon information and belief, administers federal funds provided directly or indirectly to at least one of the Plaintiffs through contracts and/or grants.

39. Defendant **Robert Wilkie** ("Secretary Wilkie") is the United States Secretary of U.S. Department of Veterans Affairs. He is sued in his official capacity. Upon information and belief, Secretary Wilkie and the Department of Veterans Affairs administer federal funds provided directly or indirectly to at least one of the Plaintiffs through contracts and/or grants.

40. Defendant **National Endowment for the Humanities**, upon information and belief, administers federal funds provided directly or indirectly to at least one of the Plaintiffs through contracts and/or grants.

41. Defendant **Jon Parrish Peede** ("Chairman Peede") is the Chairman of the National Endowment for the Humanities. He is sued in his official capacity. Upon information and belief, Chairman Peede and the National Endowment for the Humanities administer federal funds provided directly or indirectly to at least one of the Plaintiffs through contracts and/or grants.

42. Defendant **National Endowment for the Arts**, upon information and belief, administers federal funds provided directly or indirectly to at least one of the Plaintiffs through contracts and/or grants.

43. Defendant **Mary Anne Carter** ("Chairman Carter") is the Chairwoman of the National Endowment for the Arts. She is sued in her official capacity. Upon information and belief, Chairman Carter and the National Endowment for the Arts administer federal funds provided directly or indirectly to at least one of the Plaintiffs through contracts and/or grants.

## JURISDICTION & VENUE

44. Subject matter jurisdiction exists under 28 U.S.C. § 1331 because this action arises under the United States Constitution.

45. This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

46. Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) and (e)(1) because at least one Plaintiff resides in this district and each defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

## FACTS COMMON TO ALL COUNTS

**A. Acknowledging and Addressing Systemic Racism, Sexism, and anti-LGBT Bias is Vital to Plaintiffs' Provision of Health Care and Social Services, and Training of Third Parties' Employees.**

47. All Plaintiff health care providers, HIV/AIDS service organizations, SAGE, and LGBT Centers must explicitly acknowledge and address systemic racism, sexism, and structural anti-LGBT discrimination in health care and elder care as part of their missions and in their work. People of color, women, and LGBT people face significant health disparities and barriers to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

accessing care, including widespread discrimination, particularly those people who have more than one marginalized identity. These plaintiffs work explicitly to identify and address inequities in access to health care and elder care, and related health disparities based on race, sex, and LGBT status.

48. Plaintiff health care providers, HIV/AIDS service organizations, and LGBT Centers must explicitly acknowledge and confront the role of "implicit bias" among health care workers as a contributor to these health disparities and inequities. SAGE must do the same with respect to the role of implicit bias among staff caring for seniors. Implicit or unconscious biases are embedded stereotypes about groups of people that are automatic, unintentional, deeply engrained, universal, and able to influence behavior. Implicit biases develop early in life from repeated reinforcement of social stereotypes. Such biases can influence peoples' judgment and cause them to behave in biased ways even when they are not intentionally acting based on prejudice. More than thirty years of research has shown that people hold implicit biases even in the absence of heartfelt bigotry. Indeed, operating outside of a person's conscious awareness, implicit biases are pervasive, and can challenge even the most well-intentioned individuals, resulting in actions and outcomes that do not necessarily align with explicit intentions.

49. Implicit bias among health care workers shapes their behavior and produces differences in diagnosis, treatment, and health outcomes along the lines of race, sex, and LGBT status. Many health disparities are inexplicable for any reason other than implicit bias on the part of health care providers.

50. When patients experience discrimination in medical settings—whether intentional or as a result of implicit bias—medical mistrust between a patient and care provider increases, and patients stop or delay seeking care. As a result, patients' conditions remain untreated for a longer period

of time, if they ever get treatment, causing more acute health conditions and disease processes, and increasing the eventual cost of their care. Some conditions can become incurable simply because of a delay in treatment.

51. To overcome medical mistrust, health care providers must acknowledge it exists. Black patients are acutely aware of past maltreatment of people of color in medical research and by medical institutions. Such maltreatment includes not only unethical experimentation and abuse, of which the infamous Tuskegee syphilis study is but one example, but continuing inequities, such as the underrepresentation of women and people of color in federally funded medical research. To overcome medical mistrust, providers must acknowledge and address patients' fears resulting from historical and continuing structural racism in medicine.

52. Discrimination and resulting medical mistrust not only harm patients, but harm the public health as well. Bias in medical settings during an epidemic of an infectious disease, such as, HIV/AIDS or COVID-19, places the entire population at greater risk for increased disease because people who are disproportionately at risk for infection are less likely to seek or have access to testing, less likely to seek or have access to treatment, and less likely to provide information to contact tracers. Plaintiff health care providers, HIV/AIDS service organizations, and LGBT Centers train their own staff to identify and combat implicit bias, and train others to do so as well, both to ensure better access to quality health care absent discrimination on the basis of race, sex, and LGBT status, and to protect the public health. These Plaintiffs wish to continue doing so.

53. Plaintiff SAGE performs internal staff trainings and external staff trainings at facilities caring for seniors to address and combat implicit bias in order to ensure that all LGBT older people are treated equitably and with respect, and are provided the resources they need to thrive. Discrimination based on race, sex, or LGBT status—whether intentional or as a result of

implicit bias—can be particularly damaging to elderly people who may not enjoy the same freedom as others to change their surroundings. Additionally, LGBT seniors often are less willing to disclose their sexual orientations or gender identities to care providers than are younger members of the LGBT community, and can face challenges in verbalizing who their loved ones are. Maintaining contact with loved ones can be essential to a senior's physical and mental wellness, especially because loved ones may hold key information about the senior's health history. Given limitations on visitors during the COVID-19 epidemic in many facilities caring for seniors, identifying loved ones accurately has become even more important. Plaintiff SAGE must perform trainings concerning implicit bias so that staff caring for seniors have the tools they need to ensure the best possible care for marginalized older people.

54. In addition to addressing implicit bias, Plaintiff health care providers, HIV/AIDS service organizations, and LGBT Centers also must continue to acknowledge and address explicitly in their mission-driven work and in internal and external trainings the role of other forms of systemic racism, sexism, anti-LGBT bias, and the socioeconomic issues associated with poverty in patient health. Systemic racism, sexism, and anti-LGBT bias can limit access to health care, housing, HIV prevention education, and testing for HIV and COVID-19. For example, the broader economic and social disadvantages experienced by Black people are integrally linked with the disproportionate impact of HIV in Black communities. Communities of color also have suffered disproportionately during the COVID-19 crisis with respect to both morbidity and mortality in large part because of social inequities created by systemic racism. Directly and indirectly, systemic racism, sexism, and anti-LGBT bias increase the risk of infection and affect the health outcomes of marginalized populations, with a particular impact on Black and transgender people. Identifying disparities and acknowledging their underlying

causes are essential to informing testing and prevention efforts, and to improving patient and community health outcomes.

55. Plaintiff SAGE also provides internal staff trainings and external staff trainings at facilities caring for seniors about systemic racism, sexism, anti-LGBT bias, and the socioeconomic issues associated with poverty. An intersectional approach to understanding the identities of LGBT seniors is critical to ensuring that aging service providers recognize seniors' distinct experiences with stress, health, and identity connected to their sexual orientation, race or ethnicity, and sex that cannot be fully captured by considering each of these aspects of their identities separately. LGBT seniors are significantly more likely to rely on aging services and facilities because they are twice as likely to be single and live alone, and four times less likely to have children. They may be estranged from their families of origin as a result of systemic anti-LGBT bias, and face particular challenges navigating governmental assistance and medical programs, including barriers relating to race, sex, and LGBT status. LGBT older adults have faced lifetimes of systemic discrimination on account of their sex, sexual orientation, and transgender status, and this discrimination is compounded by systemic racism. The impact of exposure to both interpersonal and structural discrimination creates health disparities and increases distrust of service providers. Fear of discrimination on the bases of sex, LGBT status, and race at the hands of health care and aging service providers and facilities prevents LGBT seniors from seeking the care and services they truly need. The trainings SAGE provides are designed to overcome that fear, in addition to directly addressing the implicit bias providers may have against LGBT people, and particularly LGBT people of color, that affects both the quality and appropriateness of their care. All Plaintiffs wish to continue to provide trainings that discuss systemic racism, sexism, and anti-LGBT bias in order to effectuate their missions.

56. Brown Consulting's trainings provide content about the role of implicit bias in contributing to disparities based on race, sex, and LGBT status in the juvenile and criminal justice systems. Black people in this country face disproportionately high rates of discrimination, violence, and arrests by law enforcement, biased decision-making by prosecutors and courts, elevated rates of incarceration (both pre- and post-adjudication and sentencing), harsher juvenile dispositions and adult sentences, and increased probation and other forms of surveillance relative to their White peers. Disparities in our nation's juvenile justice system are particularly glaring. While only 14% of children under 18 in the United States are Black, 42% of boys and 35% of girls in juvenile facilities are Black.[1] LGBT and gender non-conforming youth in the juvenile justice system also face inequitable treatment and harm at higher rates than their non-LGBT and gender conforming peers. Black gender non-conforming girls face particular inequities. Brown Consulting's trainings are essential to addressing the epidemic of violence against Black people by members of law enforcement and in correctional facilities.

57. The Executive Order prohibits federal contractors, subcontractors, or grant recipients from providing trainings or performing grants using scientific and medical-based information regarding systemic race or sex disparities in the provision of medical treatment, including in relation to the COVID-19 pandemic. This amounts to the active suppression of scientific information that the administration finds inconvenient. The Executive Order prohibits "inculcating" views and bans training about systemic racism, sexism, and anti-LGBT bias, including that, especially in the context of racist and sexist social structures, individuals' race or sex causes an unconscious bias regarding themselves and others along lines of race, sex, and sexual orientation. However, these restrictions not only run afoul of First Amendment

---

[1] Wendy Sawyer, *Youth Confinement: The Whole Pie 2019*, PRISON POLICY (Dec. 19, 2019), https://www.prisonpolicy.org/reports/youth2019.html.

protections, but they ignore verifiable and truthful information, and therefore restrict highly protected professional speech.

58. The Executive Order's restriction on key concepts would prevent health care workers from discussing the historical backdrop that informs science today because this could be regarded by agencies as training that teaches that "the United States is fundamentally racist or sexist." Executive Order, Sec. 2(a)(2).

59. The Executive Order impermissibly limits the use of medical- and science-based research on racial health disparities by broadly prohibiting trainings that teach key concepts regarding systemic racism, despite a clear need for service providers to understand the racial health disparities that contribute to inequalities in the provision of health services.

**B. The Trump Administration Publicly Attacked and then Prohibited Disfavored Speech.**

    **i. Office of Management and Budget Issues Memorandum Declaring Critical Race Theory and Related Trainings to Be "Divisive, Anti-American Propaganda" that Must Ge Suppressed.**

60. On September 4, 2020, Russell Vought, Director of the OMB, located within the Executive Office of the President, issued M-20-34, a Memorandum for the Heads of Executive Departments and Agencies on Training in the Federal Government. Off. of Mgmt. & Budget, Exec. Off. of the President, Memorandum for the Heads of Executive Departments and Agencies No. M-20-34, *Training in the Federal Government* (Sept. 4, 2020).

61. The September 4, 2020 Memorandum describes the use of millions in taxpayer dollars by Executive Branch agencies to fund training regarding systemic racism and sexism that some government workers purportedly find uncomfortable, and that the Memorandum characterizes as "divisive, anti-American propaganda." *Id.*

62. The September 4, 2020 Memorandum directs agencies to "identify any contracts or spending related to training on 'critical race theory,' 'white privilege,' or any other training that teaches or suggests either (1) that the United States is an inherently racist or evil country or (2) that any race or ethnicity is inherently racist or evil." *Id.*

63. In doing so, the September 4, 2020 Memorandum conflates critical race theory and implicit bias training with specific concepts—such as that the country is inherently racist or evil—that are not actually features of critical race theory or such trainings.

      **ii.    Office of Management and Budget Director Vought and President Trump Announce Federal Anti-Critical Race Theory Efforts Through Social Media.**

64. On September 4, 2020, Director Vought announced on Twitter that "[t]he days of taxpayer-funded indoctrination trainings that sow division and racism are over. Under the direction of [President Trump], we are directing agencies to halt critical race theory trainings immediately."[2]

65. On September 5, 2020, in response to a Breitbart News article stating "[c]ritical race theory is the leftist, racist doctrine that forms the intellectual underpinnings of Black Lives Matter, Antifa, and other radical organizations currently engaged in unrest on America's streets,"[3] President Trump announced on Twitter "[t]his [critical race theory] is a sickness that cannot be allowed to continue. Please report any sightings so we can quickly extinguish!"[4]

66. On September 22, 2020, President Trump announced on Twitter "A few weeks ago, I BANNED efforts to indoctrinate government employees with divisive and harmful sex and race-based ideologies. Today I've expanded that ban to people and companies that do business

[2] Russell Vought (@RussVought45), TWITTER (Sept. 4, 2020, 7:57 PM), https://twitter.com/RussVought45/status/1302033078848753665.

[3] Allum Bokhari, *Party's Over: Trump Orders Purge 'Critical Race Theory' From Federal Agencies*, BREITBART (Sept. 4, 2020), https://www.breitbart.com/tech/2020/09/04/partys-over-trump-orders-purge-of-critical-race-theory-from-federal-agencies/.

[4] *Id.*

with our Country, the United States Military, Government Contractors, and Grantees. Americans should be taught to take PRIDE in our Great Country, and if you don't, there's nothing in it for you!"[5]

### iii. President Trump Issues Sweeping Executive Order to Defund Activities, and Penalize Entities, that Utilize "Divisive Concepts."

67. On September 22, 2020, President Trump issued Executive Order 13950 on Combating Race and Sex Stereotyping. Executive Order 13950, 85 FR 60683 (Sept. 22, 2020).

68. The Executive Order states as its purpose to establish a United States policy "not to promote race or sex stereotyping or scapegoating" in the federal workforce, Uniformed Services, or federal grants. It also prohibits federal contractors from "inculcat[ing] such views" in their own employees. Executive Order, Sec. 4(a)(1).

69. In effect, the Executive Order seeks to use the government's massive presence in all aspects of the United States economy, including especially the health care sector, to censor speech about systemic racism, implicit bias, critical race theory, intersectionality, cultural humility, and other contemporary concepts regarding the realities of race and gender in the United States. The Executive Order seeks to silence this speech because it is critical of the government (past and present) and the administration finds its message inconvenient to the President's own preferred message.

70. Section 2(a) of the Executive Order defines "divisive concepts" as

> concepts that (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her

---

[5] Donald J. Trump (@realDonaldTrump), TWITTER (Sept. 22, 2020, 6:53 PM), https://twitter.com/realDonaldTrump/status/1308539921829781504.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

race or sex; (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term "divisive concepts" also includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

71. Section 2(b) of the Executive Order defines "race or sex stereotyping" as "ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex."

72. Section 2(c) of the Executive Order defines "race or sex scapegoating" as

[A]ssigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex. It similarly encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others.

73. Section 4(a) of the Executive Order outlines a number of strict requirements for government contractors. It requires contracting agencies to include restrictive provisions in their contracts, including that "[t]he contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating" and referencing the "divisive concepts" outlined in Section 2(a).

74. Section 4(b) of the Executive Order establishes a public reporting mechanism, mandating OFCCP to establish a hotline and investigate complaints received regarding activities that violate the Executive Order.

75. Section 4(c) of the Executive Order mandates the Director of OFCCP to publish in the Federal Register a request for information for federal contractors, federal subcontractors, and employees of Federal contractors and subcontractors regarding the training, workshops, or similar programming provided to employees.

76. The Executive Order establishes penalties for federal contractors' noncompliance with the Order under Section 4(a)(3). Such penalties include cancellation, termination, or suspension of contracts in whole or in part. This Section also provides that "the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246."

77. Section 5 of the Executive Order directs federal agencies to review their respective grant programs and submit a report identifying programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use federal funds to promote the concepts that run afoul of the Executive Order. Federal agencies are required to submit a list of all grant programs so identified within 60 days of the Executive Order.

78. Section 8 of the Executive Order states that "[t]he Attorney General should continue to assess the extent to which workplace training that teaches the divisive concepts set forth in section 2(a) of this order may contribute to a hostile work environment and give rise to potential liability under Title VII."

### iv.   President Trump Attacks Critical Race Theory During Presidential Debate.

79. During the September 30, 2020, Presidential debate, the moderator questioned President Trump about the motives of the Executive Order. In response to why he directed federal agencies to "end racial sensitivity training," President Trump stated

> I ended it because it's racist . . . we were paying people hundreds of thousands of dollars to teach very bad ideas and frankly, very sick ideas. And really, they were teaching people to hate our country and I'm not going to do that. I'm not going to allow that to happen. We have to go back to the core values of this country. They were teaching people that our country is a horrible place. It's a racist place. And they were teaching people to hate our country. And I'm not going to allow that to happen.[6]

---

[6] PBS NewsHour, *The first 2020 presidential debate*, YOUTUBE (Sept. 29, 2020), https://www.youtube.com/watch?v=w3KxBME7DpM.(emphasis added).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

v.    **Office of Management and Budget Issues Memorandum Further Attacking Critical Race Theory and Related Trainings, and Implementing Executive Order 13950.**

80. On September 28, 2020, Director Vought issued M-20-37, which states that the "divisive trainings" first identified in the September 4, 2020 Memorandum "sow[] division among the workforce by attempting to prescribe and impose upon employees a conformity of belief in ideologies that label entire groups of Americans as inherently racist or evil (e.g., critical race theory)." Off. of Mgmt. & Budget, Exec. Off. of the President, OMB M-20-37 (Sept. 28, 2020).

81. In furtherance of the Executive Order and the September 4, 2020, Memorandum, the September 28, 2020 Memorandum requires federal agencies to take action: they must "[i]dentify all agency training programs related to diversity and inclusion held during Fiscal Year 2020, including both those conducted by the agency's own employees and those conducted by others (e.g., outside vendors)" and determine the spending on such programs. *Id.* at 2. Federal agencies are further required to review their trainings to determine whether they "teach, advocate, or promote" the "divisive concepts" specified in the Executive Order. *Id.* The September 28, 2020 Memorandum states that reviews of specific training curriculum materials can be supplemented by a "broader keyword search" of agency financial data and procurements for terms including, but not limited to, critical race theory, white privilege, intersectionality, systemic racism, positionality, racial humility, and unconscious bias. *Id.*

82. The September 28, 2020 Memorandum directs federal agencies that award grants to review and identify programs for which the agency can condition grants on certification that the recipient will not engage in training on the prohibited divisive concepts. *Id.* at 3. To this end, the September 28, 2020 Memorandum instructs federal agencies to "look at all Federal grant and cooperative agreement programs, not just those for the purposes of providing training,"

and to include terms and conditions in federal awards restricting the use of such funds to promote the divisive concepts set forth in the Executive Order, "including by conducting research premised upon these concepts." *Id.*

83. The September 28, 2020 Memorandum also directs federal agencies to align their public-facing information with the Executive Order, and encourage federal employees to report any noncompliant trainings or agencies to an agency's Inspector General. *Id.* at 4.

### vi.  OFCCP Issues Guidance on Executive Order 13950 and Prohibited Trainings.

84. On October 7, 2020, OFCCP released guidance on the Executive Order in the form of frequently asked questions ("FAQs").[7] The FAQs restate the requirements of the Executive Order and its mandate prohibiting federal contractors from "inculcating race or sex stereotyping in their employees in workplace diversity and inclusion trainings," but also introduce even more confusion as to what speech is and is not prohibited by the Executive Order.[8]

85. For example, among the questions contained in the DOL FAQs is "Does Executive Order 13950 prohibit unconscious bias or implicit bias training?" The response states that

> Unconscious or implicit bias training is prohibited to the extent it teaches or implies that an individual, by virtue of his or her race, sex, and/or national origin, is racist, sexist, oppressive, or biased, whether consciously or unconsciously. Training is not prohibited if it is designed to inform workers, or foster discussion, about pre-conceptions, opinions, or stereotypes that people—regardless of their race or sex—may have regarding people who are different, which could influence a worker's conduct or speech and be perceived by others as offensive.[9]

The FAQs provide no further guidance as to the boundary between permissible and impermissible trainings.

---

[7] Executive Order 13950 – Combatting Race and Sex Stereotyping, Office of Federal Compliance Programs (Oct. 7, 2020), https://www.dol.gov/agencies/ofccp/faqs/executive-order-13950.

[8] *Id.*

[9] *Id.*

86. The FAQs state "contractors found in violation may have their contracts canceled, terminated, or suspended in whole or in part. The contractor may also be declared ineligible for further Government contracts in accordance with the procedures authorized in Executive Order 11246."[10]

### vii.    OFCCP Publishes Request for Information, Seeking Submission of Training Materials that Violate Executive Order 19350.

87. On October 22, 2020, OFCCP published a Request for Information ("RFI") in the Federal Register, as directed by Section 4(c) of the Executive Order.[11]

88. The RFI "requests comments, information, and materials from Federal contractors, Federal subcontractors, and employees of Federal contractors and subcontractors concerning workplace trainings involving prohibited race or sex stereotyping or scapegoating."[12] Per the RFI, such materials include PowerPoints, photographs, videos, handwritten notes, or printed handouts that "have in recent years been used, or that may soon be used, in both voluntary and mandatory trainings, workshops, or similar programming."[13]

89. The first commentary period ends on December 1, 2020.[14]

---

[10] *Id.*

[11] Request for Information; Race and Sex Stereotyping and Scapegoating, 85 Fed. Reg. 67,375-67,378 (Oct. 22, 2020).

[12] *Id.*

[13] *Id.*

[14] The Trump Administration has, on previous occasions, opened investigations *before* agency action has been finalized. In March 2019, President Trump issued Executive Order 13864, which conditioned university and collegiate federal funding on a so-called "compliance with the First Amendment." Exec. Order. No. 13864, 84 Fed. Reg. 58 (2019). The Executive Order directed federal agencies to coordinate with OMB to implement the rule, and on September 9, 2020, the U.S. Department of Education announced a final rule outlining its plan for carrying out the order, set to take effect on November 23, 2020. Press Release, U.S Department of Education, U.S. Secretary of Education Betsy DeVos Delivers on Promise to Protect Free Inquiry and Religious Liberty (Sept. 9, 2020). However, the Department had already undertaken investigations into at least three schools–University of California, Fordham University, and Binghamton University—by that point. Katherine Mangan, "3 Universities Face U.S. Inquiries Into Free-Speech Controversies," THE CHRON. OF HIGHER ED. (Oct. 1, 2020), https://www.chronicle.com/article/3-universities-face-u-s-inquiries-into-free-speech-controversies?bc_nonce=d0s65vz1ygwo8qkk04uac&cid=reg_wall_signup.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### viii.    OFCCP Establishes Hotline for Public to Identify Entities Violating Executive Order 13950.

90. In furtherance of Section 4(b) of the Executive Order, OFCCP established a "Complaint Hotline to Combat Race and Sex Stereotyping."[15] According to the DOL's FAQs, "the hotline receives complaints via telephone at 202-343-2008 and via email at OFCCPComplaintHotline@dol.gov. Third parties may also file a complaint on behalf of an individual or a group."[16]

91. A DOL spokesperson said the agency's "Division of Policy and Program Development will monitor the hotline. Complaints requiring an investigation will be sent to the appropriate Regional and District Offices for review and handling."[17] The hotline "accepts complaints 24/7. Callers should leave a message or send an email. They will receive a response confirming receipt soon after."[18] Further, the complaints will be handled "similar to complaints filed traditionally" under other statutes and orders the agency enforces.[19]

### C. The Executive Order Had an Immediate Chilling Effect Across the Federal Government and Beyond.

### i.    The Trump Administration's Actions Have Caused an Immediate Chill of Disfavored Speech, Both Before and After Publication of the Executive Order.

92. Even before the publication of the Executive Order, Defendants were already seeking to suppress any fact-based speech about the existence of systemic racism, sexism, and implicit

---

[15] Press Release, U.S. Department of Labor, U.S. Department of Labor Launches Hotline to Combat Race and Sex Stereotyping by Federal Contractors (Sept. 28, 2020).
[16] Executive Order 13950 – Combatting Race and Sex Stereotyping, Office of Federal Compliance Programs (Oct. 7, 2020), https://www.dol.gov/agencies/ofccp/faqs/executive-order-13950.
[17] *'Anti-American' Training Hotline Set Up for U.S. Contractors (2)*, BLOOMBERG LAW (Sept. 29, 2020), https://news.bloomberglaw.com/daily-labor-report/u-s-contractors-can-now-easily-report-anti-american-training.
[18] *Id.*
[19] *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

bias in America through actions that were subsequently formalized in the Executive Order and its implementing actions.

93. On September 15, 2020, Defendant Vought responded via tweet to Christopher F. Rufo, an outspoken opponent of discussions on racism and leading advocate of the Executive Order, to confirm that a Centers for Disease Control and Prevention ("CDC") lecture series titled "Naming, Measuring, and Addressing the Impacts of Racism on the Health and Well-Being of the Nation and the World" had been cancelled per President Trump's directive.[20]

94. The chill on protected speech further accelerated after the Executive Order was issued.[21]

95. On September 22, 2020—the same day the Executive Order was issued—Defendant Vought again responded to a tweet from Christopher F. Rufo and confirmed that diversity trainings had been cancelled in the U.S. Department of State, the U.S. Department of Veterans Affairs, and Environmental Protection Agency as a result of the Executive Order.[22]

96. On October 8, 2020, in direct response to the Executive Order, Defendants Barr and the U.S. Department of Justice suspended all diversity- and inclusion-related training, programs, activities, and events that employees are required or permitted to attend.[23]

97. As a result, Defendant U.S. Department of Justice officials instructed the DOJ Gender Equality Network to cancel an event on gender diversity featuring former U.S. Attorney for the District of Columbia Jessie Liu.[24]

---

[20] Russell Vought (@RussVought45), TWITTER (Sept. 15, 2020, 11:08 AM), https://twitter.com/RussVought45/status/1305886092361715713.
[21] Hailey Fuchs, *Trump Attack on Diversity Training Has a Quick and Chilling Effect*, N.Y. TIMES (Oct. 13, 2020), https://www.nytimes.com/2020/10/13/us/politics/trump-diversity-training-race.html.
[22] Russell Vought (@RussVought45), TWITTER (Sept. 22, 2020, 6:34 PM), https://twitter.com/RussVought45/status/1308535115006570498
[23] Katie Benner, *Justice Dept. Suspends All Diversity and Inclusion Training for Staff*, N.Y. TIMES (Oct. 9, 2020), https://www.nytimes.com/2020/10/09/us/politics/justice-department-diversity-training.html.
[24] Jacqueline Thomsen, *Jessie Liu Event on Gender Diversity Canceled Due to Trump Order, DOJ Group Says*, THE NATIONAL LAW JOURNAL (Oct. 16, 2020), https://www.law.com/nationallawjournal/2020/10/16/jessie-liu-event-on-gender-diversity-canceled-due-to-trump-order-doj-group-says/#:~:text=Justice%20Department%20officials%20advised%20an,of%20that%20group%20said%20Friday.

98. Universities and colleges, which are among the agencies Plaintiffs train, have also canceled diversity trainings in response to the Executive Order for fear that it will jeopardize students' federal financial aid and instructors' grants.[25]

99. A summit for LGBT federal workers was cancelled by organizers as a result of the Executive Order. The Pride in Federal Service Summit, initially scheduled for October 21–22, 2020, was supposed to take place virtually and was intended to be a networking and educational opportunity for an estimated 500 participants affiliated with the interagency LGBTQ affinity group for federal workers.[26]

100. On October 14, 2020, the American Hospital Association ("AHA"), American Medical Association ("AMA"), and American Nurses Association ("ANA") denounced the Executive Order's chilling and harmful effects, including those on the health and well-being of patients. Specifically, the AHA, AMA, and ANA stated that the Executive Order "would effectively reverse decades of progress in combating racial inequality" and undermine "health equity." That is because, according to these leading health organizations, a patient's health status is influenced by a myriad of factors, including the social determinants of health, implicit bias, and historical systems that have led to unequal access to care.[27]

101. Similarly, on September 30, 2020, the Accreditation Council for Graduate Medical Education ("ACGME")—a private, non-profit professional organization responsible for the accreditation of over 12,000 residency and fellowship programs and the approximately 865 institutions that sponsor these programs in the United States—issued a public statement

---

[25] Colleen Flaherty, *Diversity Work, Interrupted*, INSIDER HIGHER ED (Oct. 7, 2020), https://www.insidehighered.com/news/2020/10/07/colleges-cancel-diversity-programs-response-trump-order.
[26] Chris Johnson, *Exclusive: LGBTQ summit for fed'l workers cancelled to comply with Trump order*, BLADE (Oct. 10, 2020), https://www.washingtonblade.com/2020/10/10/exclusive-lgbtq-summit-for-fedl-workers-cancelled-to-comply-with-trump-order/.
[27] American Hospital Association, *Letter to President Donald Trump on Executive Order 13950, Combating Race and Sex Stereotyping* (Oct. 14, 2020), https://www.aha.org/lettercomment/2020-10-14-letter-president-donald-trump-executive-order-13950-combating-race-and-sex.

recognizing that the Executive Order "ultimately results in worsening health outcomes for those we are dedicated to serve." This is because "[p]rohibiting institutions from providing certain types of education and training that the Executive Order deems to be promoting racial and sexual stereotypes would have devastating consequences on educating residents and fellows toward the goal of eliminating disparities in health outcomes and achieving equity within the health care profession."[28]

102. The business community, in a letter signed by the U.S. Chamber of Commerce and Business Roundtable, among others, denounced the Executive Order, stating that it "is already having a broadly chilling effect on legitimate and valuable D&I training companies use to foster inclusive workplaces, help with talent recruitment, and remain competitive in a country with a wide range of different cultures."[29] Businesses and private government contractors are also among the agencies to which the Plaintiffs provide trainings.

103. Put simply, the chilling effect of the Executive Order has been immediate and broad, affecting large swaths of American society.

**ii.   Plaintiffs Are Among the Myriad of Entities Whose Protected Speech Has Been Chilled by the Executive Order.**

104. **Plaintiff AFC** receives federal funding from both federal and state entities, including: HHS, HUD (including HUD's Housing Opportunities for Persons with AIDS Program ("HOPWA")), the Chicago Department of Public Health ("CDPH"), and the Illinois Department of Public Health ("IDPH"). As a federal grantee and sub-grantee, AFC manages local, state, and federal funds for an array of HIV/AIDS-related services. AFC provides

---

[28] Accreditation Council for Graduate Medical Education, *ACGME Issues Statement on the Executive Order on Race and Sex Stereotyping* (Sept. 30, 2020), https://www.prnewswire.com/news-releases/acgme-issues-statement-on-the-executive-order-on-race-and-sex-stereotyping-301142425.html.

[29] Coalition Letter on Executive Order 13950, U.S. Chamber of Com. (Oct. 15, 2020), https://www.uschamber.com/letters-congress/coalition-letter-executive-order-13950.

systems-level leadership to the Chicago area's HIV/AIDS sector by providing funding to and coordinating the activities of Chicago's regional case management system; distributing funding for permanent, supportive housing including rental and utility assistance; providing capacity-building services to community organizations that provide high-quality HIV/AIDS programming and services to neighborhoods that have been historically underserved by medical services, especially HIV care services; and engaging in both local and statewide policy advocacy to promote HIV/AIDS funding and services. By assisting government entities in planning, distributing, and monitoring service contracts, AFC helps develop provider expertise and promotes uniform and high-quality delivery of care across the region.

105.    AFC recognizes that it will have the greatest impact on the HIV epidemic by focusing its efforts on those most impacted by HIV, based on epidemiological data and unmet need: young Black gay and bisexual men, transgender women of color, Black women living in high-incidence areas and Latinx gay and bisexual men. Therefore, AFC's internal trainings, external federally funded trainings, and policy advocacy work all address systemic racism—explicitly. AFC convenes and trains close to 130 case managers, across 35 agencies, on providing comprehensive case management services that empower people living with HIV. Among AFC's HIV case management clients, 85% have achieved viral suppression, which AFC believes is testimony to the power of its case management.

106.    In response to the COVID-19 pandemic, AFC entered into a partnership with the Center on Halsted to launch the HUB, a project funded by the Chicago Department of Public Health. The HUB has dispensed close to $500,000 to cover COVID-19-related financial emergencies for almost 300 people living with and vulnerable to HIV in the Chicago area. The majority of these funds cover the basic necessities of food, rent, and utilities. The HUB also connects people living with HIV to medications, case management, medical care, food, mental health

and substance use treatment, among other things. Over 50% of the clients served by the HUB are HIV-positive, 43% are Black, and 31.3% are Hispanic or Latinx. Without this program, hundreds of people will enter the winter months without consistent food, shelter, or heat.

107.    As a direct result of the Executive Order, AFC's work and mission are undermined. AFC already has had approximately $6,000 in federal funding withdrawn from a conference involving scheduled discussion on the impact of structural racism on HIV prevention work, forcing AFC to cover the costs. AFC faces future loss of critical funding and is already experiencing the Executive Order's chilling effect.

108.    **Plaintiff Brown Consulting**'s mission is to prevent social inequities and end cycles of incarceration that disproportionately impact Black and Brown Americans. Brown Consulting specializes in training on the unique challenges that youth and adults involved with justice systems face based on their sexual orientation, gender identity, and gender expression ("SOGIE"), and the intersection of their SOGIE and race and ethnicity. LGBT and gender nonconforming youth and adults face disproportionately high rates of sexual harassment and sexual violence in correctional settings. Brown Consulting's trainings help professionals ensure youth and adults are safe and are protected and comply with federal law, including Prison Rape Elimination Act ("PREA") Standards.

109.    Brown Consulting is a federal subcontractor, receiving pass-through federal funding through a contract with the National Prison Rape Elimination Act Resource Center ("PRC"). PRC is funded by the DOJ Bureau of Justice Assistance and operates via a cooperative agreement between the DOJ and non-profit organization Impact Justice. Pursuant to its contract, Brown Consulting conducts training for justice system agencies, institutions (such as juvenile and adult correctional facilities), and organizations, as well as trainings for individuals who perform audits of correctional facilities for PREA compliance. Brown Consulting also

contracts with state and local governments to train law enforcement and corrections officials. These trainings involve discussions of systemic racism, sexism, and anti-LGBT bias, and the role of implicit bias in contributing to disparities in the juvenile and criminal justice systems.

110.    The Executive Order impacts Brown Consulting's ability to provide trainings apart from its PRC contract that focus on subjects prohibited by the Executive Order and that account for a significant proportion of Brown Consulting's income. Proprietor Bernadette Brown worries, given the vague nature of the Executive Order, that if she even simply relates her personal narrative as a Black, bisexual, cisgender woman, or acknowledges the existence of systemic racism, she could make trainees uncomfortable and they would then call the DOL hotline. This has had a significant chilling effect on Brown Consulting's speech related to non-PRC contract trainings and training content. As a result of the Executive Order, Brown Consulting faces the loss of critical federal funding and training revenues. Most importantly, it may not share the valuable information it conveys in trainings, which is essential to protect the safety and well-being of vulnerable people who are incarcerated or detained, putting youth and adults at risk of harm.

111.    **Plaintiff Bradbury-Sullivan Center** conducts research documenting health disparities in the LGBT community and performs related community-education efforts to improve public health within the LGBT community. Additionally, through its Training Institute, Bradbury-Sullivan Center provides training to public and private agencies throughout Pennsylvania, many of which receive federal contracts and/or grants, to ensure LGBT inclusion as well as to address health care disparities and barriers to care. All of this work necessarily and importantly includes discussions of issues around systemic racism, intersectionality, and implicit bias. Approximately one third of Bradbury-Sullivan Center's annual budget consists of federal funding, either directly or indirectly. This includes funding from HHS (through the CDC and

National Institutes of Health ("NIH")), the National Endowment for the Humanities, and the National Endowment for the Arts. Some of these funds are federal grants that are pass-through funds administered by state or local governments, such as the Pennsylvania Department of Health.

112.    The Executive Order frustrates the very purpose of some of the grants that Bradbury-Sullivan Center receives. Through the Pennsylvania Department of Health, Bradbury-Sullivan Center has been incorporated into a five-year grant funded by the CDC meant to study and address tobacco-use disparities. For the grant, the Bradbury-Sullivan Center must provide training to contractors and subcontractors of the Pennsylvania Department of Health's Division of Tobacco Prevention and Control on promising practices and evidence-based strategies for addressing LGBT tobacco disparities in Pennsylvania. It is impossible to properly conduct these trainings without discussing the social determinants of health disparities based on race, sex, and LGBT status, which are critical to understanding the causes of such disparities.

113.    The Bradbury-Sullivan Center also receives funding from the Network of the National Library of Medicine of the NIH specifically to conduct trainings of personnel at mental health outpatient clinics on promising practices for LGBT care, and to conduct community outreach via public libraries to educate the public on breast cancer screenings, LGBT health disparities, and barriers to care. These trainings and community outreach events necessarily discuss health disparities within the LGBT community, such as those based on race and gender, and address their root causes. Health care providers cannot properly address health disparities without addressing the systemic problems that cause them.

114.    The Bradbury-Sullivan Center also receives funding through the Pennsylvania Department of Health to train Pennsylvania's COVID-19 contact tracers regarding how to interview LGBT people, including how to ask questions related to sexual orientation and gender identity.

Because of higher risk factors such as smoking, higher incidence of cancer and unsuppressed HIV, and decades of barriers to care that have caused many LGBT people to delay or avoid seeking health care when they are sick, LGBT people are uniquely vulnerable to COVID-19 and its worst effects. Accordingly, the trainings for COVID-19 contact tracers include discussion of health disparities within the LGBT community, as well as health disparities pertaining to COVID-19. Upon information and belief, the Pennsylvania Department of Health receives federal funding for COVID-19 contact tracing.

115.    Upon information and belief, the clients of Bradbury-Sullivan Center's training programs include entities that participate in federal contracts and/or grants. These include school districts, universities and colleges, and state and local governmental agencies. Each of these entities may now be more reluctant to seek, or may even be prohibited from seeking, Bradbury-Sullivan Center's trainings for employees for fear of being deemed noncompliant with the Executive Order and thus losing their federal funding. Bradbury-Sullivan Center is aware of entities in Pennsylvania like those outlined above that have canceled or sought to excise content from diversity and inclusion trainings as a direct result of the Executive Order.

116.    Further, Bradbury-Sullivan Center spends a significant amount of resources documenting health disparities in the LGBT community for the Pennsylvania LGBT Health Needs Assessment—a comprehensive study funded by the Pennsylvania Department of Health. Bradbury-Sullivan Center previously worked on the 2018 version of the LGBT Health Needs Assessment and is currently working on the 2020 version of the LGBT Health Needs Assessment. Upon information and belief, some of the funds being used for the 2020 LGBT Health Needs Assessment are federal in origin. As a result of the Executive Order, Bradbury-Sullivan Center faces the loss of critical federal funding and trainings revenue. Bradbury-Sullivan Center also has experienced, and will continue to experience, a chilling effect on its

ability to properly and effectively fulfill its mission and perform its work. For example, Bradbury-Sullivan Center has already been forced to reschedule some of its trainings to earlier dates out of concern that there will be even greater unwillingness to participate in these trainings as the government increases its enforcement efforts.

117.    Additionally, the vague nature of the Executive Order burdens Bradbury-Sullivan Center because it cannot be certain of what material might be considered noncompliant. Bradbury-Sullivan Center worries that even by simply relating a personal narrative, or acknowledging the existence of systemic racism, a member of its staff could make members of the audience uncomfortable and cause them to call the DOL hotline. This has had a significant chilling effect on Bradbury-Sullivan Center's ability to plan and execute its critical mission.

118.    **Plaintiff CrescentCare** strives to lead in quality-driven, culturally humble health and wellness care, and to meet existing and emerging needs with active participation from the community it serves. CrescentCare is particularly focused on providing services to those who come from traditionally medically underserved communities: the service industry, the LGBTQ community, the uninsured and the underinsured, immigrants, and communities of color.

119.    CrescentCare receives various forms of federal funding directly and indirectly via federal programs, including but not limited to those authorized by the Ryan White Comprehensive AIDS Resources Emergency Act of 1990 and the HOPWA Program. These federal grants are administered by HHS and HUD. Some of these federal grants are pass-through funds administered by state or local governments. CrescentCare's relationship with the federal government account for a significant portion of its revenue; this includes savings realized through the 340B Drug Pricing Program, which allows CrescentCare to receive discounts from drug manufacturers on purchases of outpatient drugs. Without such revenues, CrescentCare could not provide many of the services it now provides to its clients. Cultural competency,

including an acknowledgment of medical mistrust within communities of color and recognition of the ongoing impacts of structural racism, is an integral part of CrescentCare's delivery of care.

120.   As a provider embedded in the Deep South, CrescentCare's staff must understand the history and legacy of slavery, implicit bias, and the ongoing impact of systemic racism in order to provide culturally competent care to its diverse population—including LGBTQ patients, transgender patients, and patients of color. Indeed, many of CrescentCare's grants necessitate an acknowledgement of, and an effort to provide, culturally competent care, and several require targeted outreach to minority populations. Such grants include the SAMHSA Targeted Capacity Expansion-HIV Program: Substance Use Disorder Treatment for Racial/Ethnic Minority Population at High Risk for HIV/AIDS, which is focused on African Americans; its Health Resources and Services Administration's ("HRSA") Ryan White Part F grant for Implementation of Evidence-Informed Behavioral Health Models to Improve HIV Health Outcomes for Black Men who Have Sex with Men; and CrescentCare's PS17-1704 grant from the CDC for Comprehensive High-Impact HIV Prevention for Young Men of Color Who Have Sex with Men and Young Transgender Persons of Color.

121.   It is essential that CrescentCare continue to train its own staff, including health care professionals, on matters relating to cultural competency and diversity. Specifically, it is absolutely necessary that CrescentCare's staff receive training on systemic racism, sexism, and implicit bias as these concepts relate to health care disparities for the patients CrescentCare serves. CrescentCare's stated goal with trainings and this work is to create a culture within its organization of reflection, insight, awareness, acceptance, kindness, and support for its staff so that it can more effectively serve the community and achieve its mission. The purpose of this facilitated dialogue and the training is to provide a fact-based historical context, and an

understanding of historical trauma, and to enhance CrescentCare staff's ability to assist the clients and communities CrescentCare serves. The training is meant to make CrescentCare's staff more effective at the work of improving health outcomes. It is meant to ensure that all of its staff are approaching the care and services CrescentCare provides with an understanding of the complex issues the clients face in navigating their day-to-day world. It is intended to improve the communication and understanding between staff and provide tools and vocabulary for navigating challenging conversations and topics.

122.    The Executive Order significantly impacts CrescentCare's ability to effectively implement and manage many of its federal grants. CrescentCare has often been awarded competitive grants—such as the Part F SPNS grant, the 1704 grant and the COVID-19 grants—precisely because CrescentCare has a demonstrated track record of engaging marginalized communities and improving health outcomes by improving access to care and services, including through the provision of training and facilitated dialogue on many of the topics now prohibited by the Executive Order. Cultural competency is specifically referenced in a number of CrescentCare's grants, and CrescentCare's staff must be able to competently provide services to meet the grant requirements. For example, the Health Center Program Site Visit protocol for the Section 330 FQHC grant requires CrescentCare to provide evidence of training of front desk and clinical staff in cultural knowledge, attitudes, and beliefs of patient populations. CrescentCare's Ryan White Part A grant from the City of Baton Rouge requires the organization to provide yearly proof of cultural humility trainings for its staff.

123.    The Executive Order also chills and negatively affects CrescentCare's ability to provide trainings to other entities. For example, CrescentCare created a Transgender Advisory Committee ("TAC") in 2017 that has collaborated with other organizations providing transgender-related services, and hosted the first Community Forums on Transgender Health

in New Orleans, with over 50 participants focusing on Creating Accountability in Healthcare. The TAC also created a training and presentation on "Prioritizing Trans-Feminine and Gender Non-Conforming Voices in Public Health" that was presented to 100 fellow public health workers, providers, and organizers at the Philadelphia Transgender Wellness Conference. The TAC also developed best practices for transgender leadership skills and transgender care delivery. Many of the recipients of these trainings are federal contractors and/or grantees who would be prohibited by Executive Order 13950 from undergoing these trainings necessary to address the health disparities faced by the communities they and CrescentCare serve.

124.    Finally, through its Legal Services program that is federally funded, CrescentCare engages in advocacy, outreach, education, and litigation to address discrimination (including in housing and access to health care), secure public benefits, protect rights to privacy, and assist with permanency/estate planning. A typical tool used by CrescentCare's attorneys to address the needs of their clients and the community CrescentCare serves is to demand and secure trainings, as part of any legal resolution, that address systemic issues and bias against people living with HIV. Many of the defendants or respondents in these matters are themselves federal contractors who would be prohibited from agreeing to or providing these trainings as a result of the Executive Order. The Executive Order thus also inhibits CrescentCare's ability to secure legal resolution of its clients' problems in a manner that prevents the same discrimination from occurring in the future.

125.    **Plaintiff SAGE** conducts extensive trainings and provides educational materials and technical assistance pursuant to federal grants, as well as independently, for a range of public and private service providers, health and senior care settings, aging agencies, and organizations serving other minority aging populations to help them create LGBT-welcoming environments and ensure culturally competent care. This work necessarily includes discussion of systemic

racism, sexism, homophobia, biphobia, and transphobia; the intersection of LGBT identity and other aspects of human identity such as race and ethnicity, implicit bias, bias in health care, and cultural competency.

126.    SAGE's mission seeks to ensure that LGBT older people can age with respect and dignity. Providing resources, technical assistance, and training to the government and private entities that form the aging network about the unique life experiences and needs of LGBT seniors—including where their vulnerabilities are compounded by discrimination based on various aspects of their identities—is central to that mission.

127.    Since 2010, SAGE has received over $4,000,000 in grants from HHS's Administration for Community Living ("ACL"), nearly $3,000,000 of which has gone directly to fund the National Resource Center on LGBT Aging to "educate mainstream aging services organizations about the existence and special needs of LGBT elders, sensitize LGBT organizations to the existence and special needs of older adults, and educate LGBT individuals about the importance of planning ahead for future long-term care needs." These ACL grants are aimed at strengthening the aging and disability networks through emphasis on diversity and cultural competency.

128.    The current grant SAGE receives for the National Resource Center on LGBT Aging is entitled, "Strengthening Aging Services for Minority Populations Through Technical Assistance, Resource Development, and Program Coordination." ACL described the purpose of this grant as carrying out the directive of the Older Americans Act to take particular note of, and prioritize serving, older adults who face the greatest economic and social challenges due to their racial or ethnic background, limited English proficiency, sexual orientation, or gender identity. SAGE has received $215,114 for the first year of the grant, and additional awards of $220,999 have been recommended for each of the next two years. Under this grant, SAGE

39

provides support to other ACL-funded organizations in reaching the most vulnerable older members of the community, many of whom are LGBT and also racial or ethnic minorities. This support includes training and technical assistance, such as webinar presentations to ACL-funded State Units on Aging, Area Agencies on Aging, and subcontractors. The work required by the grant also includes collaborating with ACL-funded Technical Assistance and Resource Centers serving African American, Latinx, Asian and Pacific Islander, and Native American older adults to create resources, webinars, and presentations, as well as working together on promoting and disseminating a jointly created best practices guide for serving diverse elders.

129.    The work SAGE conducts to fulfill this grant's purpose necessarily includes work that focuses on issues of systemic racism, sexism, homophobia, biphobia, and transphobia; the intersection of LGBT identity and other aspects of human identity such as race and ethnicity; implicit bias; bias in health care; and other barriers that LGBT older adults, particularly those who are also minorities, face in day-to-day life. The Executive Order chills SAGE's ability to discuss, present, develop materials about, and create dialogue around these issues by conditioning its federal grant funding on not doing so.

130.    SAGE also runs SAGECare, which offers trainings and consulting on cultural competency to a mix of for-profit and not-for-profit services providers, government-funded federal, state, and local entities, and academic institutions. SAGE has received payment for these trainings directly from state and federal government agencies and entities that receive funding from federal sources, including under the Workforce Investment Opportunity Act and through the VA, but is also able to subsidize the trainings through the ACL-funded National Resource Center on LGBT Aging. SAGECare training and consulting revenue has totaled approximately $1,500,000 since July 2016. These trainings include material that SAGE believes will be

flagged by the keyword search cited in OMB's memorandum, which it fears will lead to these SAGECare trainings being cancelled.

131.    SAGE has already experienced disruptions to its work by the Executive Order. A SAGE staff member was scheduled to participate in a webinar series focused on supporting the needs of diverse populations of older veterans. The webinar series was part of the VA's Geriatric Scholars Program, a project funded through the Veterans Health Administration Offices of Rural Health, Patient Care Services, and Geriatrics and Extended Care. The Geriatric Scholars Program provides continuing education and professional development on geriatric topics to care providers throughout the Veterans Health Administration to improve the quality of care received by older veterans across the country. The webinar series was to focus on gerodiversity—or multicultural aging issues—to address and raise awareness about equity, diversity, and inclusion issues among aging veterans. Specifically pointing to the Executive Order, the September 4, 2020 Memorandum, and the September 28, 2020, Memorandum, the VA Office of Rural Health instructed that the webinar series could not be held as scheduled. SAGE worries that many more government agencies, or entities that receive government funding, will do the same, undermining SAGE's ability to carry out its mission of ensuring culturally competent care for LGBT seniors.

132.    SAGE also trains its own staff on both the systematic structural problems of racism, homophobia, biphobia, and transphobia as well as the ways that those structural problems manifest in individual behaviors through discriminatory actions, micro aggressions, and implicit bias. This ensures that staff understand the unique perspective, experiences, and concerns of this population. Because the trainings include terms that the OMB's keyword search would flag, SAGE is concerned it will risk its critical federal funding merely by

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

adequately preparing its staff to serve, and educate others about, the LGBT older adult population.

133.   **Plaintiff The Diversity Center** provides a diversity training program to a range of clients, including businesses and educational and health care institutions. The Diversity Center offers specialized bilingual trainings upon request, in addition to LGBTQ+ Aging Sensitivity trainings to local businesses and organizations so that they can improve how they serve LGBTQ+ seniors. The Diversity Center's trainings often cover issues relating to systemic racism and intersectionality. For example, trainers discuss with participants the extraordinary level of physical and sexual violence experienced by Black transgender women of color and the systemic sexism, racism, and transphobia that underlie this violence. The Diversity Center also performs internal training of its staff, volunteers, and board members with a focus on race equity and inclusion.

134.   In addition to performing trainings, The Diversity Center operates a "Triangle Speakers" bureau that trains LGBTQ+ members of the public to be ambassadors, public speakers, and educators in the community. Members of the Triangle Speakers bureau often speak about the role of structural racism in shaping their lives. In all, diversity trainers and Triangle Speakers reached 2,800 participants during the last fiscal year through 93 trainings.

135.   The Diversity Center receives pass-through federal funding through Santa Cruz County to provide outreach and services to prevent the sexual exploitation of LGBTQ+ teens. The Diversity Center's current contract for these services was issued September 16, 2020, for $25,000. The Diversity Center also participates in Medi-Cal Administrative Activities ("MMA") through Santa Cruz County.

136.   Upon information and belief, the clients of The Diversity Center's training program include both federal contractors and grantees. The Diversity Center has trained a local sheriff's

department, a child welfare agency, students and staff at research universities, and over 500 health care workers at major medical institutions. The Diversity Center is scheduled to train a local police department next month. The Diversity Center is worried that an attendee at a training could call the DOL hotline and risk The Diversity Center's federal funding and trainings revenue. The Diversity Center is also concerned that community clients now are more reluctant to seek its trainings for their employees for fear of being deemed noncompliant with the Executive Order and losing their own federal funding.

137.  **Plaintiff LA LGBT Center** has more than 750 employees and provides services to more LGBT people than any other organization in the world, with about 500,000 client visits per year. Approximately 80% of LA LGBT Center's revenue arises from federal programs, including, but not limited to, a contract with the VA, funding under the Ryan White Comprehensive AIDS Resources Emergency Act of 1990, direct funding from the CDC, discounts under the 340B Drug Pricing Program, grants under section 330 of the PHSA; grants from HRSA Bureau of Primary Health Care under which LA LGBT Center is a FQHC; and Medicaid and Medicare reimbursements. LA LGBT Center also receives federal funding for research programs, and is currently a participant in multiple federally funded studies, including through the National Heart, Lung, and Blood Institute; National Institute of Allergy and Infectious Diseases; National Institute of Child Health and Human Development; the NIH; National Institute of Drug Abuse; and the Patient-Centered Outcomes Research Institute.

138.  As part of its general workplace practices and onboarding procedures, LA LGBT Center trains its staff on implicit bias, cultural competency, and historical barriers to health services access. Lack of such training would exacerbate health care disparities that people of color face in the broader health care environment—a directly contradictory outcome to its grants' mandates. Without addressing topics such as implicit bias and grappling with historical racism

in the medical field, LA LGBT Center cannot successfully fulfill the obligations of its federal funding.

139.   LA LGBT Center's grants mandate that it provide care to people with barriers to traditional care, including people of color who traditionally have poor access to health care services due largely to a historical mistrust of medical professionals. In order to achieve this mandate, LA LGBT Center must train its staff to address issues that lead to medical distrust, such as issues associated with historical racial inequity, including implicit bias on the basis of sex and race. Such training is inherent in the work LA LGBT Center has been funded to do.

140.   **Plaintiff Dr. Ward Carpenter** has patients who come from different areas of California and other states to obtain services in a safe and affirming environment. Dr. Carpenter's patient population is disproportionately low-income and experiences high rates of chronic medical conditions, homelessness, unstable housing, and extensive trauma history. In addition, many of Dr. Carpenter's patients, as well as those of the other medical providers he supervises at LA LGBT Center, already have experienced traumatic and discriminatory denials of health care based on their sexual orientation, gender identity, transgender status, or HIV status at the hands of providers outside LA LGBT Center, including by health care providers who have expressed religious or moral objections to treating them.

141.   Dr. Carpenter is acutely aware of the many disparities facing his patients based on race, sex, and LGBT status. He works to overcome medical mistrust among his patients, many of whom have had negative interactions with the medical establishment, law enforcement, and other institutions that leave them feeling powerless. Dr. Carpenter also is aware of research indicating that Black patients have worse health outcomes when cared for by White doctors. Dr. Carpenter, who is White, wishes to continue to participate in workplace diversity training at LA LGBT Center in order to better serve his patients. Specifically, he would like to

44

participate in trainings on systemic racism and implicit bias. If LA LGBT Center can no longer provide those trainings, Dr. Carpenter will suffer directly in the exercise of his profession, and his patients will suffer. It is the responsibility of physicians to be expert in the factors impacting their patients' health, whether it is the diabetes a patient developed because the patient's neighborhood was a fresh-produce desert, the hypertension a patient developed from having to work three jobs rather than having time to exercise, or the suicidality a patient developed from being Black and transgender in a racist and transphobic society. Dr. Carpenter cannot perform his job effectively without access to training on systemic racism, sexism, LGBT bias, and implicit bias.

142.    As a health care provider with LA LGBT Center, Dr. Carpenter oversees performance of federal grants, including grants funded under the Ryan White Comprehensive AIDS Resources Emergency Act of 1990 and from the CDC. The purpose of these grants is frustrated by the Executive Order. These grants account for a significant portion of his work and the health care services that he and those he supervises provide to patients. Losing the funding would mean inadequate care for his patients.

## CLAIMS FOR RELIEF

### COUNT I
### U.S. Constitution, First Amendment
### Free Speech Clause

143.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

144.    All Plaintiffs state this cause of action against all Defendants (including President Trump in exclusively his official capacity for purposes of declaratory relief), seek preliminary and permanent injunctions, and challenge the Executive Order and any agency action seeking to implement it both facially and as applied to them.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

145.   Plaintiffs' cause of action arises from the principle of non-statutory review to enjoin Executive Officers and Departments seeking to enforce illegal, *ultra vires* Presidential action.

146.   The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech."

147.   The Executive Order violates the Free Speech Clause of the First Amendment because it impermissibly chills the exercise of the Plaintiffs' constitutionally protected speech, based on the content and viewpoint of their speech.

148.   Discrimination against speech based on its content and viewpoint is a violation of the First Amendment. Efforts to suppress speech based on the government's opposition to the speaker's view are unconstitutional.

149.   The government is unable to circumvent these First Amendment protections by acting through private, third parties or conditioning government spending on restrictions to speech.

150.   All the Plaintiffs conduct, for their own employees, or for the benefit of third parties, cultural competency trainings that address issues of systemic racism, sexism, anti-LGBT bias, and implicit bias, and Plaintiff Dr. Carpenter wishes to continue to receive such training himself. Plaintiffs believe that these trainings are critical to their missions and necessary to effectively provide their services, and thus wish to continue conducting and/or participating in them.

151.   The Plaintiffs do not conduct these trainings on behalf of the government itself, but for their own employees, their clients, or the populations they serve. They receive federal funding both directly and indirectly, including through other federal contractors and grantees. The decision by Plaintiffs to conduct trainings that address subjects that the Executive Order deems "destructive" and "divisive" constitutes protected First Amendment activity, as does their decision to acknowledge and address these issues in the provision of their services.

152.   The purpose and effect of the Executive Order is to suppress constitutionally protected First Amendment activity by targeting specific content and viewpoints through a range of mechanisms. For example, the Executive Order on its face prohibits federal contractors from "inculcating" certain views in their employees through trainings that teach "divisive concepts." It also requires federal grant recipients to "certify that [they] will not use Federal funds to promote the concept[] that," *inter alia*, "any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex." It further directs OFCCP to establish a hotline for the purpose of investigating complaints about such trainings from any member of the public.

153.   The Executive Order penalizes Plaintiffs for engaging in protected First Amendment activity, primarily by leveraging the federal funding that is key to their ability to operate and execute their missions. Contractors found to be noncompliant with the Executive Order's requirements—even if the prohibited activity does not relate to their direct or indirect federal funding—are to have their contracts "canceled, terminated, or suspended in whole or in part," among other potential penalties. It further requires agencies to identify grant recipients that may, as a condition of receiving such a grant, be required to certify that they will not use such funds for these trainings. These penalties chill the Plaintiffs from engaging in such trainings for fear of lost contracts or funding.

**COUNT II**
**U.S. Constitution, Fifth Amendment**
**Due Process Clause**

154.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

155.   All Plaintiffs state this cause of action against all Defendants (including President Trump in exclusively his official capacity for purposes of declaratory relief), seek preliminary and

permanent injunctions, and challenge the Executive Order and any agency action seeking to implement it both facially and as applied to them.

156. Plaintiffs' cause of action arises from the principle of non-statutory review to enjoin Executive Officers and Departments seeking to enforce illegal, *ultra vires* Presidential action.

157. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

158. Under the Fifth Amendment to the United States Constitution, a governmental enactment, like the Executive Order, is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement. Differently stated, governmental enactments are unconstitutionally void for vagueness when their prohibitions are not clearly defined. Such enactments may also be void for vagueness if they inhibit First Amendment freedoms.

159. Vague prohibitions inhibit freedom of speech when individuals do not know whether their speech is permitted, and choose not to exercise their rights for fear of the consequences.

160. The Executive Order includes vague and subjective terms prohibiting trainings on "divisive concepts." "Divisive concepts" are defined to include a non-exhaustive list of broad, ambiguous themes that lend themselves to conflicting interpretations.

161. In particular, "divisive concepts" are defined to include concepts that "any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex."

162. The Executive Order includes numerous other undefined terms and phrases whose meanings are key to understanding the scope of its prohibitions, including what it means to

"inculcate" a concept in an employee, what activities qualify as a "workplace training," and what it means to suggest that the United States is "fundamentally" racist or sexist.

163.    Additionally, the DOL FAQs create further ambiguity as to which concepts and trainings are permissible and which are disallowed by stating:

> "Unconscious or implicit bias training is prohibited to the extent it teaches or implies that an individual, by virtue of his or her race, sex, and/or national origin, is racist, sexist, oppressive, or biased, whether consciously or unconsciously. Training is not prohibited if it is designed to inform workers, or foster discussion, about pre-conceptions, opinions, or stereotypes that people—regardless of their race or sex—may have regarding people who are different, which could influence a worker's conduct or speech and be perceived by others as offensive."

164.    The Executive Order fails to provide adequate notice as to which concepts may or may not be promoted or included in trainings or in the performance of federal grants and/or contracts.

165.    In spite of the Executive Order's vagueness, it includes a range of penalties, including cancellation of existing contracts and loss of eligibility for future government contracts, and implied discontinuation of federal grants.

166.    Plaintiffs conduct trainings, research, and advocacy that involve systemic racism, implicit bias, and other related concepts that are central to fulfillment of their missions. Plaintiffs do not know which of their activities are prohibited by the Executive Order. Because of this uncertainty, they are justifiably fearful of conducting any activities that might threaten their direct or indirect federal funding, in spite of these activities' centrality to their missions and their ability to serve vulnerable and marginalized communities.

167.    The Executive Order violates the Due Process Clause of the Constitution and is void for vagueness because it infringes on Plaintiffs' constitutionally protected right to free speech and provides inadequate notice of the conduct it purports to prohibit.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs seek for judgment against the Defendants for:

a.    A declaratory judgment under 28 U.S.C. § 2201(a) that the Executive Order and its implementing agency action are unlawful and unconstitutional;

b.    Preliminary and permanent injunctions enjoining Defendants other than the President from implementing and enforcing the Executive Order;

c.    Costs and reasonable attorney's fees;

d.    Such further relief as the Court may deem just and equitable.

The Plaintiffs demand a trial by jury on all issues so triable.

Respectfully,
/s/ Anne Johnson Palmer

Dated this 2nd of November, 2020.

JENNIFER C. PIZER (SBN 152327)
*jpizer@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
     EDUCATION FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, California 90010
Telephone: (213) 590-5903

CAMILLA B. TAYLOR*
*ctaylor@lambdalegal.org*
SCOTT A. SCHOETTES*
*sschoettes@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
     EDUCATION FUND, INC.
65 E. Wacker Place, Suite 2000
Chicago, Illinois 60601
Telephone: (312) 663-4413

M. CURREY COOK*
*ccook@lambdalegal.org*
OMAR GONZALEZ-PAGAN*
*ogonzalez-pagan@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND

ANNE JOHNSON PALMER (SBN 302235)
*Anne.JohnsonPalmer@ropesgray.com*
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315-6337

DOUGLAS HALLWARD-DRIEMEIER*
*Douglas.Hallward-*
*Driemeier@ropesgray.com*
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Telephone: (202) 508-4776

KIRSTEN MAYER*
*Kirsten.Mayer@ropesgray.com*
JESSICA L. SOTO*
*Jessica.Soto@ropesgray.com*
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600

EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: (212) 809-8585

KAREN L. LOEWY*
*kloewy@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Telephone: (202) 804-6245

AVATARA SMITH-CARRINGTON*
*asmithcarrington@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, Texas 75219
Telephone: (214) 219-8585

Telephone: (617) 951-7753

ETHAN M. WEINBERG*
*Ethan.Weinberg@ropesgray.com*
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9688

*Counsel for All Plaintiffs*

* Application for admission *pro hac vice*
forthcoming.