ANNE JOHNSON PALMER (SBN 302235)
*Anne.JohnsonPalmer@ropesgray.com*
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315-6337

DOUGLAS HALLWARD-DRIEMEIER*
*Douglas.Hallward-Driemeier@ropesgray.com*
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Telephone: (202) 508-4776

KIRSTEN MAYER*
*Kirsten.Mayer@ropesgray.com*
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7753

JENNIFER C. PIZER (SBN 152327)
*jpizer@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, California 90010
Telephone: (213) 590-5903

CAMILA B. TAYLOR*
*ctaylor@lambdalegal.org*
SCOTT A. SCHOETTES*
*sschoettes@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
65 E. Wacker Place, Suite 2000
Chicago, Illinois 60601
Telephone: (312) 663-4413

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

---------------------------------------------------------------- x

SANTA CRUZ LESBIAN AND GAY COMMUNITY CENTER d/b/a THE DIVERSITY CENTER OF SANTA CRUZ; LOS ANGELES LGBT CENTER; AIDS FOUNDATION OF CHICAGO; B. BROWN CONSULTING, LLC; BRADBURY-SULLIVAN LGBT COMMUNITY CENTER; NO/AIDS TASK FORCE d/b/a CRESCENTCARE; SERVICES AND ADVOCACY FOR GLBT ELDERS; DR. WARD CARPENTER,

                    *Plaintiffs*,

          v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF LABOR; EUGENE SCALIA, in his official

Case No. 5:20-CV-07741-BLF

**PLAINTIFFS' MOTION FOR NATIONWIDE PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES**

Hearing Date: January 7, 2021

Hearing Time: 9:00 A.M.

Trial Date: None Set

capacity as Secretary of Labor; CRAIG E. LEEN, in
his official capacity as Director of the Office of
Federal Contract Compliance Programs; OFFICE OF
MANAGEMENT AND BUDGET; RUSSELL
VOUGHT, in his official capacity as Director of the
Office of Management and Budget; U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; ALEX M. AZAR II, in his official
capacity as Secretary of Health and Human Services;
U.S. DEPARTMENT OF JUSTICE; WILLIAM
PELHAM BARR, in his official capacity as United
States Attorney General; U.S. DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT;
BENJAMIN SOLOMON CARSON, SR., in his
official capacity as Secretary of Housing and Urban
Development; U.S. DEPARTMENT OF VETERANS
AFFAIRS; ROBERT WILKIE, in his official capacity
as Secretary of Veterans Affairs; NATIONAL
ENDOWMENT FOR THE HUMANITIES; JON
PARRISH PEEDE, in his official capacity as
Chairman of the National Endowment for the
Humanities; NATIONAL ENDOWMENT FOR THE
ARTS; MARY ANNE CARTER, in her official
capacity as Chairman of the National Endowment for
the Arts,

                *Defendants.*

---------------------------------------------------------------- X

## <u>TABLE OF CONTENTS</u>

**Page(s)**

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION ......................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

I.        THE EXECUTIVE ORDER, ITS ROOTS, AND ITS IMPLEMENTATION ................. 3

II.       DIVERSITY TRAININGS THAT ARE VITAL TO DELIVERING CARE
          AND PREVENTING HARM HAVE BEEN CHILLED BY THE EXECUTIVE
          ORDER. ............................................................................................................................. 7

ARGUMENT ..................................................................................................................... 11

I.        PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ............................... 12

          A.        Plaintiffs Are Likely to Succeed in Demonstrating that the Executive
                    Order Violates the First Amendment ................................................................ 12

          B.        Plaintiffs Are Likely to Succeed in Demonstrating that the Executive
                    Order Violates the Due Process Clause of the Fifth Amendment ...................... 16

II.       THE RULE WILL IRREPARABLY HARM PLAINTIFFS. ....................................... 18

          A.        Courts Routinely Find that Infringement of Free Speech Itself
                    Constitutes Irreparable Injury ........................................................................... 18

          B.        The Rule Will Compromise Plaintiffs' Missions And Operations ...................... 19

III.      THE BALANCE OF THE EQUITIES FAVORS PLAINTIFFS, AND AN
          INJUNCTION IS IN THE PUBLIC INTEREST. .......................................................... 21

IV.       THE COURT SHOULD ENTER A NATIONWIDE INJUNCTION............................. 23

CONCLUSION.................................................................................................................... 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agency for Intern. Development v. Alliance for Open Society Intern., Inc.*,
570 U.S. 205 (2013) ..................................................................................................15

*Alpha Delta Chi-Delta Chapter v. Reed*,
648 F.3d 790 (9th Cir. 2011) ....................................................................................13

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) ..................................................................................21

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ....................................................................................24

*Cnty. of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017) ......................................................................21

*Cohen v. San Bernardino Valley Coll.*,
92 F.3d 968 (9th Cir. 1996) ......................................................................................17

*CPR for Skid Row v. City of Los Angeles*,
779 F.3d 1098 (9th Cir. 2015) ..................................................................................17

*CTIA - The Wireless Ass'n v. City of Berkeley, California*,
928 F.3d 832 (9th Cir. 2019) ..............................................................................18, 19

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975) ..................................................................................................21

*E. Bay Sanctuary Covenant v. Trump*,
354 F. Supp. 3d 1094 (N.D. Cal. 2018), *aff'd*, 950 F.3d 1242 (9th Cir. 2020) ...............19, 23

*Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*,
739 F.2d 466 (9th Cir. 1984) ....................................................................................18

*Hunt v. City of Los Angeles*,
638 F.3d 703 (9th Cir. 2011) ...............................................................................17, 18

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001) ..................................................................................................15

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ....................................................................................22

*Nken v. Holder*,
   556 U.S. 418 (2009)....................................................................................................21

*Norwood v. Harrison*,
   413 U.S. 455 (1973)....................................................................................................15

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
   961 F.3d 1062 (9th Cir. 2020) ...................................................................................13

*Pimentel v. Dreyfus*,
   670 F.3d 1096 (9th Cir. 2012) ...................................................................................12

*R.A.V. v. City of St. Paul, Minn.*,
   505 U.S. 377 (1992)....................................................................................................14

*Reed v. Town of Gilbert, Ariz.*,
   576 U.S. 155 (2015)....................................................................................................14

*Regents of the Univ. of Calif. v. U.S. Dep't of Homeland Security*,
   908 F.3d 476 (9th Cir. 2018) ..............................................................................11, 23

*Sammartano v. First Judicial District Court*,
   303 F.3d 959, 973 (9th Cir. 2002) .............................................................................19

*Snyder v. Phelps*,
   562 U.S. 443 (2011)..............................................................................................14, 17

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)..............................................................................................13, 14

*Texas v. Johnson*,
   491 U.S. 397 (1989)................................................................................................1, 14

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981)....................................................................................................11

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ...................................................................................19

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).......................................................................................................21

**Constitutional Provisions, Statutes, and Rules**

Civil Local Rule 65-2..........................................................................................................1

Civil Local Rule 7-2............................................................................................................1

*Executive Order 13950*, 85 FR 60683 (Sept. 22, 2020)......................................................... *passim*

Race and Sex Stereotyping and Scapegoating,
   85 Fed. Reg. 67, 375–78 (Oct. 22, 2020).....................................................................7

U.S. Constitution First Amendment.................................................................... *passim*

U.S. Constitution Fifth Amendment ...............................................................12, 16

**Other Authorities**

*'Anti-American' Training Hotline Set Up for U.S. Contractors (2)*,
   Bloomberg Law (Sept. 29, 2020), https://news.bloomberglaw.com/daily-
   labor-report/u-s-contractors-can-now-easily-report-anti-american-training............................7

Elizabeth Hinton, LeShae Henderson, & Cindy Reed, *An Unjust Burden: The
   Disparate Treatment of Black Americans in the Criminal Justice System*, Vera
   Instit. of Just. (May 2018), https://www.vera.org/downloads/publications/for-
   the-record-unjust-burden-racial-disparities.pdf ....................................................9

Executive Order 13950 – Combatting Race and Sex Stereotyping, Office of
   Federal Compliance Programs (Oct. 7, 2020),
   https://www.dol.gov/agencies/ofccp/faqs/executive-order-13950 ................................. *passim*

James Bell, *Repairing the Breach: A Brief History of Youth of Color in the Justice
   System*, W. Haywood Burns Instit., https://burnsinstitute.org/wp-
   content/uploads/2020/09/Repairing-the-Breach-BI_compressed.pdf.........................................9

Merlin Chowkwanyun, Ph.D., M.P.H. & Adolph L. Reed, Jr., Ph.D., *Racial
   Health Disparities and Covid-19—Caution and Contex*t, 383 New Eng. J.
   Med. 201, 202 (2020), *available at*
   https://www.nejm.org/doi/full/10.1056/NEJMp2012910 ..........................................9

Movement Advancement Project and Center for Am. Progress, *Unjust: How the
   Broken Criminal Justice System Fails LGBT People*
   (Feb. 2016), https://www.lgbtmap.org/file/lgbt-criminal-justice.pdf .....................................10

Nat'l Juvenile Defender Center, *Annotated Bibliography: Implicit Racial Bias in
   the Criminal/Juvenile Justice System* (Oct. 2020),
   https://defendracialjustice.org/wp-content/uploads/toolkit-files/Confronting-
   Bias/Implicit-Racial-Bias-Studies-Annotated-Bibliography-Updated-October-
   2020.pdf ...............................................................................................10

Nat'l Prison Rape Elimination Comm'n Report 73 (June 2009),
   https://www.ncjrs.gov/pdffiles1/226680.pdf .........................................................10

Off. of Mgmt. & Budget, Exec. Off. of the President, Memorandum for the Heads of Executive Departments and Agencies No. M-20-34, Training in the Federal Government (Sept. 4, 2020)................................................................................................2, 3

Off. of Mgmt. & Budget, Exec. Off. of the President, OMB M-20-37 (Sept. 28, 2020) .................................................................................................................................6, 7

### NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that on January 7, 2021, or as soon thereafter as they may be heard before Judge Freeman, Plaintiffs will hereby and do move pursuant to Rule 65 of the Federal Rules of Civil Procedure and Civil Local Rules 7-2 and 65-2 for a preliminary injunction prohibiting Defendants from enforcing Executive Order 13950 and implementing agency actions. Without an order from the Court, the Executive Action will continue to cause Plaintiffs irreparable harm. This motion is based on this notice; the Memorandum of Points and Authorities; the Declarations of Sharon Esther Papo for Santa Cruz Lesbian and Gay Community Center d/b/a The Diversity Center ("Papo Decl."), Aisha N. Davis for AIDS Foundation of Chicago ("Davis Decl."), John Peller for AIDS Foundation of Chicago ("Peller Decl."), Adrian Shanker for Bradbury-Sullivan LGBT Community Center ("Shanker Decl."), Bernadette Brown for B. Brown Consulting ("Brown Decl."), Darrel Cummings for Los Angeles LGBT Center ("Cummings Decl."), Alice Riener for NO/AIDS Task Force d/b/a CrescentCare ("Riener Decl."), Hilary Meyer for Service and Advocacy for GLBT Elders ("Meyer Decl."), and Dr. Ward Carpenter ("Carpenter Decl."); this Court's file; and any matters properly before the Court.

### MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The First Amendment is the foundation of our country's freedom. Chief among its protections is the right to criticize the government, and even the Nation itself, for failing to live up to the ideals we espouse. This freedom to speak uncomfortable truths to power has been central to the various civil rights movements of the past century, exposing the Nation's shortcomings in order to push it forward in its treatment of racial minorities, women, and the LGBT community. Courts have long recognized that the government cannot silence its critics by labeling their speech "un-American," including even the burning of the flag. *See Texas v. Johnson,* 491 U.S. 397 (1989). Indeed, more generally, the government cannot discriminate against speech based on its content and viewpoint. Nor can the government leverage its spending powers in an effort to silence private speech.

Executive Order 13950 (the "Executive Order") violates these core principles. Executive Order 13950, 85 FR 60683 (Sept. 22, 2020). It silences speech that identifies and counter-acts the continuing stain of racism, sexism, and anti-LGBT bias in our society by labeling it, in the words of the Director of the Office of Management and Budget ("OMB"), "anti-American propaganda." *See* Off. of Mgmt. & Budget, Exec. Off. of the President, Memorandum for the Heads of Executive Departments and Agencies No. M-20-34, Training in the Federal Government (Sept. 4, 2020) [hereinafter "Memorandum M-20-34"]. The concepts of systemic racism and sexism, White privilege, and unconscious or implicit bias hold a mirror up to America and expose the ongoing pernicious effects of centuries of subjugation, discrimination, and criminalization of Black and Brown people, women, and LGBT people. Precisely because these truths make some listeners "feel discomfort, guilt, [or] anguish," the President has labeled them "divisive concepts" and silenced this protected speech. *See* Executive Order, Section 2(a).

Plaintiffs are non-profit organizations, a consultancy, and an individual for whom these concepts of systemic bias and privilege are critical to their ability to protect LGBT people from harm and serve clients who are LGBT or living with HIV. The LGBT community has endured centuries of discrimination through criminalization and medical persecution, including having their identities labeled "disorders." Fear of persecution and enforced silence contributed to the spread of HIV and hundreds of thousands of avoidable deaths. Many in the community have suffered even greater stigmatization due to the confluence of race and sex. To effectively serve their clients, protect LGBT people from harm, and help the LGBT community overcome this history of discrimination, Plaintiffs address and apply lessons from the study and analysis of systemic racism, sexism, anti-LGBT bias, White privilege, implicit bias, and intersectionality, as well as principles of cultural humility and from critical race theory, in diversity trainings that they provide to their own employees, to those of third-party clients, and as part of grant-funded work.

The Executive Order, and the steps already taken by Defendants to implement it, silences Plaintiffs' advocacy. It cuts Plaintiffs off from federal funding in the form of grants and contracts, and from providing diversity trainings to recipients of such grants and contracts, even when the

trainings are unrelated to the program that is the basis of the federal funding. This scheme infringes Plaintiffs' constitutional rights. Plaintiffs must censor their trainings, or cease them altogether, in the face of an Executive Order and vague administrative guidance that deliberately silence Plaintiffs' speech on account of its message. Plaintiffs are already experiencing harm, including self-censorship and client loss, resulting in irreparable injury.

Because the infringement on Plaintiffs' constitutional rights is clear, and their injuries irreparable, they are entitled to an injunction to stop Defendants' unconstitutional conduct. The public interest also favors Plaintiffs' unrestricted, undiluted speech, particularly in the context of an ongoing crisis for Black and Brown people involved with the justice system, and the COVID-19 pandemic, in which the communities that Plaintiffs and their clients serve comprise a disproportionate share of those affected. The government, by contrast, faces no harm if the Court enjoins the implementation and enforcement of the Executive Order during the pendency of this suit. A preliminary injunction is thus warranted not only to protect Plaintiffs, but to safeguard the public interest, and therefore the Court should issue such an injunction immediately.

## STATEMENT OF FACTS

### I.   THE EXECUTIVE ORDER, ITS ROOTS, AND ITS IMPLEMENTATION

On September 4, 2020, Russell Vought, Director of the Office of Management and Budget, issued a Memorandum to the Heads of Executive Departments and Agencies on training in the federal government. *See* Memorandum M-20-34. It describes the use of millions in taxpayer dollars by federal agencies to fund what it labels "divisive, anti-American propaganda," and directs agencies to "identify any contracts or spending related to training on 'critical race theory,' 'white privilege,' or any other training that teaches or suggests either (1) that the United States is an inherently racist or evil country or (2) that any race or ethnicity is inherently racist or evil." *Id*. That same day, on Twitter, Director Vought announced that "[t]he days of taxpayer-funded indoctrination trainings that sow division and racism are over. Under the direction of [President Trump], we are directing agencies to halt critical race theory trainings immediately." Russell Vought   (@RussVought45),   TWITTER   (Sept.   4,   2020,   7:57   PM),

https://twitter.com/RussVought45/status/1302033078848753665. The following day, President Trump announced on Twitter "[t]his [critical race theory] is a sickness that cannot be allowed to continue. Please report any sightings so we can quickly extinguish!" Donald J. Trump (@realDonaldTrump),        TWITTER        (Sept.        5,        2020,        7:52        AM), https://twitter.com/realDonaldTrump/status/1302212909808971776.

On September 22, 2020, President Trump issued Executive Order 13950 on Combating Race and Sex Stereotyping. Its stated purpose is to establish a United States policy against what it characterizes as "promot[ing] race or sex stereotyping or scapegoating" in the federal workforce, Uniformed Services, or federal grants. Executive Order, Sec. 1. It also prohibits federal contractors from "inculcat[ing]" those views in their own employees. *Id*. In effect, the Executive Order seeks to use the government's massive presence in all aspects of our society to censor specific speech that the President dislikes or finds inconvenient: speech about systemic racism, sexism, implicit bias, intersectionality, cultural humility, and other concepts that shed light on the realities of race and gender in the United States.

The Executive Order includes a range of restrictions and means of implementation regarding what it calls "divisive concepts." Section 2(a) of the Executive Order defines "divisive concepts" as "concepts that (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her race or sex; (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term 'divisive concepts' also includes any other form

of race or sex stereotyping or any other form of race or sex scapegoating," which are defined in Sections 2(b) and 2(c) of the Executive Order. *See* Executive Order, Secs. 2(a), (b), (c).

In defining these prohibited ideas, the government intentionally lumps together concepts that have nothing to do with each other, in an attempt to delegitimize scientifically based criticism of systemic oppression—equating, for example, teaching racist theories that "one race or sex is inherently superior to another race or sex" with *exposing* such racism by exploring the "unconscious" biases Americans hold as a result of centuries of racism and discrimination. *See id*. In essence, the President seeks to gaslight Americans into believing that the very raising of awareness regarding systemic racism, implicit bias, and White privilege that is *necessary* to combat racism is itself racist.

Section 4 prohibits government contractors from using any workplace training for their employees that includes the "divisive concepts," and requires provisions in their contracts binding them to that commitment. *Id*., Sec. 4. This restriction applies even if the contracts at issue bear no relation to the prohibited trainings. Noncompliance may lead to contract termination or suspension, as well as ineligibility for future contracts that likewise might have nothing to do with implicit bias training. *Id*., Sec. 4(a)(3). Section 5 creates a similar prohibition for grant recipients, directing agencies to review their grants and identify programs for which they may condition grants on certification that funds will not be used to promote the "divisive concepts." *Id*., Sec. 5.

The Executive Order also establishes means of investigation and enforcement. Section 4(b) orders the Department of Labor's ("DOL") Office of Federal Contract Compliance Programs ("OFCCP") to establish a hotline and investigate complaints received regarding activities that violate the Executive Order. *See id*., Sec. 4(b). Section 8 directs the Attorney General to assess whether workplace trainings teaching the "divisive concepts" generate liability under the Civil Rights Act of 1964. *See id*., Sec. 8.

On September 28, 2020, Director Vought issued a second Memorandum, which, in furtherance of the Executive Order, requires federal agencies to determine how much they spend on diversity and inclusion programs, and review their trainings to determine whether they "teach,

advocate, or promote" the "divisive concepts." Off. of Mgmt. & Budget, Exec. Off. of the President, OMB M-20-37 (Sept. 28, 2020) [hereinafter "Memorandum M-20-37"]. Agencies that provide grants are directed to "look at all Federal grant and cooperative agreement programs, *not just those for the purposes of providing training*," and include conditions on awards that preclude the use of funds for promoting the "divisive concepts," even through research. *Id.* (emphasis added). Memorandum M-20-37 notes that reviews of training materials can be supplemented by a "broader keyword search" of agency financial data and procurements for terms including "'critical race theory,' 'white privilege,' 'intersectionality,' 'systemic racism,' 'positionality,' 'racial humility,' and 'unconscious bias.'" *Id.*

On October 7, 2020, OFCCP released guidance on the Executive Order in the form of frequently asked questions ("FAQs"). Executive Order 13950 – Combatting Race and Sex Stereotyping, Office of Federal Compliance Programs (Oct. 7, 2020), https://www.dol.gov/ agencies/ofccp/faqs/executive-order-13950 [hereinafter the "DOL FAQs"]. The DOL FAQs restate the requirements of the Executive Order and its mandate prohibiting federal contractors from "inculcating race or sex stereotyping in their employees in workplace diversity and inclusion trainings." *Id.* Among the FAQs is "Does Executive Order 13950 prohibit unconscious bias or implicit bias training?" The response states: "Unconscious or implicit bias training is prohibited to the extent it teaches or implies that an individual, by virtue of his or her race, sex, and/or national origin, is racist, sexist, oppressive, or biased, whether consciously or unconsciously. Training is not prohibited if it is designed to inform workers, or foster discussion, about pre-conceptions, opinions, or stereotypes that people—regardless of their race or sex—may have regarding people who are different, which could influence a worker's conduct or speech and be perceived by others as offensive." *Id.*

In furtherance of the Executive Order, OFCCP established and publicized a "Complaint Hotline to Combat Race and Sex Stereotyping." *See id.* According to the DOL FAQs, "the hotline receives complaints via telephone at 202-343-2008 and via email at OFCCPComplaintHotline@dol.gov." *Id.* The agency's Division of Policy and Program

Development will monitor the hotline. *See 'Anti-American' Training Hotline Set Up for U.S. Contractors (2)*, BLOOMBERG LAW (Sept. 29, 2020), https://news.bloomberglaw.com/daily-labor-report/u-s-contractors-can-now-easily-report-anti-american-training. "Complaints requiring an investigation will be sent to the appropriate Regional and District Offices for review and handling." *Id*.

On October 22, 2020, OFCCP published a Request for Information ("RFI") in the Federal Register that "requests comments, information, and materials" from federal contractors, subcontractors, and their employees regarding workplace trainings involving "prohibited race or sex stereotyping or scapegoating." Request for Information; Race and Sex Stereotyping and Scapegoating, 85 Fed. Reg. 67, 375–78 (Oct. 22, 2020).

The Executive Order went into "effect[] immediately," with the exception of imposing mandatory terms on government contracts, which is set to go into effect on November 21, 2020. *See* Executive Order, Secs. 4(a), 9; DOL FAQs. Additionally, agencies are required to report to OMB by November 20, 2020, the grant programs for which they may impose the restrictive conditions set forth in Section 5 of the Executive Order. *See* Memorandum M-20-37.

## II.   DIVERSITY TRAININGS THAT ARE VITAL TO DELIVERING CARE AND PREVENTING HARM HAVE BEEN CHILLED BY THE EXECUTIVE ORDER.

Health care and service providers and consultants that provide diversity training, such as Plaintiffs, must explicitly acknowledge and address systemic racism, sexism, and structural anti-LGBT discrimination as part of their missions and their work. People of color, women, and LGBT people face significant health disparities and barriers to accessing care, including widespread discrimination, particularly those with more than one marginalized identity. People of color and LGBT people also face disparities in every aspect of the justice system. Plaintiff health care providers and HIV/AIDS service providers must explicitly acknowledge and confront the role of systemic racism, sexism, anti-LGBT bias, and implicit bias as a contributor to health disparities and inequities in order to combat those disparities and inequities, reach marginalized populations, and provide quality care, as their federally funded grants require. Cummings Decl. ¶ 9; Reiner

Decl. ¶¶ 7–32; Davis Decl. ¶¶ 12–14. Plaintiff LGBT Centers and Plaintiff SAGE must acknowledge and address these concepts as they provide critical services to vulnerable people, or train others to provide such services. Cummings Decl. ¶ 10; Papo Decl. ¶ 10; Shanker Decl. ¶¶ 10–12, 21; Meyer Decl. ¶¶ 12–13, 16–17. Plaintiff Brown Consulting incorporates these concepts in trainings of law enforcement and corrections officers. Brown Decl. ¶ 12.

In particular, implicit bias among health care workers shapes their behavior and produces differences in patient diagnoses, treatments, and outcomes. Carpenter Decl. ¶ 16; Riener Decl. ¶¶ 20, 22, 28. Some health disparities are inexplicable for any reason other than implicit bias on the part of health care providers. Carpenter Decl. ¶ 16. When patients experience discrimination in medical settings, whether because of explicit or implicit bias, medical mistrust between a patient and care provider increases, and patients stop or delay seeking care. Carpenter Decl. ¶ 14; Cummings Decl. ¶ 16; Riener Decl. ¶¶ 9, 22, 29; Meyer Decl. ¶ 17. In turn, patients' conditions remain untreated for a longer period of time—if they ever get treatment—causing more acute health conditions, and increasing the eventual cost of their care. Cummings Decl. ¶¶ 15–16; Riener Decl. ¶¶ 23–29. Some conditions can become incurable simply because of a delay in treatment. Carpenter Decl. ¶ 14.

To overcome medical mistrust, health care providers must acknowledge its roots. Black patients are acutely aware of past maltreatment of people of color in medical research and by medical institutions. Providers must also acknowledge and address the role of other forms of systemic racism, sexism, anti-LGBT bias, and the socioeconomic issues associated with poverty in patient health. Systemic racism, sexism, and anti-LGBT bias can limit access to health care, housing, HIV prevention education, and screenings. Identifying disparities and acknowledging their underlying causes is essential to informing testing and prevention efforts, and to improving health outcomes. Peller Decl. ¶ 8.

The need to address systemic racism and bias is even more acute in the context of the COVID-19 pandemic, in which marginalized communities have been among those hit hardest. Riener Decl. ¶¶ 11, 21, 30; Peller Decl. ¶ 9. There are stark racial disparities in rates of COVID-

19 cases and deaths. Merlin Chowkwanyun, Ph.D., M.P.H. & Adolph L. Reed, Jr., Ph.D., *Racial Health Disparities and Covid-19—Caution and Contex*t, 383 NEW ENG. J. MED. 201, 202 (2020), *available at* https://www.nejm.org/doi/full/10.1056/NEJMp2012910. These disparities can only properly be understood and addressed within the broader context of systemic discrimination. Riener Decl. ¶¶ 10–11. Additionally, to address these disparities, Plaintiffs must identify and combat implicit bias on the part of health care providers. Bias in medical settings during an epidemic of an infectious disease, such as HIV/AIDS or a pandemic such as COVID-19, places the entire population at greater risk because people who are disproportionately at risk for infection are less likely to seek or have access to testing, less likely to seek or have access to treatment, and less likely to provide information to contact tracers. Carpenter Decl. ¶¶ 17–19. This Executive Order "will chill outreach to communities of color and LGBTQ people, including targeted efforts to address medical mistrust and encourage use of a vaccine among such communities, and result in sicker patients and increased mortality from a global pandemic. People will not show up to the health care system, and the coronavirus will spread to people around them." Riener Decl. ¶ 30. Understanding systemic racism, discrimination, and bias is vital to protecting the public health. *See*, *e.g.*, Shanker Decl. ¶¶ 14, 16, 22; Carpenter Decl. ¶¶ 17–19; Davis Decl. ¶¶ 20–21.

Implicit bias in the context of law enforcement, policing, corrections, and the juvenile and criminal justice systems fuels glaring disparities for people of color and LGBT people, particularly those with more than one marginalized identity. The nation's juvenile and criminal justice systems reflect our unresolved legacy of racism. Black people face disproportionately high rates of discrimination, violence, arrests by law enforcement; elevated rates of incarceration; and harsher penalties than their White peers. Elizabeth Hinton, LeShae Henderson, & Cindy Reed, *An Unjust Burden: The Disparate Treatment of Black Americans in the Criminal Justice System*, Vera Instit. of Just. (May 2018), https://www.vera.org/downloads/publications/for-the-record-unjust-burden-racial-disparities.pdf; James Bell, *Repairing the Breach: A Brief History of Youth of Color in the Justice System*, W. Haywood Burns Instit., https://burnsinstitute.org/wp-content/uploads/2020/09/Repairing-the-Breach-BI_compressed.pdf. LGBT people, too, are

disproportionately incarcerated and face a heightened risk of sexual abuse committed by other inmates and staff. *See* Movement Advancement Project and Center for Am. Progress, *Unjust: How the Broken Criminal Justice System Fails LGBT People* (Feb. 2016), https://www.lgbtmap.org/file/lgbt-criminal-justice.pdf; Nat'l Prison Rape Elimination Comm'n Report 73 (June 2009), https://www.ncjrs.gov/pdffiles1/226680.pdf. One of the contributors to systemic discrimination in the justice system is implicit bias on the part of school administrators, members of law enforcement, and correctional staff, which Plaintiff Brown Consulting seeks to correct through trainings. Brown Decl. ¶ 16; and *see* Nat'l Juvenile Defender Center, *Annotated Bibliography: Implicit Racial Bias in the Criminal/Juvenile Justice System* (Oct. 2020), https://defendracialjustice.org/wp-content/uploads/toolkit-files/Confronting-Bias/Implicit-Racial-Bias-Studies-Annotated-Bibliography-Updated-October-2020.pdf. The lives of LGBT people of color are at risk if corrections staff and police officers do not understand the role systemic racism and implicit basis contribute to their over-representation in the justice system and heightened risk of victimization.

Plaintiffs already are experiencing the Executive Order's chilling effect. As declared by AFC, "AFC's program staff are concerned about funding streams for necessary work that discusses race and gender equity; additionally, our partner organizations with smaller budgets are concerned that even a hint of impropriety will devastate their budgets. Moreover, our community members view this Executive Order as an attack on all the progress that we have made towards ending the HIV epidemic. In the short time since the announcement of the Executive Order, we have already held meetings to discuss the ways that funding will have to be rerouted, just in case we are operating within the unclear boundaries of the Executive Order." Davis Decl. ¶ 18. Plaintiffs' staff are chilled from covering topics in trainings, or appearing on panels at conferences. Cummings Decl. ¶¶ 11, 12, 18; Papo Decl. ¶¶ 11–14. Entities such as those routinely trained by Plaintiffs have canceled or sought to excise content from trainings as a result of the Executive Order. *See, e.g.*, Shanker Decl. ¶ 20. Plaintiff SAGE had a scheduled webinar series canceled by a government entity that expressly pointed to the Executive Order as the reason. Meyer Dec. ¶ 14. Plaintiff

Bradbury-Sullivan Center expedited many of its planned trainings to ensure that as many as possible occur prior to the Executive Order's effective date "based on the confusion caused by the Executive Order" and its "fear about its prohibition on accurate discussions of systemic problems surrounding race and sex." Shanker Decl. ¶ 13. Plaintiff AFC lost thousands of dollars when the sponsor to a conference felt compelled to withdraw its financial support explicitly because of the Executive Order, forcing AFC to fill the gap. Davis Decl. ¶ 22. Plaintiff CrescentCare's legal services clients may no longer seek certain trainings as remedies in legal actions against defendants who are federal contractors or grantees. Riener Decl. ¶ 31. Plaintiff Brown Consulting edited critical content on white privilege and racism out of a curriculum for a third-party client. Brown Decl. ¶ 19.

The harms of barring this critical content are severe. Plaintiffs work every day to address the health disparities among LGBT people, Black and Brown people, and people with multiple minority identities; the systemic barriers and bias in health care, housing, and education based on race, sex, and LGBT status; the obstacles to accessing services and care for seniors stemming from lifetimes of accumulated discrimination, distrust, and isolation; and the violence and victimization experienced by Black and Brown LGBT and gender nonconforming children and adults at the hands of law enforcement. Their efforts to combat systemic racism, sexism, and anti-LGBT bias ensure that people have access to lifesaving health care, culturally competent social services, and equitable treatment in the justice system. Stopping Plaintiffs' work puts lives at risk.

## ARGUMENT

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). A plaintiff seeking a preliminary injunction must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Regents of the Univ. of Calif. v. U.S. Dep't of Homeland Security*, 908 F.3d 476, 505 n.20 (9th Cir. 2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). In applying this standard, "the

elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (internal quotation marks omitted).

The requirements for a preliminary injunction are met here. Plaintiffs are likely to succeed in proving that Executive Order 13950 is unlawful and unconstitutional, including that it violates the First Amendment of the U.S. Constitution because it unlawfully chills and discriminates against speech based on its content and viewpoint, and the Fifth Amendment of the U.S. Constitution because its vague and ambiguous language fails to provide Plaintiffs fair warning as to what speech falls within the Executive Order's prohibitions.

The irreparable injury is clear: the Executive Order acutely harms Plaintiffs' constitutional rights, organizational missions, and service efficacy. It chills speech critical to providing health care and social services to vulnerable constituencies during the COVID-19 pandemic, as well as to training others to provide such services effectively. In stark contrast, the government will not be harmed if the Court halts the Executive Order's implementation during merits briefing. And the public interest plainly favors preventing the Executive Order from taking immediate effect, in large part due to the importance of Plaintiffs' speech to the delivery of health care and essential social services to marginalized communities, the protection of the public health during the pandemic, and the security of children and adults interacting with law enforcement and corrections officers. Because Plaintiffs are located throughout the country and serve widely dispersed populations, and relief limited to Plaintiffs will not cure their harms, the Court should issue a nationwide injunction.

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.   Plaintiffs Are Likely to Succeed in Demonstrating that the Executive Order Violates the First Amendment.

The Executive Order impermissibly chills Plaintiffs from discussing systemic racism, sexism, implicit bias, intersectionality, critical race theory, and other related concepts. In particular, it chills this speech in the context of trainings that enable service providers to deliver life-saving care and social services to marginalized communities. It sweeps even more broadly

against certain stakeholders, such as grant recipients, who are forbidden to even "promote the concepts" prohibited by the government if the program in question benefits from federal funding.

There is "little question that vocational training is speech protected by the First Amendment." *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020). Such speech "imparts a 'specific skill' or communicates advice derived from 'specialized knowledge.'" *Id.* (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010)). "An individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (quoting *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 32 (1984)). First Amendment protections also cover would-be recipients of vocational training. "[T]he Constitution protects [a] right to receive information and ideas[,]" and restrictions on this right constitute a cognizable First Amendment injury. *Kirchmeyer*, 961 F.3d at 1069 (quotation omitted). "This right to receive information naturally extends to educational settings." *Id.*

The Executive Order on its face restricts this protected speech based on its content and viewpoint, as it aims directly at a particular message—science-based approaches that expose the continuing effects of the Nation's history of discrimination on the basis of race, sexuality, and gender. As courts have stated, "'[v]iewpoint discrimination is an egregious form of content discrimination, and occurs when the specific motivating ideology or the opinion or perspective of the speaker is the *rationale* for the restriction [on speech].'" *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 800 (9th Cir. 2011) (quoting *Truth v. Kent Sch. Dist.*, 542 F.3d 634, 649–50 (9th Cir. 2008)). "A restriction on speech is unconstitutional if it is 'an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46 (1983)).

Here, the Executive Order precludes advocacy and trainings that rely on concepts the government deems offensive, including the idea that people "should feel discomfort, guilt, anguish, or any other form of psychological distress" on account of the privilege conferred on them by their race or sex. It mandates withholding federal funds from those who would otherwise

express, or engage others to express, the forbidden content and viewpoint. This includes funding for contractors and subcontractors that is *completely separate from* and *does not itself subsidize* the prohibited expression. But the government is not permitted to burden speech "because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (citations omitted). Nor can it burden speech because it may cause listeners discomfort; "speech cannot be restricted simply because it is upsetting or arouses contempt. . . . '[T]he government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.'" *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (quoting *Johnson*, 491 U.S. at 414). The government's views on the merits, validity, and propriety of the concepts it seeks to outlaw are immaterial to the constitutional analysis.

Content-based regulation, including viewpoint discrimination, is subject to "the most exacting scrutiny," *Johnson*, 491 U.S. at 412 (citation omitted). Such enactments "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "In the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." *Sorrell*, 564 U.S. at 571 (citation omitted).

Such is the case here, where the Executive Order offers no basis to counter the presumption against invalidity and withstand rigorous First Amendment scrutiny. The government's justification for its action—outlined in its stated Purpose for the Executive Order—is that the outlawed concepts derive from "a different vision of America" that the President deemed "rooted in [] pernicious and false belief[s]." Executive Order 13950, Sec. 1. In other words, the President denounced criticism of the Nation's shortcomings as a "destructive ideology . . . grounded in misrepresentations of our country's history and its role in the world" simply because the speech is inconsistent with the President's own political message. But silencing views with which the President disagrees is not a compelling governmental interest, even if characterized as a "malign ideology." *Id*. And even assuming counteracting racism is a compelling interest, the Executive Order does the opposite. In true Orwellian fashion, the Executive Order simply labels speech

designed to root out and expose even unconscious race and sex bias as instead "perpetuat[ing] racial stereotypes and division." *Id*. The Executive Order concludes that the prohibited trainings "undermine[] efficiency in Federal contracting" and "promote divisiveness" in a contractor's workplace. *Id*. But prohibiting diversity trainings is not necessary to achieve these stated interests—which are hardly compelling—and its vague language and broad sweep are not narrowly-tailored means of achieving them.

The Executive Order's chill is not only direct, but also magnified through leveraging federal spending. The Executive Order prohibits federal contractors from spending *any* money, including their own, even to *receive* trainings involving the outlawed concepts. The government's compulsion of intermediaries to censor trainings is equally as forbidden as its direct censorship. The government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 463, 465 (1973).

The government cannot leverage its spending powers "to regulate speech outside the contours" of the federal programs it funds. *Agency for Intern. Development v. Alliance for Open Society Intern., Inc.*, 570 U.S. 205, 214 (2013). Using its vast economic resources to stifle speech by conditioning federal contracts and grants on limits to expression outside of the government's programs is unconstitutional. The government cannot "demand[] that funding recipients adopt—as their own—the Government's view on an issue of public concern," as such a condition "by its very nature affects 'protected conduct outside the scope of [a] federally funded program.'" *Id*. at 218 (quoting *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). Further, even when a program is federally funded, "funding decision[s] cannot be aimed at the suppression of ideas thought inimical to the Government's own interest" if the expression at issue is private, rather than public. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001).

Here, the government is restricting speech based on viewpoint, and using its spending powers to do so. President Trump and his Administration have labeled trainings and grant-funded work "offensive" and "un-American" for calling attention to the lamentable extent to which the United States has failed to uphold the rights of minorities and marginalized communities. On that

basis, it determined that anyone who might view the prohibited concepts differently, and would share those views with others, should be precluded from receiving federal funding, even for purposes entirely unrelated to the speech at issue. There is no cognizable justification for the Executive Order's restrictions on speech and the harms that will ensue. The Executive Order restricts protected speech simply because the government disagrees with the content and viewpoint expressed. The First Amendment violation could not be more clear.

**B.      Plaintiffs Are Likely to Succeed in Demonstrating that the Executive Order Violates the Due Process Clause of the Fifth Amendment.**

The Executive Order casts an especially broad chill on Plaintiffs' speech because its vague and ambiguous language fails to put Plaintiffs on notice of precisely what speech is subject to penalty. For example, it prohibits the promotion and teaching of concepts that people "should feel discomfort, guilt, anguish, or any other form of psychological distress" on account of their race or sex, which defines the prohibited conduct based on how a listener might react. Additionally, the FAQs published by OFCCP in an effort to clarify the Executive Order only sow more confusion. They provide that "[u]nconscious or implicit bias training is prohibited to the extent it teaches or implies that an individual, by virtue of his or her race, sex, and/or national origin, is racist, sexist, oppressive, or biased, whether consciously or unconsciously." *See* DOL FAQs. But such training *is* allowed "if it is designed to inform workers, or foster discussion, about pre-conceptions, opinions, or stereotypes that people—regardless of their race or sex—may have regarding people who are different, which could influence a worker's conduct or speech and be perceived by others as offensive." *Id*. The boundary between the two is impossible to assess, and the Executive Order offers no objective standard for agencies' enforcement. There are numerous other undefined terms and phrases whose meanings are key to understanding the scope of the Executive Order's prohibitions, including what it means to "inculcate" a concept in an employee, what activities qualify as a "workplace training," and what it means to suggest that the United States is "fundamentally" racist or sexist. *See* Executive Order 13950, Secs. 2(a)(2), 4(a)(1). These terms and phrases also create ambiguity and confusion.

1    "'It is a basic principle of due process that an enactment is void for vagueness if its

2    prohibitions are not clearly defined.'" *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir.

3    2011) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). A regulation may be void

4    for vagueness if it "'abuts upon sensitive areas of basic First Amendment freedoms, operating to

5    inhibit the exercise of those freedoms.'" *Id.* (quoting *Grayned*, 408 U.S. at 109) (parentheses and

6    brackets omitted). In particular, "[t]here are three objections to vague policies in the First

7    Amendment context. First, they trap the innocent by not providing fair warning. Second, they

8    impermissibly delegate basic policy matters to low level officials for resolution on an ad hoc and

9    subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, a

10   vague policy discourages the exercise of first amendment freedoms." *Cohen v. San Bernardino

11   Valley Coll.*, 92 F.3d 968, 972 (9th Cir. 1996). *See also CPR for Skid Row v. City of Los Angeles*,

12   779 F.3d 1098, 1103 (9th Cir. 2015) ("Uncertain meanings inevitably lead citizens to steer far

13   wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.")

14   (quoting *Grayned*, 408 U.S. at 109). Where a restriction implicates First Amendment rights, "a

15   'more demanding' standard of scrutiny applies." *Hunt*, 638 F.3d at 712 (citing *Holder*, 561 U.S.

16   at 28 (2010); *Maldonado v. Morales*, 556 F.3d 1037, 1045 (9th Cir. 2009)).

17       Plaintiffs are at a loss as to how to discern what they can and cannot say, at the risk of

18   running afoul of the Executive Order. As they impart vital lessons about race, sexuality, and

19   gender, they must now contend with the impossible (and counterproductive) task of determining

20   whether their trainings and advocacy may invoke feelings of discomfort, guilt, and anguish. While

21   the First Amendment does not permit the government to restrict speech "because it is upsetting"

22   to the listener, *Snyder*, 562 U.S. at 458, it is an independent constitutional violation to specifically

23   *define* the prohibition based on the listener's reaction, which necessarily means "[t]he line between

24   allowable and prohibited [speech] is so murky, enforcement . . . poses a danger of arbitrary and

25   discriminatory application." *Hunt*, 638 F.3d at 712. The FAQs only further complicate Plaintiffs'

26   predicament: whether a diversity training is suitable to the government will be a fact-intensive,

27   highly subjective inquiry that renders it impossible for Plaintiffs to know how to discuss these

28

issues in the context of providing vital services. DOL and other federal agencies are empowered to exercise enormous discretion in determining what speech is disqualifying. As a result, Plaintiffs will have to censor their speech or not speak at all to avoid potential penalty. *See Hunt*, 638 F.3d at 713 (A "lack of clarity may operate to inhibit the exercise of freedom of expression because individuals will not know whether the [enactment] allows their conduct, and may choose not to exercise their rights for fear of [the consequences].")

These situations are not hypothetical—they are already happening. Plaintiffs cannot discern whether they may discuss systemic racism or "which terms and ideas to avoid" when training law enforcement, Brown Decl. ¶ 19, 20; the causes of health disparities based on race when invited to participate on a panel about HIV, Cummings Decl. ¶ 12; or the intersectional roots of the modern movement for LGBT inclusion. Meyer Decl. ¶ 13; Shanker Decl. ¶ 23. The Executive Order and its implementing guidance are unconstitutionally vague and violate Plaintiffs' Due Process rights.

## II.     THE RULE WILL IRREPARABLY HARM PLAINTIFFS.

When, as here, an enactment likely to be held unconstitutional frustrates the core missions of organizational plaintiffs, courts recognize that the injury is irreparable and justifies a preliminary injunction. That is especially so when First Amendment rights are at stake, the deprivation of which by definition qualifies as irreparable. Here, Plaintiffs' speech is already being curtailed, and will continue to be, in a manner that frustrates Plaintiffs' core missions.

### A.     Courts Routinely Find that Infringement of Free Speech Itself Constitutes Irreparable Injury.

Infringement of Plaintiffs' speech itself constitutes irreparable harm warranting a preliminary injunction. "Irreparable harm is relatively easy to establish in a First Amendment case. A party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim." *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 851 (9th Cir. 2019) (quotation omitted). *See also Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472

(9th Cir. 1984) ("[P]urposeful unconstitutional suppression of speech constitutes irreparable harm for preliminary injunction purposes."). "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *CTIA*, 928 F.3d at 851 (quotation omitted).

Moreover, "even if the merits of the constitutional claim [are] not 'clearly established] at [the] early stage in the litigation, the fact that a case raises serious First Amendment questions compels a finding that there exists 'the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [a plaintiff's] favor.'" *Sammartano v. First Judicial District Court*, 303 F.3d 959, 973 (9th Cir. 2002) (quoting *Viacom Int'l, Inc. v. FCC,* 828 F.Supp. 741, 744 (N.D. Cal.1993)). Because "the harm claimed is a serious infringement on core expressive freedoms, a plaintiff is entitled to an injunction even on a lesser showing of meritoriousness." *Id.*

Plaintiffs' First Amendment claim is exceptionally strong, far surpassing the bar of a "lesser showing of meritoriousness." The First Amendment protects both Plaintiffs who wish to provide trainings on issues such as systemic racism, as well as would-be recipients of that training, like Plaintiff Dr. Carpenter. The Executive Order and implementing agency action constitute content and viewpoint discrimination by restricting advocacy and trainings that employ "divisive concepts" that the government disfavors. Plaintiffs' speech has been chilled because the Executive Order punishes them for discussing concepts related to systemic racism and implicit bias— concepts that are key to effectively reaching, treating, and protecting the communities they serve. And in the case of employees like Dr. Carpenter, they are unable to listen to speech that is vital to doing their jobs effectively. Accordingly, the infringement of speech by the Executive Order constitutes irreparable injury counseling in favor of a preliminary injunction.

## B.     The Rule Will Compromise Plaintiffs' Missions And Operations.

The Executive Order will frustrate Plaintiffs' core missions, which itself is irreparable harm. *See, e.g.*, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). *See also E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D. Cal. 2018), *aff'd*, 950 F.3d 1242 (9th Cir. 2020) ("[T]he Organizations 'have established a likelihood of irreparable harm' based on

their showing of serious 'ongoing harms to their organizational missions.'") (quoting *Valle del Sol Inc.*, 732 F.3d 1006 at 1029). It will jeopardize Plaintiffs' ability to ensure that the individuals that they and their clients serve and protect receive high quality, compassionate, and culturally-competent care and services and are free from harm. The Executive Order forbids Plaintiffs from empowering their employees and those they train to understand the complexities around serving and working with marginalized and multiply-oppressed communities, such as racial minorities who are also LGBT.

The Executive Order directly frustrates the missions of Plaintiff health care providers and HIV/AIDS service providers to deliver high quality and culturally competent health care and services, and to perform grant-funded work addressing health disparities. Riener Decl. ¶¶ 11, 29; Cummings Decl. ¶¶ 3, 19. Plaintiff LGBT Centers and SAGE cannot effectuate their missions of protecting the LGBT community through trainings that explain the systemic challenges vulnerable people face. Shanker Decl. ¶ 22; Meyer Decl. ¶ 12. Plaintiff Brown Consulting cannot reduce disparities for people of color and LGBT people in the justice system if unable to address systemic racism, implicit bias, and intersectionality in trainings. Brown Dec. ¶¶ 17, 21. Plaintiffs, their employees, and their clients are sabotaged in their ability to serve their constituents. Riener Decl. ¶ 12; Shanker Decl. ¶ 21; Meyer Decl. ¶¶ 12–13, 16–17; Davis Decl. ¶¶ 19, 23. Plaintiffs are trusted for the comprehensive, fact-based services and training they provide and that trust will be harmed by self-censorship about the concepts deemed "divisive" by the Executive Order. Riener Decl. ¶ 12; Shanker Decl. ¶ 22; Meyer Decl. ¶¶ 16–17.

Moreover, without certainty in how to comply with the Executive Order and maintain their federal funding or federally funded clients, Plaintiffs' ability to budget, plan for the future, and secure the resources they need is compromised. Cummings Decl. ¶ 8 (Approximately 80% of LA LGBT Center's revenue consists of federal funding); Riener Decl. ¶ 7 (Approximately 70% of CrescentCare's revenue consists of federal funding); Shanker Decl. ¶ 7 (Approximately 33% of Bradbury-Sullivan's revenue consists of federal funding); Davis Decl. ¶ 10 (Approximately 79.2% of AFC's revenue consists of federal funding); Meyer Decl. ¶ 8 (A significant portion of SAGE's

revenue consists of federal funding). Courts have recognized that such existential business risks constitute irreparable harm. Where plaintiffs face "substantial loss of business and perhaps even bankruptcy, [this injury] sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975). *See also Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("The threat of being driven out of business is sufficient to establish irreparable harm.") (citing *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1203 (9th Cir. 1980)); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) ("This budget uncertainty is also causing the Counties irreparable harm, and it will continue to do so absent an injunction. . . . Without clarification regarding the Order's scope or legality, the Counties will be obligated to take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services. These mitigating steps will cause the Counties irreparable harm.") (citing *United States v. North Carolina*, 192 F.Supp.3d 620, 629 (M.D.N.C. 2016)). Here, organizations who continue to perform these necessary trainings stand to lose current funding, and be blacklisted from receipt of future federal funding—even if their government contracts have *nothing* to do with the training that the Executive Order prohibits.

## III.   THE BALANCE OF THE EQUITIES FAVORS PLAINTIFFS, AND AN INJUNCTION IS IN THE PUBLIC INTEREST.

The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," while paying "particular regard for the public consequences" of entering or withholding injunctive relief. *Winter*, 555 U.S. at 20, 24. When the government is the defendant, those inquiries merge, resulting in a balancing that turns on the public interest. *Nken v. Holder*, 556 U.S. 418, 435–36 (2009).

In addition to considering the demonstrated harm to the Plaintiffs, it is also in the public interest to permit Plaintiffs to continue to speak about the concepts that the Executive Order outlaws. The advocacy and training that the Executive Order prohibits facilitates the proper

delivery of health care and social services, something that the government ostensibly made no effort to consider. The communities Plaintiffs and their clients serve are often the most isolated from life-saving health care and social services, and vulnerable to abuse from law enforcement and other authorities. Without Plaintiffs' efforts to combat systemic racism, sexism, and anti-LGBT bias, more people will fall out of care, more will sicken, and more will face injustice at the hands of officials charged with protecting them.

The public interest in enjoining the Executive Order is even more apparent in the context of the COVID-19 pandemic, which has disproportionately impacted the communities that Plaintiffs and their clients serve. Cummings Decl. ¶ 5; Davis Decl. ¶¶ 20–21; Shanker Decl. ¶ 22; Riener Decl. ¶ 30; Meyer Decl. ¶ 18. Absent the trainings, marginalized people will fail to get tested, decline to take a vaccine when it becomes available, decline to participate in contact tracing, remain isolated, sicken, and even die. Davis Decl. ¶ 20; Riener Decl. ¶ 30; Meyer Decl. ¶ 18; Carpenter Decl. ¶¶ 17–19. "Proper staff training is one of the best ways" to reach and provide services to the population served by Plaintiff SAGE (LGBT older adults), who are particularly vulnerable to COVID-19 and the effects of isolation. Meyer Decl. ¶ 18. The secondary effects of providing training to engage with marginalized communities weigh even further in favor of a preliminary injunction. Shanker Decl. ¶ 14.

Plaintiffs also have demonstrated that the Executive Order infringes on their constitutional rights, which weighs in favor of awarding a preliminary injunction. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights") (quoting *Sammartano*, 303 F.3d at 974). This harm outweighs any government interest in immediate enforcement of the Executive Order.

Meanwhile, it is plain from the Executive Order's stated Purpose that the government's proffered interests are merely a facade for its dislike of the "divisive concepts" and its desire to avoid hard truths regarding racism and bias. The government claims that the "divisive concepts" could promote inefficiency and "divisiveness in the workplace and distract from the pursuit of excellence and collaborative achievements in public administration." *See* Executive Order, Sec. 1.

Yet, in the same breath, the government makes clear that these interests are pretense: it labels these concepts a "malign ideology" that it believes "misrepresent[s] our country's history," presenting "a different vision of America" that is "rooted in [] pernicious and false belief[s]." *Id*. In other words, the government's purported justification is just a restatement of its hostility to the speech it finds inconvenient. If that justification cannot withstand First Amendment scrutiny, neither can it be given any weight in balancing the interests at issue. Moreover, even if the Court *did* credit these explanations, there is no basis to believe that the government would be harmed if implementation were delayed pending the outcome of this lawsuit.

There will be immediate harm to Plaintiffs and their clients if the Executive Order is implemented, and in turn immediate harm to the communities that Plaintiffs and their clients serve. These harms are magnified in the context of the COVID-19 pandemic, and will generate significant adverse public health consequences. In contrast, there is no credible harm to the government if the Executive Order is delayed. Consideration of the relevant factors favors freezing the status quo pending final resolution of Plaintiffs' claims.

## IV.    THE COURT SHOULD ENTER A NATIONWIDE INJUNCTION.

"[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff." *E. Bay*, 909 F.3d at 1255 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). There is "no general requirement that an injunction affect only the parties in the suit." *Regents of the Univ. of Cal.*, 908 F.3d at 511 (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1169 (9th Cir. 1987)). Instead, "[a]n injunction may extend 'benefit or protection' to nonparties if such breadth is necessary to give prevailing parties the relief to which they are entitled." *E. Bay*, 909 F.3d at 1255 (internal quotation marks and citation omitted).

Nationwide relief is necessary to stop the significant harms described here. Plaintiffs are located throughout the country and serve widely dispersed populations. *See* Cummings Decl. ¶¶ 3–4; Papo Decl. ¶ 5; Meyer Decl. ¶¶ 3–4; Brown Decl. ¶¶ 1–2. Additionally, Plaintiffs will be deprived of complete relief if the injunction is limited to the parties because of the third parties that fund Plaintiffs or pay for trainings. Papo Decl. ¶¶ 6, 8–12; Shanker Decl. ¶ 20; Cummings

Decl. ¶ 8; Meyer Decl. ¶¶ 7–8, 11. An injunction limited to the parties will not prevent the harm Plaintiffs presented. *See California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018).

In particular, the work that Plaintiffs perform includes services provided pursuant to state, county, and local contracts and grants. If those public entities are required to comply with the Executive Order while Plaintiffs are not, the pass-through funding stream remains cut off. Similarly, Plaintiffs provide trainings to private third parties who receive federal funding, including contractors who would be forbidden from using any workplace training that they would otherwise offer through Plaintiffs, even if their relationship with the federal government has *nothing* to do with the trainings at issue. In both cases, the harms to the Plaintiffs and, more importantly, the communities that they and their clients serve and work to protect, would persist.

The Executive Order's harms have been, and will continue to be, deep and widespread, and are occurring across the country. An injunction limited to Plaintiffs will not remedy these harms. This Court can prevent these injuries by entering a nationwide preliminary injunction.

## CONCLUSION

The Court should preliminarily enjoin implementation of the Executive Order.

Respectfully,

/s/ Anne Johnson Palmer

Dated this 16th of November, 2020.

| | |
|---|---|
| JENNIFER C. PIZER (SBN 152327) | ANNE JOHNSON PALMER (SBN 302235) |
| *jpizer@lambdalegal.org* | *Anne.JohnsonPalmer@ropesgray.com* |
| LAMBDA LEGAL DEFENSE AND | ROPES & GRAY LLP |
| EDUCATION FUND, INC. | Three Embarcadero Center |
| 4221 Wilshire Boulevard, Suite 280 | San Francisco, CA 94111-4006 |
| Los Angeles, California 90010 | Telephone: (415) 315-6337 |
| Telephone: (213) 590-5903 | |
| | DOUGLAS HALLWARD-DRIEMEIER* |
| CAMILLA B. TAYLOR* | *Douglas.Hallward-* |
| *ctaylor@lambdalegal.org* | *Driemeier@ropesgray.com* |
| SCOTT A. SCHOETTES* | ROPES & GRAY LLP |
| *sschoettes@lambdalegal.org* | 2099 Pennsylvania Avenue, NW |
| LAMBDA LEGAL DEFENSE AND | Washington, DC 20006-6807 |
| EDUCATION FUND, INC. | Telephone: (202) 508-4776 |

65 E. Wacker Place, Suite 2000
Chicago, Illinois 60601
Telephone: (312) 663-4413

M. CURREY COOK*
*ccook@lambdalegal.org*
OMAR GONZALEZ-PAGAN*
*ogonzalez-pagan@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
   EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: (212) 809-8585

KAREN L. LOEWY*
*kloewy@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
   EDUCATION FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Telephone: (202) 804-6245

AVATARA SMITH-CARRINGTON*
*asmithcarrington@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
   EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, Texas 75219
Telephone: (214) 219-8585

KIRSTEN MAYER*
*Kirsten.Mayer@ropesgray.com*
JESSICA L. SOTO*
*Jessica.Soto@ropesgray.com*
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7753

ETHAN M. WEINBERG*
*Ethan.Weinberg@ropesgray.com*
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9688

*Counsel for All Plaintiffs*

*Admitted pro hac vice*

PLAINTIFFS' MOT. FOR NATIONWIDE PRELIMINARY INJUNCTION AND MEM. OF POINTS AND AUTHORITIES