JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BRAD P. ROSENBERG
CARLOTTA P. WELLS
Assistant Branch Directors

ZACHARY A. AVALLONE (SBN 295545)
ELLIOTT M. DAVIS
Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel:     (202) 514-2705
Fax:     (202) 616-8470
Email: zachary.a.avallone@usdoj.gov

Counsel for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| SANTA CRUZ LESBIAN AND GAY COMMUNITY CENTER d/b/a THE DIVERSITY CENTER OF SANTA CRUZ *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP *et al.*,<br><br>Defendants. | Case No. 5:20–cv–07741–BLF<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:   December 10, 2020<br>Time:   9:00 a.m.<br>Judge:  Hon. Beth Labson Freeman |

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND .......................................................................................................... 1

ARGUMENT .............................................................................................................. 5

I.      Plaintiffs Lack Standing To Challenge the Order ..................................... 5

II.     Plaintiffs Are Not Likely To Succeed on the Merits ............................... 10

        A.      Plaintiffs Have Not Demonstrated a First Amendment Violation ........ 10

        B.      The Executive Order Is Not Unconstitutionally Vague ........................ 15

III.    Plaintiffs Have Not Demonstrated Irreparable Harm ............................ 19

IV.     Public Interest Weighs Against an Injunction ......................................... 21

V.      A Nationwide Injuction of the Entire Order Is Inappropriate ............... 23

VI.     The Court Should Not Enjoin the President in Any Event ..................... 25

CONCLUSION ......................................................................................................... 25

i

# TABLE OF AUTHORITIES

**CASES**

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995) ................................................................................................ 8

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) ........................................................................................ 11, 12

*Agostini v. Felton*,
    521 U.S. 203 (1997) .............................................................................................. 18

*Alpha Delta Chi-Delta Chapter v. Reed*,
    648 F.3d 790 (9th Cir. 2011) ................................................................................ 10

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
    750 F.2d 1470 (9th Cir. 1985) ........................................................................ 20, 21

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) .......................................................................... 16, 17

*Board of County Commissioners v. Umbehr*,
    518 U.S. 668 (1996) .............................................................................................. 11

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos*,
    344 F. Supp. 3d 158 (D.D.C. 2018) ...................................................................... 19

*Calence, LLC v. Dimension Data Holdings, PLC*,
    222 F. App'x 563 (9th Cir. 2007) .................................................................... 12, 15

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) .............................................................................................. 23

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989) .............................................................................................. 22

*Cmty. House, Inc. v. City of Boise*,
    490 F.3d 1041 (9th Cir. 2007) .............................................................................. 18

*Connick v. Myers*,
    461 U.S. 138 (1983) .............................................................................................. 14

*CTIA - The Wireless Ass'n v. City of Berkeley*,
    928 F.3d 832 (9th Cir. 2019) ................................................................................ 20

*Edge v. City of Everett*,
    929 F.3d 657 (9th Cir. 2019) .......................................................................... 10, 15

ii

*Eliahu v. Israel*,
No. 14–cv–01636–BLF, 2015 WL 981517 (N.D. Cal. Mar. 3, 2015),
*aff'd*, 659 F. App'x 451 (9th Cir. 2016) .................................................................................... 16

*Faragher v. City of Boca Raton*,
524 U.S. 775 (1998) ........................................................................................................... 17

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ..................................................................................................... 13, 14

*Garcia v. Colvin*,
No. 14–cv–00870–BLF, 2014 WL 7146452 (N.D. Cal. Dec. 15, 2014) .................................. 6

*Gerber Prods. Co. v. Perdue*,
254 F. Supp. 3d 74 (D.D.C. 2017) ..................................................................................... 16

*Get Outdoors II, LLC v. City of San Diego, Cal.*,
506 F.3d 886 (9th Cir. 2007) ............................................................................................... 6

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007) ................................................................................................ 19

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ..................................................................................................... 15, 16

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ............................................................................................................. 18

*Johnson v. Poway Unified Sch. Dist.*,
658 F.3d 954 (9th Cir. 2011) ............................................................................................. 22

*Laird v. Tatum*,
480 U.S. 1 (1972) ............................................................................................................... 9

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001) ......................................................................................................... 13

*Lopez v. Brewer*,
680 F.3d 1068 (9th Cir. 2012) ............................................................................................. 5

*Lopez v. Candaele*,
630 F.3d 775 (9th Cir. 2010) ....................................................................................... 5, 8, 9

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ..................................................................................................... 5, 7, 9

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ......................................................................................................... 24

*Matter of Reyes*,
  910 F.2d 611 (9th Cir. 1990) .................................................................................... 23

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ..................................................................................... 10, 19

*McKenzie v. City of Chicago*,
  118 F.3d 552 (7th Cir. 1997) .................................................................................... 25

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999) ................................................................................................ 23

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1866) ................................................................................... 25

*Moran v. Washington*,
  147 F.3d 839 (9th Cir. 1998) .................................................................................... 14

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ............................................................................... 25

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................................ 21

*Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*,
  961 F.3d 1062 (9th Cir. 2020) .................................................................................. 14

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*,
  391 U.S. 563 (1968) ..................................................................................... 11, 13, 14

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ..................................................................................... 10, 11

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ................................................................................................ 10

*Raines v. Byrd*,
  521 U.S. 811 (1997) .................................................................................................. 5

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015) ................................................................................................ 10

*Regan v. Taxation With Representation of Wash.*,
  461 U.S. 540 (1983) ................................................................................................ 12

*Rhode Island v. Massachusetts*,
  37 U.S. (12 Pet.) 657 (1838) .................................................................................... 24

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995)...................................................................................... 13

*Rust v. Sullivan,*
  500 U.S. 173 (1991).............................................................................. 12, 13

*San Diego Cnty. Gun Rights Comm. v. Reno,*
  98 F.3d 1121 (9th Cir. 1996) ............................................................... 6, 7

*Snyder v. Phelps,*
  562 U.S. 443 (2011)...................................................................................... 10

*Stormans, Inc. v. Selecky,*
  586 F.3d 1109 (9th Cir. 2009) ............................................................... 21

*Texas v. Johnson,*
  491 U.S. 397 (1989)...................................................................................... 10

*Texas v. United States,*
  523 U.S. 296 (1998)........................................................................................ 8

*Twin Rivers Paper Co. LLC v. SEC,*
  934 F.3d 607 (D.C. Cir. 2019) ................................................................. 6

*United States v. Am. Library Ass'n, Inc.,*
  539 U.S. 194 (2003)...................................................................................... 12

*United States v. Bronstein,*
  849 F.3d 1101 (D.C. Cir. 2017) ............................................................. 18

*United States v. Mendoza,*
  464 U.S. 154 (1984)............................................................................. 24, 25

*United States v. Williams,*
  553 U.S. 285 (2008)...................................................................................... 17

*Waters v. Churchill,*
  511 U.S. 661 (1994)............................................................................. 11, 14

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)................................................................................ 5, 9, 21

*Yazzie v. Hobbs,*
  977 F.3d 964 (9th Cir. 2020) .................................................................. 5, 6

*Zepeda v. INS,*
  753 F.2d 719 (9th Cir. 1983) ................................................................... 25

v

**STATUTES**

20 U.S.C. § 1681 .................................................................................................... 22

28 U.S.C. § 511 ..................................................................................................... 15

40 U.S.C. § 101 ....................................................................................................... 2

40 U.S.C. § 121 ....................................................................................................... 2

42 U.S.C. § 2000d ................................................................................................. 22

42 U.S.C. § 2000e–5 ............................................................................................... 9

42 U.S.C. § 2000e-6 ............................................................................................... 9

**REGULATIONS**

28 C.F.R. § 0.50 ..................................................................................................... 9

Exec. Order No. 13950,
    85 Fed. Reg. 60,683 (Sept. 28, 2020) ............................................................... 2

Request for Information; Race and Sex Stereotyping and Scapegoating,
    85 Fed. Reg. 67,375 (Oct. 22, 2020) ................................................................. 3

**U.S. CONSTITUTION**

U.S. Const. art. II, § 2 ......................................................................................... 15

**OTHER AUTHORITIES**

Elizabeth Paluck & Donald Green, "Prejudice Reduction: What Works? A Review and
    Assessment of Research and Practice."
    Ann. Rev. Psych. 2009 ..................................................................................... 15

Frank Dobbin & Alexandra Kalev, "Why Diversity Programs Fail."
    *Harv. Bus. Rev.* (July-August 2016) ............................................................... 15

OFCCP, Executive Order 13950 – Combating Race and Sex Stereotyping (Oct. 7, 2020),
    https://www.dol.gov/agencies/ofccp/faqs/executive-order-13950 ........................... 18

**INTRODUCTION**

Plaintiffs' motion for preliminary injunction should be denied because it is overly broad, relies on incorrect legal standards, and ignores that Executive Order 13950 is carefully tailored to regulate *government* speech and government contractors—not private speech by citizens.  In these contexts, the federal government has the right to promote ideas it finds constructive and the corollary right to *discourage* ideas it believes are destructive.  Simply put, the government commits no constitutional violation when it declines to subsidize speech it disfavors, as it does in this Order.

The government in no way discounts the important work that many of the Plaintiffs perform in delivering care to members of historically underserved communities—which in part is why the government directly or indirectly provides financial support for some of their operations.  But Plaintiffs fail to explain how or why workplace training that incorporates race and sex stereotyping and scapegoating—as opposed to inclusive diversity training that does not perpetuate race or sex stereotypes—is necessary to their missions.  In fact, Plaintiffs do not demonstrate that their training even runs afoul of the Order.  Despite submitting over 100 pages of declarations, Plaintiffs fail to submit *any* training materials.  Instead, they tend to describe their training using indeterminate concepts like "intersectionality" and "cultural humility," which might very well be acceptable under the Order so long as that training does not incorporate race or sex stereotyping or scapegoating.  Plaintiffs' lack of details is fatal to their motion.

Plaintiffs' request to enjoin the entire Order on a nationwide basis is also overbroad because much of the Order has no impact on them at all.  The Order directs agencies to collect data, investigate existing training programs, and provide guidance for the Uniformed Services and agencies on what types of trainings are appropriate.  For federal grants, the Order simply asks federal agencies to collect data about existing grant programs that may—at some point in the future—have limits on how funds might be used.  As for federal contractors, the government has broad discretion to regulate its own contractor workforce to ensure efficiency.  The Order is constitutional and Plaintiffs' motion for a preliminary injunction should be denied.

**BACKGROUND**

On September 22, 2020, the President signed Executive Order 13950 "in order to promote

1

economy and efficiency in Federal contracting, to promote unity in the Federal workforce, and to combat offensive and anti-American race and sex stereotyping and scapegoating." Exec. Order No. 13950, 85 Fed. Reg. 60,683 (Sept. 28, 2020) (the "Order" or "EO"); *see* 40 U.S.C. §§ 101, 121(a) (the President has the power to "prescribe policies and directives . . . necessary to carry out" an "economical and efficient system for" procurement). The Order declares that "it shall be the policy of the United States not to promote race or sex stereotyping or scapegoating in the Federal workforce or in the Uniformed Services, and not to allow grant funds to be used for these purposes. In addition, Federal contractors will not be permitted to inculcate such views in their employees." EO § 1.

The Order expressly states that it "does not prevent agencies, the United States Uniformed Services, or contractors from promoting racial, cultural, or ethnic diversity or inclusiveness." *Id.* § 10(a). But training that "perpetuates racial stereotypes and division" has "no place in programs and activities supported by Federal taxpayer dollars." *Id.* § 1. To effectuate the policy, the Order issues distinct directives regarding (1) government training, (2) government information gathering, (3) review of federal grant programs, (4) government contracts, and (5) Title VII guidance.

*1. Government Training.* The Order prohibits the United States Uniformed Services from training its own members to believe certain defined "divisive concepts," and similarly directs heads of federal agencies to ensure that agency trainings of their own employees, whether provided by agency employees or contractors, do not teach the divisive concepts. *Id.* §§ 3, 6. As applied to government training, the term "divisive concepts" incorporates nine concepts, such as "one race or sex is inherently superior to another race or sex," "the United States is fundamentally racist or sexist," and "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously." *Id.* § 2(a).

The term "divisive concepts" also "includes any other form of race or sex stereotyping or any other form of race or sex scapegoating." *Id.* "Race or sex stereotyping" means "ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex." *Id.* § 2(b). And "race or sex scapegoating" means "assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their

2

race or sex" and also "encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others." *Id.* § 2(c). Nothing in the Order categorically prohibits training that incorporates concepts like "unconscious bias" or "intersectionality." The question is whether such training promotes a "divisive concept" like race or sex stereotyping or scapegoating, all as defined in the Order.

The Order further directs the Office of Personnel Management (OPM) to review and preclear any training programs that an agency wants to use relating to diversity or inclusion to ensure compliance with the Order. *Id.* § 7(a).

*2. Government Information Gathering.* The Order directs agencies to collect information about trainings that have been conducted within federal agencies and government contractors. Each agency must "report to OMB [the Office of Management and Budget] all spending in Fiscal Year 2020 on Federal employee training programs relating to diversity or inclusion." *Id.* § 7(c). Pursuant to the Order, the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) published a request for information about trainings provided by federal contractors. *Id.* § 4(c); "Request for Information; Race and Sex Stereotyping and Scapegoating," 85 Fed. Reg. 67,375 (Oct. 22, 2020) ("RFI").

*3. Review of Federal Grant Programs.* The Order directs agencies to "review their respective grant programs and identify programs for which [they] may . . . require the recipient to certify that it will not use Federal funds to promote" certain divisive concepts. EO § 5. Agencies must "submit a report to the Director of the [OMB] that lists all grant programs so identified." *Id.* The Order does not direct any changes to current or future grants or grant programs.

*4. Government Contracts.* The Order instructs agencies to include in most government contracts entered into after November 21, 2020, certain contractual language providing that during the performance of the contract, the contractor agrees "not [to] use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating." EO § 4(a)(1). The phrases "race or sex stereotyping" and "race or sex scapegoating" are defined as they are in the government-training section, and include all of the

3

divisive concepts except for the concept that "the United States is fundamentally racist or sexist." *Compare id. with id.* §§ 2(a)–(c). The Order also directs contractors to include the contractual language in certain subcontracts or purchase orders. *Id.* § 4(a)(4).

The Order's contractual language does not prevent the contractor or third parties from expressing divisive concepts or race or sex stereotypes to the contractor's employees in contexts other than workplace training, and it does not restrict employees from expressing their personal views in the workplace (though certain types of such expression could potentially violate other federal laws). Nor does the Order's contractual language restrict contractors or their employees from expressing their views outside of the workplace such as in public remarks, newspaper articles, social media, or *amicus* briefs.

The Order further directs the Department of Labor to set up a hotline to collect and investigate complaints alleging that a federal contractor uses training programs prohibited by the Order. *Id.* § 4(b).

*5. Title VII Guidance.* The Order instructs the Attorney General to "continue to assess the extent to which workplace training that teaches the divisive concepts . . . may contribute to a hostile work environment and give rise to potential liability under Title VII." *Id.* § 8. And the Attorney General and Equal Employment Opportunity Commission are, if appropriate, to "issue publicly available guidance" related to compliance with Title VII of the Civil Rights Act of 1964. *Id.*

\*     \*     \*

Plaintiffs are providers of healthcare and other services to the LGBT community, and a consultancy that trains law enforcement. Compl. ¶¶ 1–6, Dkt. 1. Plaintiffs train their employees and the staffs, and, in doing so, they allegedly "provide information that staff members and officials need in order to prevent and address discrimination against the populations they serve, including information about how systemic racism and implicit bias contribute to health disparities, mortality, and disproportionate criminalization." *Id.* ¶ 7. On November 2, 2020, Plaintiffs filed their Complaint, alleging that the Order violates the First and Fifth Amendments. *See* Compl. On November 16, 2020, Plaintiffs moved for a nationwide preliminary injunction of the entire Order. Pls.' Mot. for Prelim. Inj., Dkt. 51 ("Mot.").

1

**ARGUMENT**

2
Plaintiffs are not entitled to a preliminary injunction because they have not demonstrated

3
standing and because they fail every element of the preliminary-injunction test.  "At th[e]

4
preliminary injunction stage," Plaintiffs "*must* make a clear showing of *each element* of standing."

5
*Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (per curiam) (emphases added, citation

6
omitted).  "A plaintiff seeking a preliminary injunction must [also] establish that he is likely to

7
succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

8
relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

9
*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Plaintiffs, in other words, must

10
prevail on *every* preliminary-injunction element before the Court may grant their motion.

11
Plaintiffs have neither demonstrated standing nor carried their heavy burden of "clear[ly]

12
showing" their entitlement to the "extraordinary and drastic remedy" of a preliminary injunction.

13
*Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).  Their motion should be denied.

14
**I.       PLAINTIFFS LACK STANDING TO CHALLENGE THE ORDER**

15
The "irreducible constitutional minimum of standing contains three elements": (1) an

16
"injury in fact—an invasion of a legally protected interest which is concrete and particularized"

17
and "actual or imminent, not conjectural or hypothetical"; (2) a "causal connection between the

18
injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative,

19
that the injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

20
560–61 (1992) (citations and quotation marks omitted).  To be sure, the standing analysis is

21
somewhat more "relaxed" in the context of a First Amendment pre-enforcement challenge, *Lopez*

22
*v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010), but even in that context Plaintiffs still carry the

23
"burden of making a clear showing of injury in fact," *id.* at 788.  And where, as here, "reaching

24
the merits of [a] dispute would force [a court] to decide whether an action taken by one of the other

25
two branches of the Federal Government was unconstitutional," the "standing inquiry [is]

26
especially rigorous."  *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

27
Plaintiffs have made no serious effort to carry their "especially rigorous" burden: the single

28
paragraph that they dedicate to their purported injuries, Mot. at 10–11, does not begin to satisfy

5

their burden to "clearly show" a concrete, particularized, and imminent injury that can be traced to the Order and is likely to be redressable by a favorable decision.  *Yazzie*, 977 F.3d at 966.  "Because standing must be shown in the same way as other issues . . . the ordinary rules of forfeiture apply to standing."  *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 615 (D.C. Cir. 2019) (internal citation omitted); *see also id.* ("Those rules include the basic precept that arguments generally are forfeited if raised for the first time in reply.").  The Court "is not required to comb the record"—here, 111 pages of declarations—to develop a standing argument on Plaintiffs' behalf.  *Garcia v. Colvin*, No. 14–cv–00870–BLF, 2014 WL 7146452, at *5 (N.D. Cal. Dec. 15, 2014) (Freeman, J.) (citation omitted); *cf. id.* ("'[J]udges are not like pigs, hunting for truffles buried in briefs.'"); Standing Order § IV(H) (concerning "lengthy documents").

In all events, Plaintiffs lack standing to challenge any of the Order's distinct parts.  A party has "standing to challenge only those provisions that appl[y] to it."  *Get Outdoors II, LLC v. City of San Diego, Cal.*, 506 F.3d 886, 892 (9th Cir. 2007).  Plaintiffs plainly lack standing to challenge the portions of the Order that direct the government to gather information, review federal grant programs, provide guidance, and ensure appropriate training of agency employees.  Although the provisions adding language to new government contracts perhaps come closer to the mark, even there Plaintiffs fail to demonstrate how their alleged harms are concrete, particularized, and imminent; fairly traceable; and redressable.

*1. Government Training.*  Plaintiffs lack standing to challenge the directives that relate to the government's own training.  *See* EO §§ 3, 6.  Plaintiffs' injury paragraph, Mot. at 10–11, does not identify a single upcoming federal-agency training session, put on by a Plaintiff, that is likely to be canceled because of the Order.  Plaintiffs argue that a government entity canceled a webinar series aimed at government employees, *see* Mot. at 10; Decl. of H. Meyer ¶ 14, Dkt. 51–8, but where, as here, "plaintiffs seek declaratory and injunctive relief only . . . it is insufficient for them to demonstrate only a past injury."  *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996).  Rather, Plaintiffs must "show a very significant possibility of future harm."  *Id.*  And "[a]lthough 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III

1   purposes—that the injury is '*certainly* impending.'" *Lujan*, 504 U.S. at 564 n.2 (emphasis in
2   original). Plaintiffs have not "clearly shown" any "certainly impending" injury related to training
3   government employees. Instead, they identify only past (and mostly vague and unspecific) injuries
4   that cannot be redressed by prospective relief, and generalized "concern[s]" about speculative
5   future injuries that are too hypothetical for standing purposes. Mot. at 10–11. None of this "clearly
6   shows" that Plaintiffs have standing.

7           Nor can Plaintiffs demonstrate that some hypothetical future training cancellation is
8   traceable to the Order or certain to be redressed by an injunction. Even if the Court were to grant
9   Plaintiffs all the relief they seek and enjoin the Order in its entirety, nothing would stop agencies
10   from cancelling trainings as they did before the Order issued, *see, e.g.*, Compl. ¶ 93, or force the
11   government to hire any of these Plaintiffs to train the federal workforce on divisive concepts.

12           *2. Government Information Gathering.* Plaintiffs have no standing to challenge the
13   information-gathering directed by the Order. Plaintiffs ask the Court to prevent the government
14   from conducting "reviews of agency spending on diversity and inclusion programs," Proposed
15   Order, § 1(d), Dkt. 51-10, publishing "further Requests for Information ('RFI') that seek
16   comments, information, or materials from federal contractors, subcontractors, and their
17   employees," *id.* § 1(f), and "review[ing] any materials provided to any federal agency or employee
18   pursuant to any existing RFI," *id.* But nowhere do Plaintiffs assert any imminent injury-in-fact
19   traced to these directives or explain how enjoining those directives would redress any harm.

20           *3. Review of Federal Grant Programs.* Although "the policy of the United States"
21   is "not to allow grant funds to be used" "to promote race or sex stereotyping or scapegoating,"
22   EO § 1, the Order does not direct any changes to existing or future grants. All the Order does is
23   direct the heads of agencies to identify and report grant programs for which the agency may, as a
24   condition of receiving a grant, require the recipient to certify that it will not use federal funds to
25   promote certain of the divisive concepts. *Id.* § 5.

26           Here too, Plaintiffs have not clearly "show[n] a very significant possibility of future harm."
27   *San Diego Cnty. Gun Rights Comm.*, 98 F.3d at 1126. And further, the reports of identified grant
28   programs were due "[w]ithin 60 days of the date of this order"—that is, by November 21, 2020.

EO § 5.  That date has passed.  Plaintiffs have not explained how any supposed harm caused by the identification and reporting of grant programs could be redressed.  Plaintiffs also have no standing to challenge the hypothetical harm that some as-yet-undetermined federal grants might contain a restriction in the future.  *See also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.").  Plaintiffs fail this standard twice over.  First, they have not identified *any* federal grants that are in immediate and certain danger of being restricted.  Second, none of the Plaintiffs identifies any of its own grants or grant applications that will contain restrictions on how funds may be used.  And to the extent that Plaintiffs speculate that their federal grants might be restricted in the future, those claims are not ripe.

   *4.  Government  Contractors.*  As the government-contractor provision operates prospectively, EO § 9, the pertinent question is whether Plaintiffs "ha[ve] made an adequate showing that sometime in the relatively near future [they] will bid on another Government contract," *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995), or that they will be a subcontractor to a rebidding federal contractor.  Plaintiffs have made no such showing.

   Even if they could, they still would not have standing because, in the First Amendment pre-enforcement context, they "must still show an actual or imminent injury to a legally protected interest."  *Lopez*, 630 F.3d at 786.  Plaintiffs must clearly show, *inter alia*: (1) that there is "a reasonable likelihood that the government will enforce the" Order's contractual language against them, and (2) "with some degree of concrete detail, that they intend to violate" that provision.  *Id.*

   As to the first *Lopez* element, Plaintiffs do not assert that the government has specifically threatened any of them with enforcement.  The Ninth Circuit has explained that, even in the First Amendment context, "general threats by officials to enforce those laws which they are charged to administer"—like the general language in the Order that noncompliance with the contractual provision may be subject to enforcement—"do not create the necessary injury in fact."  *Id.* at 787 (citation and alteration marks omitted).  And "'allegations of a subjective chill'"—like those leveled in Plaintiffs' injury paragraph, Mot. at 10–11—"'are not an adequate substitute for . . . a threat of specific future harm.'"  *Lopez*, 630 F.3d at 787 (quoting *Laird v. Tatum*, 480 U.S. 1, 13–

14 (1972)).   Plaintiffs may be "'concerned about funding streams,'" for example, Mot. at 10 (quoting one Plaintiff), but the Ninth Circuit's "inquiry into injury-in-fact does not turn on the strength of plaintiffs' concerns about a law, but rather on the credibility of the threat that the challenged law will be enforced *against them*." *Lopez*, 630 F.3d at 792 (emphasis added).

Nor have Plaintiffs "articulate[d] a 'concrete plan' to violate" the Order's government-contractor provision.   *Id.* at 787.   Plaintiffs have not identified any concrete, imminent plans to provide workplace training containing race or sex stereotyping or scapegoating to a government contractor *after* that contractor enters into a new federal contract with the Order's now-required language.   Two Plaintiffs claim that their training clientele include federal contractors, but only "[u]pon information and belief," Decl. of S. Papo, ¶ 11, Doc. 51–1; Decl. of A. Shanker, ¶ 20, Doc. 51–4—hardly the "clear showing" that Plaintiffs must make at the preliminary-injunction stage.   To the extent that some Plaintiffs wish to provide training to federal contractors bound by the Executive Order at some point in the future, "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require." *Lujan*, 504 U.S. at 564 (emphasis in original).

*5. Title VII Guidance*.   Plaintiffs ask the Court to enjoin the Attorney General from "continu[ing] to assess the extent to which workplace training that teaches the divisive concepts set forth in" the Executive Order "may contribute to a hostile work environment and give rise to potential liability under Title VII of the Civil Rights Act of 1964."   EO § 8; *see* Proposed Order, §§ 1(c), (h).   But Plaintiffs do not explain how the Attorney General's mere *assessment* of a law that the Department of Justice enforces in part, *see* 42 U.S.C. §§ 2000e–5, 2000e–6; 28 C.F.R. § 0.50(a), (b), could possibly injure them.   If that were the case, any plaintiffs could show harm by demonstrating that the Department of Justice has analyzed a law that might apply to them.   That is plainly absurd.   Plaintiffs here cannot have standing based on such an ethereal "injury"—especially in light of the possibility that the Attorney General may well determine that workplace trainings with divisive concepts may not give rise to Title VII liability.

In sum, Plaintiffs have not shown that they have standing to challenge any part of the Order.

1    **II.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS**

2          "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be

3    granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v.*

4    *Armstrong*, 520 U.S. 968, 972 (1997) (internal quotes and citations omitted; emphasis in original).

5    And a "'[l]ikelihood of success on the merits is the most important factor.'"  *Edge v. City of*

6    *Everett*, 929 F.3d 657, 663 (9th Cir. 2019).  "'[I]f a movant fails to meet this threshold inquiry, [a

7    court] need not consider the other factors.'"  *Id.*

8          A.     Plaintiffs Have Not Demonstrated a First Amendment Violation

9          Plaintiffs' motion for preliminary injunction relies on the wrong First Amendment legal

10   standard.   Plaintiffs' proposed most-exacting-scrutiny standard for "content based regulation"

11   relies on cases where the government has criminalized, blocked, or imposed civil liability for

12   speech.  *See Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 797 (9th Cir. 2011) (plaintiffs

13   claimed that public university "excluded them from an expressive forum on the basis of their

14   religious viewpoint, in violation of their free speech rights"); *R.A.V. v. City of St. Paul*, 505 U.S.

15   377, 380 (1992) (striking down ordinance that provided criminal penalties for engaging in certain

16   types of speech like cross-burning); *Snyder v. Phelps*, 562 U.S. 443, 461 (2011) (holding that First

17   Amendment "shield[s] Westboro from tort liability for its picketing" of a service member's

18   funeral); *Texas v. Johnson*, 491 U.S. 397, 399 (1989) (reversing criminal conviction for flag

19   burning); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 159 (2015) (striking down a sign

20   ordinance).  But none of those cases is on point.

21         Less scrutiny applies to the government's regulation of its own speech and that of its

22   employees and contractors.  Indeed, the First Amendment does not even apply to regulations of

23   the government's own training because "[t]he Free Speech Clause . . . does not regulate

24   government speech."  *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).  Further,

25   although the Order itself places no restrictions on grants, even if the government were in the future

26   to implement the policy of not "allow[ing] grant funds to be used" to promote divisive concepts,

27   *see* EO § 1, the government would be entitled to do so, as long as any speech restrictions do not

28   extend beyond the scope of the grant program.  *See Agency for Int'l Dev. v. All. for Open Soc'y*

*Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("*USAID*").   As to government-contractor speech, the appropriate standard is not, as Plaintiffs argue, the unconstitutional-conditions doctrine.   Mot. at 15 (citing *USAID*, 570 U.S. at 214).   Instead, the Supreme Court squarely held in *Board of County Commissioners v. Umbehr* that restrictions on government-contractor speech are governed by the *Pickering* balancing test.   518 U.S. 668, 672–73 (1996) (holding that "the *Pickering* balancing test, adjusted to weigh the government's interests as contractor rather than as employer, determines the extent of their protection") (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)).   While the "government cannot restrict the speech of the public at large just in the name of efficiency, . . . where the government is employing someone [or contracting] for the very purpose of effectively achieving its goals, such restrictions may well be appropriate." *Waters v. Churchill*, 511 U.S. 661, 675 (1994).   Plaintiffs have not shown that they are likely to succeed on their First Amendment claim, especially since they do not even identify or rely on the correct legal frameworks.

　　　　*1. Government Training*.   Plaintiffs cannot assert a First Amendment claim based on the government's training of its own employees.   "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove*, 555 U.S. at 467.   "A government entity has the right to speak for itself, [i]t is entitled to say what it wishes, and to select the views that it wants to express." *Id.* at 467–68 (quotation marks and citations omitted).   In this context, the government has the freedom to choose the content of its own trainings—and that right does not change just because the government sometimes hires third parties to conduct those trainings.   "A government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message." *Id.* at 468.   Plaintiffs cannot dictate the government's message and thus have no First Amendment claim arising from the government's own training.

　　　　*2. Government Information Gathering*.   Plaintiffs do not argue that the government's mere collection of information about agency and contractor trainings violates the First Amendment, and they would have no basis to challenge this information gathering in any event.   Plaintiffs have waived any argument that the collection of information violates the First Amendment. *See*

1  *Calence, LLC v. Dimension Data Holdings, PLC*, 222 F. App'x 563, 566 (9th Cir. 2007).

2  *3. Grant Recipients.* The Order does not restrict how grant recipients may use their funds.

3  The Order simply instructs agencies to "*review* their respective grant programs and *identify*

4  programs for which the agency may, as a condition of receiving a grant, require the recipient to

5  certify that it will not use Federal funds to promote" certain of the divisive concepts.  EO § 5

6  (emphases added).  The Order directs agencies to submit the compiled lists to the OMB Director.

7  *Id.*  Plaintiffs do not explain how the mere review and identification of certain grant programs

8  could violate the First Amendment.

9  Even if agencies eventually require grant recipients to certify that federal funds will not be

10  used to promote certain divisive concepts, that future restriction would be constitutional because

11  the government has broad authority to place conditions on how grant recipients use federal funds.

12  *USAID*, 570 U.S. at 214.  "As a general matter, if a party objects to a condition on the receipt of

13  federal funding, its recourse is to decline the funds. This remains true when the objection is that a

14  condition may affect the recipient's exercise of its First Amendment rights."  *Id.* (citing *United*

15  *States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 212 (2003) and *Regan v. Taxation With*

16  *Representation of Wash.*, 461 U.S. 540, 546 (1983)).  "The Government can, without violating the

17  Constitution, selectively fund a program to encourage certain activities it believes to be in the

18  public interest, without at the same time funding an alternative program which seeks to deal with

19  the problem in another way."  *Rust v. Sullivan*, 500 U.S. 173, 193 (1991).

20  When a grant condition compels or prohibits a grantee's speech "outside the scope of the

21  federally funded program," it violates "the First Amendment and cannot be sustained."  *USAID*,

22  570 U.S. at 219 & 221.  But when "regulations [do] not 'prohibit the recipient from engaging in

23  the protected conduct outside the scope of the federally funded program,' they [do] not run afoul

24  of the First Amendment."  *Id.* at 217 (quoting *Rust*, 500 U.S. at 193).  The Supreme Court, for

25  example, upheld regulations that prohibited the use of Title X funds in any program where

26  "abortion is a method of family planning" because "when the Government appropriates public

27  funds to establish a program it is entitled to define the limits of that program."  *Rust*, 500 U.S. at

28  193–94.  Those limitations did not violate the First Amendment because they did not "prohibit[]

12

the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Id.* at 197.  While there are some limits to this principle, they do not apply here.  *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001) (condition on funding for legal services violated separation of powers when it blocked attorneys from challenging constitutionality of statutes); *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995) (when government funds a limited public forum, conditions cannot discriminate based on viewpoint). Here, the Order declares that "the policy of the United States" is that "grant *funds*" should not be used to promote race or sex stereotyping or scapegoating.  EO § 1 (emphasis added).  Per *USAID* and *Rust*, a future restriction limited to the use of grant funds would pass constitutional muster.

*4. Government Contractors.* The government's power to regulate its contractors' speech is broader than its power to regulate grant recipients' speech and is generally coextensive with its power over the speech of federal employees.  *See Umbehr*, 518 U.S. at 673.  When analyzing First Amendment challenges made by government contractors, courts are required to strike a "balance between the interests of the [government contractor], in commenting upon matters of public concern and the interest of the State, . . . in promoting the efficiency of the public services it performs through its [contractors]."  *Pickering*, 391 U.S. at 568; *Umbehr*, 518 U.S. at 673.

The *Pickering* balancing test proceeds in two steps: first, a court must determine "whether the [contractor] spoke as a citizen on a matter of public concern"—if it does not, there is no "First Amendment cause of action" and the inquiry ends.  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). But even if it does, the government "has broader discretion to restrict speech when it acts in its role as employer"—or as a contractor—"but the restrictions it imposes must be directed at speech that has some potential to affect the [contractor's] operations."  *Id.*; *Umbehr*, 518 U.S. at 673.

The Court need not proceed past the first *Pickering* step.  The restrictions on government contractors are limited to their employee trainings—the Order does not regulate contractors' expressions outside of employee trainings, or any speech outside the workplace.  *See* EO § 4(a)(1). An employee "d[oes] not act as a citizen when . . . conducting his daily professional activities." *Garcetti*, 547 U.S. at 422.  The same principles apply to employee trainings.  *Umbehr*, 518 U.S. at 673.  A deputy district attorney, for example, does not act as a citizen when he writes an internal

memo as part his job.  *See Garcetti*, 547 U.S at 423.  But a teacher acts as a citizen when she submits a letter to the editor of a local newspaper criticizing a proposed tax increase because writing a letter to the editor is outside of her employment duties.  *See Pickering*, 391 U.S. at 568. Plaintiffs' reliance on *Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020), *see* Mot. at 13, is misplaced because that case involves regulation of a vocational school open to the public—not a government agency or contractor training its own employees.  Limits on government contractors' trainings cannot violate the First Amendment because when contractors train their own employees they are not acting as "citizen[s]" speaking "on matters of public concern."  *Garcetti*, 547 U.S. at 417.  And nothing in the Order prohibits government contractors or their employees from expressing views outside of workplace trainings.

Even if internal trainings could be considered speech by "citizen[s]" on "matters of public concern," Plaintiffs' First Amendment claim still fails *Pickering*'s second step.  The constitutionality of a restriction on a government contractor's speech depends on balancing the expressive interests at stake against the government's "legitimate interests as contractor." *Umbehr*, 518 U.S. at 680, 685; *see also Connick v. Myers*, 461 U.S. 138, 143–51 (1983).  "[T]he *very point* of the *Pickering* balancing test is to weigh the value of the speech that causes the disruption against the harm of the disruption that is caused, either directly or indirectly, by the speech."  *Moran v. Washington*, 147 F.3d 839, 848 (9th Cir. 1998) (emphasis in original).

The Order explains that trainings that promote race or sex stereotyping or scapegoating are disruptive.  "[I]n executing the *Pickering* balance, courts should not require government employers to demonstrate that . . . speech actually disrupted efficient office operation; rather, 'reasonable predictions of disruption' are sufficient."  *Id.* at 846 (citing *Waters*, 511 U.S. at 673).  The Order concludes that "blame-focused diversity training reinforces biases and decreases opportunities for minorities."  EO § 1.  It further explains that "participation of contractors' employees in training that promotes race or sex stereotyping or scapegoating similarly undermines efficiency in Federal contracting" and that "[s]uch requirements promote divisiveness in the workplace and distract from the pursuit of excellence and collaborative achievements in public administration."  *Id.*; *see, e.g.*, Frank Dobbin & Alexandra Kalev, "Why Diversity Programs Fail." *Harv. Bus. Rev.* (July-

14

August 2016) ("people often respond to compulsory courses with anger and resistance—and many participants actually report more animosity toward other groups afterwards"); Elizabeth Paluck & Donald Green, "Prejudice Reduction: What Works? A Review and Assessment of Research and Practice." Ann. Rev. Psych. 2009; 60:339–67 (trainings that categorize individuals are "often enough to create prejudice").  Under the *Pickering* standard, the Order's reasonable predictions of disruption from trainings that include race and sex stereotyping or scapegoating suffice to outweigh Plaintiffs' claimed expressive interests in continuing workplace trainings that promote such stereotyping and scapegoating.

    *5. Title VII Guidance*.  Plaintiffs do not articulate any First Amendment challenge to the Order's instructions regarding Title VII guidance in either their complaint or motion for preliminary injunction.  *See* Mot. at 5 (describing EO § 8); Compl. ¶ 78 (same).  As a result, Plaintiffs have waived any arguments that these directives violate the First Amendment.  *See Calence*, 222 F. App'x at 566.  And enjoining these provisions would (1) violate the Opinions Clause, which empowers the President to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices," U.S. Const., art. II, § 2, cl. 1, and (2) fly in the face of the Attorney General's statutory duty to "give his advice and opinion upon questions of law when required by the President," 28 U.S.C. § 511; *see also* 28 C.F.R. § 0.50(b), (f).

    B.    <u>The Executive Order Is Not Unconstitutionally Vague</u>

    Plaintiffs are not likely to succeed on their claim that the Order violates the Due Process Clause.  The Due Process Clause requires that laws "'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly'" and "'provide explicit standards for those who apply them.'"  *Edge*, 929 F.3d at 664–65 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

    Plaintiffs have no legitimate concerns about subjecting themselves to "potential penalty," Mot. at 18, when training federal employees.  The Order provides that agency heads must ensure that "contractors hired by the agency to provide training . . . to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts

listed in section 2(a) of" the Order.  EO § 6(a)(i).  But even assuming *arguendo* that certain of the divisive concepts are vague, the Order does not place the burden of "discern[ing]," Mot. at 17, the contours of permissible federal-agency training on Plaintiffs.  Rather, the Order provides that "all training programs for agency employees relating to diversity or inclusion shall, before being used, be reviewed by OPM for compliance with the requirements of section 6."  EO § 7(a).  In the context of federal-agency training, Plaintiffs will not lack for "fair warning as to what" federal-agency training "falls within the Executive Order's prohibitions," Mot. at 12, because OPM will review any such training for compliance "before being used."  EO § 7(a).

Plaintiffs' due-process challenge to the Order's government-contractor provisions, EO § 4(a), or hypothetical future grant conditions, *id.* § 5, is similarly misguided.  As a threshold matter, Plaintiffs do not purport to have made any effort to inquire—formally or otherwise—about the contours of any contractual or grant terms that they believe to be ambiguous.  The OFCCP's October 22, 2020, RFI explained that "[f]ederal contractors and subcontractors questioning whether their workplace trainings, workshops, or similar programs are compliant with Executive Order 13950 or Executive Order 11246 are encouraged to voluntarily submit information and materials in response to this request for information."  85 Fed. Reg. at 67,377.  And OFCCP pledged to "provide compliance assistance as requested to Federal contractors and subcontractors that voluntarily submit such information or materials."  *Id.*  "If a plaintiff can easily remedy . . . purported harm by seeking clarification from an agency, but has not done so, then the plaintiff cannot claim to suffer from an injury in fact for purposes of standing."  *Gerber Prods. Co. v. Perdue*, 254 F. Supp. 3d 74, 81 (D.D.C. 2017).  After all, "[a] plaintiff cannot sustain Article III standing based on injuries that are self-inflicted."  *Eliahu v. Israel*, No. 14–cv–01636–BLF, 2015 WL 981517, at *8 (N.D. Cal. Mar. 3, 2015) (Freeman, J.), *aff'd*, 659 F. App'x 451 (9th Cir. 2016).

In all events, Plaintiffs' due-process claim will likely fail on the merits.  "Due process does not require impossible standards of clarity."  *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (citation omitted).  The Supreme Court has recognized that "we can never expect mathematical certainty from our language."  *Grayned*, 408 U.S. at 110.  "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *United States v.*

1    *Williams*, 553 U.S. 285, 304 (2008).

2       The Order's contractual language and the potential future grant conditions are not vague.

3 The contractual language provides that contractors "shall not use any workplace training that

4 inculcates in its employees any form of race or sex stereotyping or any form of race or sex

5 scapegoating." EO § 4(a)(1). It further defines "race or sex stereotyping" and "race or sex

6 scapegoating" in objective terms. "The term 'race or sex stereotyping' means ascribing character

7 traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an

8 individual because of his or her race or sex, and the term 'race or sex scapegoating' means

9 assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race

10 or sex." *Id.* If that were not sufficiently clear, the contractual language provides eight examples

11 of such stereotyping and scapegoating (which examples may, at some indeterminate future time,

12 constitute restrictions in certain grant programs, *see* EO § 5). These terms are far more definite

13 than the statute at issue in *Arce*, which barred school districts from holding classes that, *inter alia*,

14 "'[p]romote resentment toward a race or class of people'" or "'[a]dvocate ethnic solidarity instead

15 of the treatment of pupils as individuals.'" 793 F.3d at 973 (quoting Ariz. Rev. Stat. § 15–112(A)).

16 "[I]n light of the statute's purpose to reduce racism in schools," the Ninth Circuit held that "the

17 phrases here in issue sufficiently give notice as to what conduct is prohibited and do not inherently

18 invite arbitrary enforcement." *Id.* at 988. *See also id.* at 988–89.

19       Plaintiffs proffer several so-called examples of vagueness, but they all lack merit. *First*,

20 Plaintiffs argue that the contractual language in part "defines the prohibited conduct based on how

21 a listener might react." Mot. at 16; *see also id.* at 17 ("it is an independent constitutional violation

22 to specifically *define* the prohibition based on the listener's reaction"). Even assuming this were

23 somehow fatal, *but see, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (subjective

24 offensiveness is an element of a Title VII hostile-work-environment claim), Plaintiffs misread the

25 Order. The Order plainly states that one example of race or sex stereotyping or scapegoating is

26 the *concept* that "any individual should feel discomfort, guilt, anguish, or any other form of

27 psychological distress on account of his or her race or sex." EO § 4(a)(1)(g). In other words,

28 contractors bound by this language are precluded from inculcating into employees the concept that

they *should* feel distressed on account of their race or sex—it does not depend on listener reaction.

    *Second*, Plaintiffs argue that OFCCP's guidance about unconscious bias or implicit bias training is unclear. Mot. at 16. It is not. As the guidance explains, such training "is prohibited to the extent it teaches or implies that an individual, *by virtue of his or her race, sex, and/or national origin*, is racist, sexist, oppressive, or biased, whether consciously or unconsciously." *See* OFCCP, Executive Order 13950 – Combating Race and Sex Stereotyping (Oct. 7, 2020), https://www.dol.gov/agencies/ofccp/faqs/executive-order-13950) ("OFCCP Guidance") (emphasis added). But it is not prohibited if such training "is designed to inform workers, or foster discussion, about pre-conceptions, opinions, or stereotypes that people—*regardless of their race or sex*—may have regarding people who are different, which could influence a worker's conduct or speech and be perceived by others as offensive." *Id.* (emphasis added). Plaintiffs contend that "[t]he boundary between the two is impossible to assess," Mot. at 16, but in reality, the boundary is clear: the question turns on whether training teaches that individuals' beliefs and opinions are necessarily defined by their race or sex. And if Plaintiffs have any questions, OFCCP has offered compliance assistance.

    *Third*, Plaintiffs complain that the word "inculcate" is "undefined." Mot. at 16. To be sure, the word "may not roll off the average person's tongue," *United States v. Bronstein*, 849 F.3d 1101, 1108 (D.C. Cir. 2017), but that does not render it unconstitutionally vague. "Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid." *Id.* at 1107. The word "inculcate" is readily defined in standard dictionaries and, in fact, has been a familiar element of the Supreme Court's Establishment Clause jurisprudence. *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 223 (1997) ("As we have repeatedly recognized, government inculcation of religious beliefs has the impermissible effect of advancing religion."); *see also Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1056 (9th Cir. 2007) ("The Supreme Court uses 'indoctrination' synonymously with 'inculcation.'"). It can hardly be deemed unconstitutionally vague.

    *Fourth*, Plaintiffs profess confusion about "what activities qualify as a 'workplace training.'" Mot. at 16. But this strained contention is belied by Plaintiffs' own use of the phrase,

1    reinforcing that it is not unconstitutionally vague. *See* Decl. of A. Riener, ¶ 24, Dkt. No. 51–6

2    ("Workplace training . . . is especially crucial for our staff . . . ."); Decl. of W. Carpenter, ¶ 7, Dkt.

3    51–9 ("Workplace training . . . is especially crucial for all of our staff, including for me . . . .").

4    *Cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 22 (2010) ("[P]laintiffs themselves have

5    repeatedly used the terms 'training' and 'expert advice' throughout this litigation to describe their

6    own proposed activities, demonstrating that these common terms readily and naturally cover [their]

7    conduct."). And to the extent there is any doubt, OFCCP stands ready to help.

8        *Finally*, Plaintiffs argue that they do not know "what it means to suggest that the United

9    States is 'fundamentally' racist or sexist." Mot. at 16. But that concept applies only to the

10   Uniformed Services and federal-agency provisions of the Executive Order, *see* EO §§ 2(a), 3,

11   6(a)(i)—and is not among the concepts prohibited by the Order's contractual language or potential

12   future grant conditions. *See id.* §§ 4(a), 5 (specifically omitting that prong of the "divisive

13   concepts" definition). Plaintiffs cannot level a constitutional-vagueness challenge to a provision

14   that does not, and could not, apply to them.

## III.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

16        Even if Plaintiffs had clearly shown a likelihood of success on the merits (and they have

17   not), the Court should still deny their motion because Plaintiffs fail to establish that they are "likely

18   to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20 (clarifying

19   that plaintiffs must show something more than just a possibility). Plaintiffs "must demonstrate

20   that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative,

21   but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to

22   resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)

23   (citation omitted). "And what is at issue here is not even a defendant's motion for summary

24   judgment, but a plaintiff's motion for preliminary injunctive relief, as to which the requirement for

25   substantial proof is *much higher*." *Mazurek*, 520 U.S. at 972.

26        Here, Plaintiffs fail this test for all the same reasons that they fail to establish standing:

27   they cannot show that they will suffer any imminent and certain injury. Indeed, Plaintiffs' burden

28   to show irreparable harm is "more demanding" than their burden to show standing. *Cal. Ass'n of*

*Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018); *see Mazurek*, 520 U.S. at 972.  As explained above, Plaintiffs fail to allege any harm arising from most of the Order. And although they make generalized claims about provisions related to grants and contracts, they fail to identify any applicable contract or grant that will contain the challenged restrictions.

Plaintiffs attempt to side-step their rigorous burden by claiming that "[i]rreparable harm is relatively easy to establish . . . by demonstrating a colorable First Amendment claim."  Mot. at 18 (citing *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019)).  But Plaintiffs here have not made out a colorable First Amendment claim—as shown, their arguments rely on the wrong legal standards—and, just as Plaintiffs' own lead case explains, their "mere assertion of First Amendment rights does not automatically require a finding of irreparable injury." *CTIA*, 928 F.3d at 851 (finding that irreparable harm "has not been established here").  As explained above, the government's proposed restrictions on its own trainings, use of grant funds, and the training of its contractors are permitted under the First Amendment.

Plaintiffs have also failed to show how the Order will compromise their missions and operations.  Mot. at 19–20.  They claim that the Order will impact Plaintiffs' ability "to deliver high quality and culturally competent health care and services."  *Id.* at 20.  But their motion lacks necessary details.  They tiptoe around the issue by representing that their trainings incorporate indeterminate concepts like "implicit bias," "cultural humility," and "intersectionality" that may not run afoul of the Order.  But do Plaintiffs' workplace trainings all include race or sex stereotyping or scapegoating as defined in the Order?  And if so, do they necessarily need to perpetuate such scapegoating and stereotyping in their trainings to accomplish their missions? Plaintiffs never answer these crucial questions.  And the Court has no way to answer them because Plaintiffs failed to attach any of their training materials.  Plaintiffs cannot demonstrate irreparable harm based on vague notions that they are "chilled" from providing training that they have not even shared with the government or the Court.  In fact, amici prove Defendants' point: they also claim that their training includes abstract concepts like "systemic racism" and "anti-racis[m]," Dkt. 58-1 at 8, and yet they "do not believe they are violating any aspect of the Order," *id.* at 11.

Plaintiffs also fail to show how the Order will cause them irreparable financial harm.  As

1   cases cited by Plaintiff hold, "[m]onetary damages are not usually sufficient to establish irreparable

2   harm." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473–74 (9th Cir.

3   1985). While an actual "threat of being driven out of business is sufficient to establish irreparable

4   harm," "sustain[ing] large losses" and "forecast[ing] large losses" are not enough unless the losses

5   are so severe as to "threaten[] . . . extinction." *Id.* at 1474. Plaintiffs claim to be "concerned about

6   funding streams," have "held meetings to discuss ways that funding will have to be rerouted,"

7   "expedited [] planned trainings," and decided not to include certain content in a curriculum. Mot.

8   at 10–11. These concerns do not show that any of Plaintiffs' funding is at *imminent* risk—much

9   less that they face actual and imminent danger of "being driven out of business." Mot. at 20–21.

10      Plaintiffs' alleged harm from an unnamed sponsor that supposedly "felt" compelled to pull

11   funding also does not reflect irreparable harm that could be redressed by an injunction because

12   that claimed harm was not caused by the Order. The AIDS Foundation of Chicago claims that

13   before a conference in October an unidentified sponsor "*felt* compelled by the Executive Order to

14   pull close to $6,000 in federal funding." Decl. of A. Davis, Dkt. 51-2, ¶ 22 (emphasis added). Left

15   unsaid is whether this sponsor was even a federal grantee or a contractor, but in all events, nothing

16   in the Executive Order actually compelled any entity to withdraw funding in October 2020, given

17   that the relevant provisions of the Executive Order had not yet taken effect. EO §§ 5, 9.

18      With regard to prospective harm, Plaintiffs do not identify even a single federal contract or

19   grant that (1) incorporates the Order's restrictions, and (2) will *actually* impair their operations.

20   Without this evidence, at most Plaintiffs advance an abstract "possibility of irreparable injury."

21   *Nken v. Holder*, 556 U.S. 418, 434 (2009). But, as the Supreme Court has emphasized, the

22   "'possibility' standard is too lenient" a basis upon which to issue the drastic remedy of a

23   preliminary injunction. *Winter*, 555 U.S. at 22. Given that irreparable harm is an indispensable

24   element, *id.*, the mere theoretical possibility of future harm does not suffice.

25   **IV.   PUBLIC INTEREST WEIGHS AGAINST AN INJUNCTION**

26      When a plaintiff seeks an injunction against the federal government, the balance-of-

27   equities and public-interest factors "merge." *Nken*, 556 U.S. at 435. "The plaintiffs bear the initial

28   burden of showing that the injunction is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d

21

1109, 1139 (9th Cir. 2009).  Plaintiffs have not carried their burden.

The government has a fundamental right to speak to its own workforce.  "[T]he government has the right to speak for itself" and "[w]hen it does, it is *entitled* to say what it wishes . . . and to select the views that it wants to express."  *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 975 (9th Cir. 2011) (emphasis added, citation omitted).  The United States—which enforces multiple statutes that prohibit race and sex discrimination in housing, voting, education, and employment, among other contexts—has a strong interest in *not* perpetuating race and sex stereotypes within its own workforces.  There should be no dispute about that.

The government similarly owes a duty to the public to ensure "that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (plurality opinion).  Recipients of federal funds, for example, are generally prohibited from discriminating on the basis of race, color, sex, or national origin.  *See* 20 U.S.C. § 1681(a); 42 U.S.C. § 2000d.

Against the government's weighty public interest in combating race and sex stereotyping, Plaintiffs argue that inculcating race and sex stereotyping in the federal and contracting workforces through workplace training is somehow necessary "to combat systemic racism, sexism, and anti-LGBT bias."  Mot. at 22.  Again, the government does not in any way intend to discredit Plaintiffs' work.  But the Order does not, as Plaintiffs put it, "prohibit[] diversity trainings."  *Id.* at 15.  Quite the opposite: the Order explicitly provides that it "does *not* prevent agencies, the United States Uniformed Services, or contractors from promoting racial, cultural, or ethnic diversity or inclusiveness"—so long as race or sex stereotyping and scapegoating is not part of the workplace training.  EO § 10(a) (emphasis added).  Plaintiffs have not sufficiently explained why race and sex stereotyping is so integral to their workplace trainings such that training on topics like implicit or unconscious bias that do not rely on generalized race or sex stereotypes—which is entirely permissible under the Order, *see* OFCCP Guidance—will somehow cause people to "sicken, and even die."  Mot. at 22.

Plaintiffs also overstate the Order's reach.  Nothing in the Order prohibits Plaintiffs from "continu[ing] to speak about the concepts" described in the Order.  *Id.* at 21.  Even if Plaintiffs

were to enter into a federal contract governed by the Order's contractual language, Plaintiffs would remain free to inculcate race and sex stereotypes into their own workforces (if not otherwise prohibited by law)—just not in the narrow context of workplace trainings during the performance of that contract.   And Plaintiffs remain free to advocate for race and sex stereotyping and scapegoating—just not in trainings directed to the federal workforce, or to federal contractors governed by the Order's contractual language.

Finally, Plaintiffs have not demonstrated "immediate harm." Mot. at 23.  The organization Plaintiffs have presumably been training their own workforces for years.  Even crediting for the sake of argument the notion that race and sex stereotyping and scapegoating is necessary to deliver the care that they provide, it is not plausible that allowing the Order to remain in effect through the ordinary course of this litigation will cause recipients of such training, like Plaintiff Ward Carpenter, to immediately start disserving their patient populations.

Put simply, the public's interest in combating race and sex stereotyping in the federal and contractor workforces far outweighs Plaintiffs' competing interest in performing workplace trainings that further race and sex stereotypes and scapegoating.

## V.   A NATIONWIDE INJUNCTION OF THE ENTIRE ORDER IS INAPPROPRIATE

Plaintiffs' request to enjoin the entire Order is impermissibly broad.  "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  If this Court finds that Plaintiffs are entitled to a preliminary injunction, it should limit the scope to the actual provisions of the Order that impact Plaintiffs, and should limit injunctive relief to the named plaintiffs in this case.

Any injunctive relief should be limited to the provisions of the Order at issue in this case because the Order is severable.  Courts apply the traditional test for severability to executive orders: "[u]nless it is evident that the [President] would not have enacted those provisions which are within [his] power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Matter of Reyes*, 910 F.2d 611, 613 (9th Cir. 1990); *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) (applying standards to an executive order).  The Order makes this analysis easy: the President included a severability

clause in the Order, clearly indicating that he would have enacted the provisions independently. Order § 10(c).  So if the Court decides to enjoin a portion of the Order, the rest must stand.

Plaintiffs' motion, for example, provides no basis for this Court to enjoin the government from reviewing agency spending, reviewing government training, or providing guidance to agencies about federal government training.  *See* Proposed Order, §§ 1(d) & (e).  Plaintiffs likewise make no argument why the Court should block the government from publishing RFIs seeking information about existing workplace trainings or reviewing information already provided.  *Id.* § 1(f).  If the Court determines, for example, that Plaintiffs are entitled to an injunction related to the Order's directive to add terms to government contracts, then any injunction should be crafted narrowly to enjoin only Section 4(a), and nothing more.

A nationwide injunction would also be inappropriate because its relief would extend beyond the parties to this case.  The Supreme Court has long interpreted the equitable power of Article III courts as the power "to render a judgment or decree upon the rights of the litigant parties" consistent with the exercise of such powers at common law or in English courts of equity. *See Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 718 (1838).  And the Court has recognized the "general rule"—rooted in traditional equitable principles—that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).

A nationwide injunction is also inappropriate in this case because it would unnecessarily impact related litigation pending in another court.  *See Nat'l Urban League, et al. v. Trump*, 20–cv–3121 (D.D.C. filed Oct. 29, 2020) (similarly challenging the Order).  The Supreme Court notes that "[g]overnment litigation frequently involves legal questions of substantial public importance," and allowing one court to issue a definitive ruling against the government "would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue.  Allowing only one final adjudication would deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari." *United States v. Mendoza*, 464 U.S. 154, 160 (1984).  When considering the similar practice of nonmutual offensive collateral estoppel, the Supreme Court

24

1   declared that doctrine "does not apply against the government in such a way as to preclude

2   relitigation of issues." *Id.* at 162.  Instead, in recognition that "the [g]overnment is not in a position

3   identical to that of a private litigant," *id.* at 159 (internal citation omitted), the government should

4   be afforded the opportunity to press its case in different courts and against different plaintiffs.  The

5   same principle applies to nationwide injunctions.

6        A nationwide injunction also ignores the existing rules designed to ensure orderly

7   resolution of disputed legal issues that impact many parties.  The federal rules already provide a

8   specific mechanism for large numbers of similarly situated persons to pursue relief efficiently: the

9   class action system.  *See McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997) ("Because

10  a class has not been certified, the only interests at stake are those of the named plaintiffs. . . . A

11  wrong done to plaintiff in the past does not authorize prospective, class-wide relief unless a class

12  has been certified. Why else bother with class actions?"); *Zepeda v. INS*, 753 F.2d 719, 727, 729

13  n.1 (9th Cir. 1983) (holding that "the injunction must be limited to apply only to the individual

14  plaintiffs unless the district judge certifies a class of plaintiffs," because "[plaintiffs] are not

15  entitled to relief for people whom they do not represent. If this elementary principle were not true,

16  there would be no need for class actions.").  Class action rules have safeguards in place that are

17  faithful to the constitutional limits on judicial power and that protect the interests of all parties.

18       To the extent the Court awards any injunctive relief (and it should not), that relief should

19  be narrowly tailored to the parties in this case and the provisions actually challenged.

20  **VI.    THE COURT SHOULD NOT ENJOIN THE PRESIDENT IN ANY EVENT**

21       Finally, the Court lacks power to enjoin the President.  "With regard to the President, courts

22  do not have jurisdiction to enjoin him." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010).

23  Indeed, the Supreme Court has long recognized that federal courts cannot exercise authority over

24  the President's discretionary policy judgments. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475,

25  501 (1866) (the judicial branch has "no jurisdiction of a bill to enjoin the President in the

26  performance of his official duties").

27                          **CONCLUSION**

28       Plaintiffs' motion for a preliminary injunction should be denied.

DATED:  November 25, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BRAD P. ROSENBERG
CARLOTTA P. WELLS
Assistant Branch Directors

*/s/ Zachary A. Avallone*
ZACHARY A. AVALLONE (SBN 295545)
ELLIOTT M. DAVIS
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel:     (202) 514-2705
Fax:     (202) 616-8470
Email: zachary.a.avallone@usdoj.gov

*Counsel for Defendants*