ANNE JOHNSON PALMER (SBN 302235)
*Anne.JohnsonPalmer@ropesgray.com*
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315-6337

DOUGLAS HALLWARD-DRIEMEIER*
*Douglas.Hallward-Driemeier@ropesgray.com*
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Telephone: (202) 508-4776

KIRSTEN MAYER*
*Kirsten.Mayer@ropesgray.com*
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7753

JENNIFER C. PIZER (SBN 152327)
*jpizer@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, California 90010
Telephone: (213) 590-5903

CAMILLA B. TAYLOR*
*ctaylor@lambdalegal.org*
SCOTT A. SCHOETTES*
*sschoettes@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
65 E. Wacker Place, Suite 2000
Chicago, Illinois 60601
Telephone: (312) 663-4413

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

-------------------------------------------------------------- X

SANTA CRUZ LESBIAN AND GAY COMMUNITY
CENTER, et al.,

                                    *Plaintiffs*,

        v.

DONALD J. TRUMP, et al.,

                                    *Defendants*.

-------------------------------------------------------------- X

: Case No. 5:20-CV-07741-BLF
:
: **PLAINTIFFS' REPLY IN**
: **SUPPORT OF MOTION FOR**
: **NATIONWIDE PRELIMINARY**
: **INJUNCTION**
:
: Hearing Date: December 10, 2020
:
: Hearing Time: 9:00 A.M.
:
: Judge: Hon. Beth Labson Freeman
:
: Trial Date: None Set

# **TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 1

I.   DEFENDANTS FAIL TO GRAPPLE WITH, AND THUS FAIL TO DEFEND, THE MOST PROBLEMATIC FEATURES OF THE EXECUTIVE ORDER. ................. 1

II.  PLAINTIFFS HAVE STANDING TO CHALLENGE THE EXECUTIVE ORDER. ............................................................................................................................ 4

III. THE EXECUTIVE ORDER'S CHILLING EFFECTS AND AMBIGUITY CLEARLY VIOLATE THE FIRST AND FIFTH AMENDMENTS. ............................. 8

     A.   Defendants Misstate the Applicable Level of Scrutiny, and Erroneously Argue that Plaintiffs Can Be Regulated as If They Were Government Employees. .................................................................................................... 8

     B.   Defendants Fail to Explain the Order's Unconstitutional Ambiguities and Propose Resolving Them Via Prior Restraint. ...................................... 12

IV. THE CONSTITUTIONAL VIOLATIONS AND HARM TO MISSIONS AND OPERATIONS CONSTITUTE IRREPARABLE HARM. ............................................ 14

V.  THE PUBLIC INTEREST FAVORS AN INJUNCTION. ............................................ 14

VI. A NATIONWIDE INJUNCTION IS NECESSARY. .................................................... 15

CONCLUSION ...................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agency for Intern. Development v. Alliance for Open Society Intern., Inc.*,
  570 U.S. 205 (2013)................................................................................................9

*Barone v. City of Springfield, Oregon*,
  902 F.3d 1091 (9th Cir. 2018) ...........................................................................10

*Board of Comm'rs, Wabaunsee Cty. v. Umbehr*,
  518 U.S. 668 (1996).....................................................................................10, 11

*California Pro-Life Council, Inc. v. Getman*,
  328 F.3d 1088 (9th Cir. 2003) ..............................................................................5

*E. Bay Sanctuary Covenant v. Trump*,
  950 F.3d 1242 (9th Cir. 2020) ...........................................................................15

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006).....................................................................................10, 11

*Hunt v. City of Los Angeles*,
  638 F.3d 703 (9th Cir. 2011) ..............................................................................12

*Legal Services Corporation v. Velazquez*,
  531 U.S. 533 (2001)...................................................................................... 9, 10

*Long Beach Area Peace Network v. City of Long Beach*,
  574 F.3d 1011 (9th Cir. 2009) ...........................................................................13

*Lopez v. Candaele*,
  630 F.3d 775 (9th Cir. 2010) ................................................................................6

*Nat'l Urban League, et al. v. Trump*,
  20–cv–3121 (D.D.C. filed Oct. 29, 2020)..........................................................15

*Nebraska Press Ass'n v. Stuart*,
  427 U.S. 539 (1976)............................................................................................13

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*,
  391 U.S. 563 (1968)................................................................................10, 11, 12

*Pool v. VanRheen*,
  297 F.3d 899 (9th Cir. 2002) ........................................................................10, 11

*Posey v. Lake Pend Oreille Sch. Dist. No. 84*,
     546 F.3d 1121 (9th Cir. 2008) ................................................................10

*Raines v. Byrd*,
     521 U.S. 811 (1997).................................................................................4, 5

*Rankin v. McPherson*,
     483 U.S. 378 (1987).................................................................................11, 12

*Susan B. Anthony List v. Driehaus*,
     573 U.S. 149 (2014).................................................................................5

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
     425 U.S. 748 (1976).................................................................................6

*Wolfson v. Brammer*,
     616 F.3d 1045 (9th Cir. 2010) ................................................................5

**Constitutional Provisions, Statutes, and Rules**

U.S. Constitution First Amendment.................................................................... *passim*

U.S. Constitution Fifth Amendment .................................................................8, 12

**Other Authorities**

American Psychological Association, *Summary of Psychological Research and
     Science of Diversity Training* (Nov. 11, 2020), https://bit.ly/2HRQ9MG.............................12

Executive Order 13950 – Combatting Race and Sex Stereotyping, Office of
     Federal Compliance Programs (Oct. 7, 2020),
     https://www.dol.gov/agencies/ofccp/faqs/executive-order-13950 .................................. *passim*

Dismas Locaria & Krista A. Nunez, *Despite Industry Concern and Questionable
     Legality, DOL Moves Forward with Efforts to Implement Racial Sensitivity
     Training Prohibition,* VENABLE LLP (Oct. 9, 2020), https://bit.ly/33M0TUP .......................4

Off. of Mgmt. & Budget, Exec. Off. of the President, OMB M-20-37 (Sept. 28,
     2020) ........................................................................................................3, 9

Press Release, U.S. DEP'T OF LABOR, *U.S. Department of Labor Launches Hotline
     to Combat Race and Sex Stereotyping by Federal Contractors* (Sept. 28,
     2020), https://bit.ly/33vm7Gb.................................................................................3

**INTRODUCTION**

Defendants' Opposition amounts to an elaborate exercise in sleight of hand: the Administration attempts to define concepts at the heart of Plaintiffs' work—"implicit bias," "systemic racism," and "White privilege"—as "race and sex stereotyping and scapegoating," while Defendants assert that, unless Plaintiffs admit to engaging in loathsome "stereotyping and scapegoating," they have no standing to challenge Executive Order 13950, 85 FR 60683 (Sept. 22, 2020) (the "Executive Order" or "Order"). *See, e.g.*, Defs.' Opp. to Pls.' Mot. for Prelim. Inj., ECF No. 68, at 7–9 ("Opposition" or "Opp."). The law does not support this gamesmanship. First Amendment jurisprudence does not require a silenced party to accept the government's pejorative labels before challenging a speech restriction. Nor does the First Amendment allow the government to use categories like "contractor" and "grantee" to leverage its vast spending to silence disfavored speech. Finally, Defendants' strained contention that Plaintiffs lack standing because they have *already* been harmed by the Executive Order turns standing doctrine on its head.

Plaintiffs cover a broad range of entities chilled by the Executive Order—government grantees, government contractors, and/or suppliers of diversity training to such grantees and contractors. They have detailed the immediate harms that they are already suffering and will continue to suffer as a consequence of the Executive Order. *See* Pls.' Mot. for Nationwide Prelim Inj., ECF No. 51, at 10–11 ("Pls.' Mot."). And Plaintiffs have shown that they are likely to prevail on their argument that the Executive Order's restrictions on expression extend far beyond the government's own speech, lack a compelling governmental interest, and, due to vagueness (an independent constitutional defect), chill more speech than could possibly be justified. For the same reasons, Plaintiffs have established the remaining factors for a nationwide injunction.

**ARGUMENT**

**I.   DEFENDANTS FAIL TO GRAPPLE WITH, AND THUS FAIL TO DEFEND, THE MOST PROBLEMATIC FEATURES OF THE EXECUTIVE ORDER.**

Defendants' Opposition paints the Executive Order in broad strokes, and fails to engage with, let alone defend, its most pernicious and problematic features.

First, rather than acknowledge the full list of "divisive concepts" banned by the Executive Order, *see* Executive Order, Sec. 2, Defendants frame the Order as limited to "race and sex stereotyping and scapegoating." *See, e.g.*, Opp. at 1, 9, 13, 14, 15, 20, 22. But the list of "divisive concepts" is fundamental to the Executive Order. It purposefully uses this phrase to lump together views that Plaintiffs actively work to combat—such as the inherent superiority of one race or sex, or that an individual should receive adverse treatment because of race or sex, Executive Order, Sec. 2(a)(1), (4)—with concepts that are critical to overcoming our nation's history of discrimination on the basis of race, gender, and sexual orientation. The Executive Order appears to prohibit advancing the view that "systemic racism" has resulted from the country's history of slavery, segregation, red-lining, over-criminalization, and pervasive discrimination (*i.e.*, that "the United States is fundamentally racist," Sec. 2(a)(2)); that White Americans are unaware of their own privilege and biases, unconsciously developed through deep-seated racism and discrimination in our culture (*i.e.*, "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously," Sec. 2(a)(3)); or that race, sexuality, and gender are so fundamental to our identity and experience—including our experience of racism and sexism—that failing to acknowledge them and their impact on our interactions is itself a form or racism or sexism (*i.e.*, "members of one race or sex cannot and should not attempt to treat others without respect to race or sex," Sec. 2(a)(5)). By labeling these nuanced concepts that are key to understanding and overcoming racism and sexism as forms of "stereotyping and scapegoating," the Opposition repeats the most pernicious features of the Executive Order. This sleight of hand permeates the Opposition, from its erroneous assertion that Plaintiffs lack standing because they have not self-characterized their future training programs as "containing race or sex stereotyping or scapegoating," Opp. at 9, to its attempt to justify the Order on the theory that "race or sex stereotyping or scapegoating are disruptive," Opp. at 14, to its offensive suggestion that Plaintiffs have failed to show irreparable harm because they have not proved "they necessarily need to perpetuate such scapegoating and stereotyping in their trainings to accomplish their missions," Opp. at 20.

The Opposition ignores that Defendants have already begun to implement the Executive Order in a manner that fully validates Plaintiffs' concerns regarding its breathtaking sweep. For example, in announcing the establishment of the Department of Labor ("DOL") hotline, Defendants stated the Order "is effective immediately." Press Release, U.S. DEP'T OF LABOR, *U.S. Department of Labor Launches Hotline to Combat Race and Sex Stereotyping by Federal Contractors* (Sept. 28, 2020), https://bit.ly/33vm7Gb. And the Office of Management & Budget ("OMB") implementing memorandum (which Defendants do not acknowledge) instructs agencies to undertake a "keyword search" of grantees' training materials for terms like "'critical race theory,' 'white privilege,' 'intersectionality,' 'systemic racism,' 'positionality,' 'racial humility,' and 'unconscious bias.'" Off. of Mgmt. & Budget, Exec. Off. of the President, OMB M-20-37 (Sept. 28, 2020) ("Memorandum M-20-37"). Plaintiffs explicitly use these concepts to address racism, sexism, and anti-LGBT discrimination in their trainings. *See, e.g.*, Brown Decl. ¶¶ 12, 14; Carpenter Decl. ¶ 7; Meyer Decl. ¶¶ 12–13; 16–17; Riener Decl. ¶¶ 11, 24, 28–30.[1] By utilizing these terms to identify prohibited trainings—terms *not* listed in the Order itself—OMB's Memorandum has caused grantees and contractors to cease trainings that employ these concepts, *see*, *e.g.*, Brown Decl. ¶ 19—precisely the purpose of the Order and Memorandum.

More generally, the Opposition erroneously treats the Executive Order's call for efforts to gather information and review training materials as though they are divorced from the broader scheme to silence disfavored speech. *See* Opp. at 3, 7, 11–12. But the Opposition fails to acknowledge that gathering information through Requests for Information, the Department of Labor's hotline, and agency review of training materials is for the *express purpose* of cutting off funding or conditioning its receipt on relinquishing the right to engage in prohibited speech. M-20-37 makes this clear, as agencies are directed to "look at all Federal grant and cooperative agreement programs, not just those for the purposes of providing training," and to include conditions on awards that preclude the use of funds for promoting the "divisive concepts," even through research. *See* Memorandum M-20-37. The launch of the hotline has been a particular

---

[1] Plaintiffs' Reply utilizes the same abbreviations as set forth in its opening Motion.

source of concern for Plaintiffs and other federal funds recipients because "the OFCCP is already inviting Federal contractors, subcontractors, and their employees to file complaints based on *existing* gender and race training programs." Dismas Locaria & Krista A. Nunez, *Despite Industry Concern and Questionable Legality, DOL Moves Forward with Efforts to Implement Racial Sensitivity Training Prohibition*, Venable LLP (Oct. 9, 2020), https://bit.ly/33M0TUP (emphasis added); *see also* Shanker Decl. ¶ 23. These investigative steps *in and of themselves* chill speech by compelling those who would discuss the "divisive concepts" to moderate their expression, thereby facilitating the Executive Order's goal of silencing speech.

## II.   PLAINTIFFS HAVE STANDING TO CHALLENGE THE EXECUTIVE ORDER.

The Opposition mischaracterizes the relevant legal precedent in order to increase Plaintiffs' burden to demonstrate standing. And Defendants try to put Plaintiffs in an impossible Catch-22, faulting them for highlighting trainings that have *already* been cancelled while ignoring the relevance of these harms to demonstrating a *likelihood* that similar trainings will also be cancelled. Citing easily distinguishable fact patterns, Defendants also suggest that the Motion's detailed account over the course of five pages (Pls.' Mot. 7–11) of the specific harms they have already suffered and expect to continue to suffer—supported by extensive citations to specific paragraphs of supporting affidavits—is akin to asking the Court to "comb the record" in search of harm. Opp. at 6. That does not remotely describe Plaintiffs' Motion and supporting Declarations, which firmly establish that Plaintiffs have standing to challenge the Executive Order.[2]

To start, Defendants misstate the standard to establish standing. Defendants assert that the "standing inquiry [is] especially rigorous" when "decid[ing] whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *See* Opp. at 5 (quoting

---

[2] The cases Defendants cite, Opp. at 5–6, could hardly be more different. In *Twin Rivers Paper Co. LLC v. SEC*, the petitioner failed to submit *any* individual affidavits in support of its vague petition. 934 F.3d 607, 615 (D.C. Cir. 2019). And in *Garcia v. Colvin*, the plaintiff gave no specific citations to the 544-page administrative record. No. 14–cv–00870–BLF, 2014 WL 7146452, at *5 (N.D. Cal. Dec. 15, 2014).

*Raines v. Byrd*, 521 U.S. 811, 819–20 (1997)). But *Raines* concerned the inapposite question of legislative standing, which implicated separation-of-powers concerns. 521 U.S. at 820. "[I]n the context of First Amendment claims," by contrast, courts have "applied the requirements of ripeness and standing *less stringently*." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (citation omitted) (emphasis added). As the Ninth Circuit has recognized, "the Supreme Court has dispensed with rigid standing requirements" for First Amendment claims: "In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances . . . ." *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) (internal quotation marks and citation omitted). Plaintiffs easily satisfy that standard.

Defendants are also mistaken to suggest that Plaintiffs must concede that they "plan[] to provide workplace training containing race or sex stereotyping or scapegoating" to a government contractor. Opp. at 9. As the Supreme Court has made clear, "[n]othing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014). To the extent Defendants are complaining that Plaintiffs failed to identify specific grants or contracts subject to the Executive Order, or specific trainings that would be implicated, that contention is belied by the detailed evidence Plaintiffs have submitted in their Declarations and summarized in their Motion.

First, each Declaration extensively details the sources of Plaintiffs' public funding, whether direct or indirect. *See, e.g.*, Cummings Decl. ¶ 8 (funding from or through, *inter alia*, the Centers for Disease Control and Prevention ("CDC"), the Dep't of Veterans Affairs ("VA"), the Health Resources and Services Administration ("HRSA"), National Institutes of Health ("NIH"), the Ryan White Comprehensive AIDS Resources Emergency Act ("Ryan White Act"), and the CARES Act). Moreover, Defendants ignore Plaintiffs' assertion that they provide trainings *to* federal contractors and grantees (and sub-contractors and sub-grantees), and that the Executive Order works to restrict would-be listeners from engaging Plaintiffs to hear their speech. *See, e.g.*, Shanker Decl. ¶ 20 ("Bradbury-Sullivan Center has provided recent trainings for staff at: school

districts, such as the Allentown, Central York, Interior, Quakertown, Pennsridge, and Reading School Districts; university and colleges, such as Penn State University, Penn State College of Medicine, and Muhlenberg College; and state and local governmental agencies, such as the Pennsylvania Department of Health, Pennsylvania Housing Finance Agency, City of Allentown Health Bureau, and Erie County Department of Health."); Brown Decl. ¶ 2 (training and consulting clients include law enforcement and other state and local agencies); Papo Decl. ¶ 11 ("The Diversity Center has trained a local sheriff's department, a child welfare agency, students and staff at research universities, and over 500 health care workers at major medical institutions"). *See also* Carpenter Decl. ¶¶ 7, 13, 21; Cummings Decl. ¶ 10; Meyer Decl. ¶ 11. "[W]here a speaker exists . . . the [First Amendment] protection afforded is to the communication, to its source and to its recipients both." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). Given the ubiquitous nature of federal funding for state and local governments, higher learning institutions, and health care providers, there is no need for Plaintiffs to specify particular provisions in individual contracts to satisfy standing requirements. *See, e.g.*, Brief of 8 Institutions of Higher Education as Amici Curiae in Supp. of Pls.' Mot. for a Preliminary Inj., ECF No. 69, at 4–9 (detailing federal research grants and contracts).

Defendants also mischaracterize the law by suggesting that Plaintiffs must show a reasonable likelihood that the government will enforce the Executive Order against them individually before they can bring a pre-enforcement action to a speech ban. Opp. at 8–9 (quoting *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010)). *Lopez* specifically held that Plaintiffs "themselves *need not* be the direct target of government enforcement," and noted that courts "have considered a government's preliminary efforts to enforce a speech restriction or its past enforcement of a restriction to be strong evidence . . . that pre-enforcement plaintiffs face a credible threat of adverse state action." 630 F.3d at 786–87 (emphasis added). As to the second aspect of *Lopez*, Plaintiffs need only provide sufficient "details about their future speech" that "a court need not speculate." *Id*. at 787 (internal quotation marks and citation omitted). These requirements are easily satisfied here, where Plaintiffs have alleged that their speech has *already been chilled* by

the cancellation of trainings by government contractors and grantees who fear losing their funding if they offer their employees the trainings Plaintiffs provide, the content of which Plaintiffs have clearly set forth in their Motion and Declarations.

All Plaintiffs have provided sufficient details as to their injuries, including examples of cancelled engagements, lost revenues, and moderation or silencing of their speech. *See* Pls.' Mot. at 10–11 (citations omitted). Their Declarations establish that they expect these types of injuries to continue and to threaten their missions, operations, funding, and revenues. *See, e.g.*, Meyer Dec. ¶ 14 ("SAGE's Senior Director of National Projects was scheduled to participate in a webinar series focused on supporting the needs of diverse populations of older veterans [but] pointing to the Executive Order and the two related OMB memos, the Office of Rural Health instructed that the webinar series could not be held as scheduled."); Shanker Decl. ¶ 20 ("entities in Pennsylvania . . . have canceled or sought to excise content from diversity and inclusion trainings as a direct result of the Executive Order"); Papo Decl. ¶ 12 (explaining concern of loss of funding if "an attendee at a training could call the DOL hotline and lodge a complaint simply because the attendee does not like the anti-racist message of a training" as well as concern that clients "now are more reluctant to seek our trainings for their employees for fear of being deemed noncompliant with the Executive Order and losing their own federal funding."); Brown Decl. ¶ 23 ("[Training] participants will utilize the hotline to shut down information they don't want to hear and, as collateral damage, end my business and eliminate my livelihood."). *See also* Cummings Decl. ¶¶ 11, 12, 19; Riener Decl. ¶ 19. Likewise, the Declarations are clear as to the content of Plaintiffs' intended speech, providing extensive detail as to the types of trainings that Plaintiffs provide, the concepts those trainings incorporate, and the importance of providing trainings regarding those concepts. *See, e.g.*, Riener Decl. ¶¶ 11–13 ("[I]t is absolutely necessary that our staff receive training on systemic racism, sexism and implicit bias as these concepts relate to health care disparities for the patients we serve."); Davis Decl. ¶¶ 14–16 ("Structural racism is at the heart of the disparities that AFC witnesses . . . . Trainings cover a broad array of topics; including . . .

LGBTQ+ cultural competency."). *See also* Brown Decl. ¶¶ 12, 15–19; Cummings Decl. ¶¶ 9–10; Meyer Decl. ¶¶ 6–7; 11–13, 16–17; Papo Decl. ¶¶ 9–10; Shanker Decl. ¶¶ 10, 12, 19, 21.

Defendants also contend that Plaintiffs cannot challenge certain portions of the Executive Order, namely those involving information gathering and review of grant programs. Opp. at 6–7. But, as noted, those provisions must be viewed in the context of the scheme as a whole. The collection and review of training materials are the first steps to implement the Executive Order and to silence speech through the termination of federal funding. As surely was their intent, these initial steps have *already* begun to chill speech by causing recipients of federal funding to cancel trainings so that their essential funding streams will not be put at risk. The government cannot evade review of a speech ban through the simple expedient of taking "implementing" steps that cause speakers and listeners to self-censor before full enforcement efforts are brought to bear.

## III.   THE EXECUTIVE ORDER'S CHILLING EFFECTS AND AMBIGUITY CLEARLY VIOLATE THE FIRST AND FIFTH AMENDMENTS.

Plaintiffs are likely to succeed on the merits of their challenges to the Executive Order on both First and Fifth Amendment grounds.

### A.   Defendants Misstate the Applicable Level of Scrutiny, and Erroneously Argue that Plaintiffs Can Be Regulated as If They Were Government Employees.

Plaintiffs demonstrated that a most-exacting-scrutiny standard should be applied here because the Executive Order is a content-based regulation. Pls.' Mot. at 14–15. In response, Defendants attempt to establish that a less demanding standard should apply because, in Defendants' view, Plaintiffs are effectively government employees whose speech the government can control as *de facto* employer. *Id.* at 10–15. This framing cannot be reconciled with First Amendment jurisprudence, which makes clear that the government cannot use its funding as leverage to coerce recipients into limiting their own speech outside a governmental program. The Executive Order violates that central principle of First Amendment law.

***Grantees***. With regard to grantees, the Opposition acknowledges that "[w]hen a grant condition compels or prohibits a grantee's speech outside the scope of the federally funded

program, it violates the First Amendment and cannot be sustained." Opp. at 12 (quoting *Agency for Intern. Development v. Alliance for Open Society Intern., Inc.*, 570 U.S. 205, 219, 221 (2013)) (internal quotation marks omitted) ("*AID*"). Such is the case here. The government has directed federal agencies providing grants to "look at all Federal grant and cooperative agreement programs, *not just those for the purposes of providing training*," and include conditions on awards that preclude the use of funds for promoting the "divisive concepts" outside the context of workplace trainings, such as through research. Memorandum M-20-37 (emphasis added). The Agencies are thus instructed to condition any and all grants on the grantee's willingness not to "promote" the prohibited concepts, even beyond the scope of federally funded training programs.

The government cannot "demand[] that funding recipients adopt—as their own—the Government's view on an issue of public concern," because such a condition "by its very nature affects 'protected conduct outside the scope of [a] federally funded program.'" *AID*, 570 U.S. at 218 (citation omitted). Here, grantees will be forbidden from promoting the "divisive concepts," and instead must adopt the Administration's view that these ideas are dangerous and detrimental. Defendants argue that the Executive Order suggests only that "'grant *funds*' should not be used to promote race or sex stereotyping or scapegoating," and this somehow allows it to "pass constitutional muster." Opp. at 13. But the government "cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *AID*, 570 U.S. at 218 (quoting *Legal Services Corporation v. Velazquez,* 531 U.S. 533, 547 (2001) (internal quotation marks omitted). In fact, Defendants acknowledge this limitation on restricting federal grants, but summarily state, without any explanation, that it does not apply. *See* Opp. at 13. While the government may impose conditions on a grantee's speech within the confines of a grant program, its broad imposition of speech restrictions for the "divisive concepts" indicates that, here, the government is doing no such thing. Its funding decisions are instead "aimed at the suppression of ideas thought inimical to the Government's own interest." *Velazquez*, 531 U.S. at 549. Indeed, the parallel to *Velazquez* is striking. As in *Velazquez*, this speech restriction interferes with a Plaintiff's continued ability to secure certain remedies for its

1  legal services clients—here, workplace trainings as conditions of settlements with federally funded

2  defendants in employment discrimination cases. *Id.* at 545–49; Riener Decl. ¶ 31.

3       **Contractors**. As for contractors, Defendants argue that the unconstitutional conditions

4  doctrine is not apt, and instead look to the *Pickering* balancing test. Opp. at 11, 13; *Pickering v.*

5  *Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). Courts, however, have

6  recognized that "[i]ndependent contractors . . . lie somewhere between the case of government

7  employees, who have the closest relationship with the government, and . . . unconstitutional

8  conditions precedents, which involve persons with less close relationships with the government."

9  *Board of Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668, 680 (1996). Plaintiffs do not

10  concede that *Pickering*'s balancing test applies but, in any event, readily satisfy that test.

11       *Pickering*'s first step asks whether a public employee (or here, a contractor) seeks to

12  "sp[eak] as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)

13  (citation omitted). When applying this test to public employees, courts consider the scope of their

14  job responsibilities. *See Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th

15  Cir. 2008). Statements are made in the speaker's capacity as citizen "if the speaker had no official

16  duty to make the questioned statements, or if the speech was not the product of performing the

17  tasks the employee was paid to perform." *Id*. at 1127 n.2 (internal quotation marks, citations, and

18  brackets omitted). Speech addressing issues of racism and discrimination undoubtedly speaks to

19  matters of public concern. *See, e.g.*, *Barone v. City of Springfield, Oregon*, 902 F.3d 1091, 1098

20  (9th Cir. 2018) ("responding to a citizen inquiry about racial profiling by the [Police] Department

21  … is a matter of public concern"); *Alpha Energy Savers, Inc.*, 381 F.3d 917, 926–27 (9th Cir.

22  2004) ("Disputes over racial, religious, or other such discrimination by public officials are not

23  simply individual personnel matters. They involve the type of governmental conduct that affects

24  the societal interest as a whole—conduct in which the public has a deep and abiding interest");

25  *Pool v. VanRheen*, 297 F.3d 899, 908 (9th Cir. 2002) ("[Plaintiff] has demonstrated a career-long

26  commitment to race and gender equality, and her personal job concerns were allegedly intertwined

27

28

with race and gender equality in public law enforcement. Therefore, on balance, we find [her letter] covered a matter of public concern.").

The Executive Order clearly restricts Plaintiffs in their capacity as public citizens speaking on matters of public concern, including racism and anti-LGBT bias. In particular, Section 4 of the Executive Order prohibits government contractors from using any workplace training *for their own employees* that includes the "divisive concepts." *See* Executive Order, Sec. 4(a). This prohibition applies regardless of whether the federal contracts at issue bear *any* relation to the prohibited trainings or even the employees in question, and thus restricts speech that Plaintiffs have no official duty to make and that are not the product of performing the tasks they are being paid by the government to perform. Defendants assert, again without explanation, that because the restrictions are only limited to employee trainings, they are somehow permissible, citing *Garcetti* and *Umbehr*. *See* Opp. at 13. But *Garcetti* involved a public employee, all of whose professional activities would be in his capacity as such, rather than a contractor whose "employment" by the government is not the whole of its work. *See* 547 U.S. at 413. And *Umbehr*, which made no reference to trainings, expressly acknowledged that even a direct employee's "political expression" was protected, and implicitly acknowledged that contractors' speech was even more so. *See* 518 U.S. at 680. In short, Defendants' arguments as to the first step of *Pickering* fail, as the Order imposes restrictions on contractors that have nothing to do with the services they contract to perform for the government.

The second part of the *Pickering* test requires balancing Plaintiffs' free speech interests against the government's interests, *Umbehr*, 519 U.S. at 685, including whether the government has "an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418. "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Id*. The government may point to factors such as impairment of "discipline by superiors or harmony among co-workers," a "detrimental impact on close working relationships," impeding of "the performance of the speaker's duties," or

interference with "regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (citation omitted).

Defendants point to the Order's Purpose, which asserts that "blame-focused diversity training reinforces biases and decreases opportunities for minorities," and that such trainings "undermine[] efficiency in Federal contracting" and "promote divisiveness in the workplace." Opp. at 14–15. They claim that the "disruption from trainings that include race and sex stereotyping or scapegoating" supposedly outweighs Plaintiffs' First Amendment interests. *Id*. This conclusion is flawed. First, to advance the claim that Plaintiffs' speech would be divisive, Defendants rely on conflating Plaintiffs' trainings with the most pernicious "divisive concepts," lumping them together under the label of "stereotyping and scapegoating." Moreover, Plaintiffs employ the banned concepts in order to *improve* operations and delivery of services, not impede them. *See, e.g.*, American Psychological Association, *Summary of Psychological Research and Science of Diversity Training* (Nov. 11, 2020), https://bit.ly/2HRQ9MG (establishing that such trainings are tested, evidence-based, and effective). Defendants' purported justification is a facade for the Administration's dislike of the concepts Plaintiffs teach, and its desire to avoid hard truths about racism, discrimination, and bias in the United States. *See* Pls.' Mot. at 22–23. Accordingly, even under *Pickering*, Plaintiff contractors, too, have suffered clear First Amendment harms.

**B.** **Defendants Fail to Explain the Order's Unconstitutional Ambiguities and Propose Resolving Them Via Prior Restraint.**

Plaintiffs detailed a number of ambiguities in the Executive Order and implementing agency actions that constitute Fifth Amendment violations. *See* Pls.' Mot. at 16–18. Plaintiffs have no practical choice but to steer clear of these vague prohibitions, as the Order's "line between allowable and prohibited [speech] is so murky, enforcement . . . poses a danger of arbitrary and discriminatory application." *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011).

Here, the Opposition's answer—citing to an out-of-circuit case that did not involve First Amendment issues—is that Plaintiffs should simply seek clarification from the government before engaging in any speech. *See* Opp. at 16 (citing *Gerber Prod. Co. v. Perdue*, 254 F. Supp. 3d 74, 81

(D.D.C. 2017)). Defendants' own argument only further highlights how the Order chills protected expression: forcing entities and individuals whose speech may violate the Order to submit that very speech for advance government review itself deters the speech. Why would a speaker willingly identify its speech for rejection, rather than alter its speech or stay mum? Such a requirement is tantamount to a prior restraint, which courts have routinely found unconstitutional. A prior restraint gives "public officials the power to deny use of a forum in advance of actual expression." *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1023 (9th Cir. 2009) (internal quotation marks and citations omitted). Prior restraints warrant "a heavy presumption against [their] constitutional validity" and "are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558, 559 (1976) (internal quotation marks and citations omitted). Defendants cannot fix one unconstitutional aspect of the Executive Order by substituting it with another.

Defendants also argue that the vague terms Plaintiffs identified are not ambiguous. *See* Opp. at 16–19. As covered above, the "divisive concepts" conflate reprehensible ideas that no Plaintiff teaches with ideas that are nuanced and warrant debate and discussion. This conflation generates ambiguity that agencies can exploit when determining what funding to eliminate, including through reviews of materials using keyword searches with *an entirely different set* of terms. The Opposition also suggests that the ambiguity in the DOL FAQs regarding permissible trainings simply boils down to "whether [a] training teaches that individuals' beliefs and opinions are necessarily defined by their race or sex." Opp. at 18. But that guidance itself is unclear. What does it mean for beliefs and opinions to be "necessarily defined by race or sex"? Can Plaintiffs acknowledge research demonstrating, for example, that racial disparities in infant mortality are "cut in half when Black babies are cared for by Black physicians," as a step toward addressing implicit bias among White doctors? Carpenter Decl. ¶ 20. Lastly, Defendants suggest that terms are not unconstitutionally vague if they are defined in a dictionary or have been used in Supreme Court jurisprudence. *See* Opp. at 18. Defendants ignore that context matters, as does the identity of those who will be resolving these ambiguities. Dictionary definitions and prior judicial usage

1   hardly provide clear ground rules given the content and context of the Order as a whole, in which

2   agencies will wield broad discretion in their review of materials to quell disfavored speech.

3   **IV.    THE CONSTITUTIONAL VIOLATIONS AND HARM TO MISSIONS AND**

4   **OPERATIONS CONSTITUTE IRREPARABLE HARM.**

5       Plaintiffs have experienced and will continue to experience First Amendment harm, and

6   injury to their missions and operations. *See* Pls.' Mot. at 18–21. These constitute irreparable harm

7   and warrant a preliminary injunction. *See id*. While the Opposition contends that Plaintiffs' Motion

8   lacks specifics, *see* Opp. at 19–21, the detailed Declarations are more than sufficient. Trainings

9   are being cancelled *explicitly* because of the Executive Order, and Plaintiffs are removing content

10  that might violate the Order. *See, e.g.*, Pls.' Mot. at 10–11. As for Defendants' complaint that

11  Plaintiffs failed to specifically identify threatened contracts or grants, Opp. at 21, this ignores the

12  fact that Plaintiffs provide trainings *to* federal contractors and grantees, so naming those clients'

13  contracts and grants is not essential to show Plaintiffs' entitlement to relief. Finally, the harms that

14  Plaintiffs have already suffered are not "theoretical," *id*., and, as discussed above, sufficiently

15  substantiate their fears of future injury and further irreparable harm.

16  **V.    THE PUBLIC INTEREST FAVORS AN INJUNCTION.**

17      The public interest plainly favors an injunction here. While the government may have "a

18  fundamental right to speak to its own workforce," Opp. at 22, that right does not extend to placing

19  unconstitutional restrictions on federal contractors and grantees, especially where the funding at

20  issue bears no relation to the speech the Executive Order seeks to prohibit.

21      The Opposition claims a duty to ensure that government funds are not used "to finance the

22  evil of private prejudice." *Id*. This is a gross mischaracterization of the speech Plaintiffs wish to

23  express and an insult to their work. Addressing discrimination and injustice is at the core of

24  Plaintiffs' missions and is vital to serving their constituents. *See* Pls.' Mot. at 2–3, 7–11. Ensuring

25  that those who protect, care for, and serve historically underserved communities are able to do so

26  competently and compassionately requires training that the Order forbids by prohibiting speech

27  about race, sexuality, and gender that the Administration dislikes. *See* Pls.' Mot. at 3–4,14–15, 22

28

PLAINTIFFS' REPLY IN SUPPORT OF MOT. FOR NATIONWIDE PRELIMINARY INJUNCTION

–23. *See also* Complaint, ECF No. 1, ¶¶ 64–66, 79, 92–95. It is clearly in the public interest to allow Plaintiffs to continue to speak on these issues and incorporate them into their trainings, which Plaintiffs have explained is vital to serving their constituencies and fulfilling their missions.

## VI.    A NATIONWIDE INJUNCTION IS NECESSARY.

A nationwide injunction is necessary to stop the injuries to Plaintiffs themselves. While Defendants argue that a nationwide injunction would be inappropriate "because its relief would extend beyond the parties to this case," Opp. at 24, that is beside the point. Plaintiffs include organizations that provide trainings to federal contractors and grantees. The harms to Plaintiffs will persist if the Order can still be enforced as to those third parties, who will disassociate from Plaintiffs, cancel trainings, and withhold anticipated revenue in light of the Order. *See* Pls.' Mot. at 23–24. This is sufficient for a nationwide injunction. *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1282–83 (9th Cir. 2020). Defendants made no effort to address this argument.

Defendants point to *Nat'l Urban League, et al. v. Trump*, 20–cv–3121 (D.D.C. filed Oct. 29, 2020), as a reason to deny a nationwide injunction, but there has been no activity since its filing. Counsel for the government defendants has not appeared, nor have those plaintiffs sought an injunction. *Id*. Defendants' argument that a decision rendered by this Court would freeze the first decision regarding the Order ignores that the relief Plaintiffs seek is preliminary. Opp. at 24– 25. As for the possibility of Plaintiffs' filing a class action, Defendants do not (and cannot) argue that Plaintiffs were obligated to have done so. *See id*. at 25.

Lastly, Defendants contend that the Court should not enjoin certain provisions of the Order, such as the information gathering and review aspects of the scheme. Opp. at 23–24. But, as argued above, those provisions themselves chill speech, and should be recognized for what they are: part of the government's effort to stifle protected expression by identifying organizations whose federal funding should be eliminated. They also argue that the Court lacks the power to enjoin the President, Opp. at 25, but the Complaint explicitly disclaimed any such request. *See* Compl. at 50.

## CONCLUSION

The Court should preliminarily enjoin implementation of the Executive Order.

Respectfully,

Dated this 1st of December, 2020.          /s/ Anne Johnson Palmer

JENNIFER C. PIZER (SBN 152327)          ANNE JOHNSON PALMER (SBN 302235)
*jpizer@lambdalegal.org*                  *Anne.JohnsonPalmer@ropesgray.com*
LAMBDA LEGAL DEFENSE AND                 ROPES & GRAY LLP
   EDUCATION FUND, INC.                   Three Embarcadero Center
4221 Wilshire Boulevard, Suite 280        San Francisco, CA 94111-4006
Los Angeles, California 90010             Telephone: (415) 315-6337
Telephone: (213) 590-5903
                                          DOUGLAS HALLWARD-DRIEMEIER*
CAMILLA B. TAYLOR*                        *Douglas.Hallward-*
*ctaylor@lambdalegal.org*                 *Driemeier@ropesgray.com*
SCOTT A. SCHOETTES*                       ROPES & GRAY LLP
*sschoettes@lambdalegal.org*              2099 Pennsylvania Avenue, NW
LAMBDA LEGAL DEFENSE AND                 Washington, DC 20006-6807
   EDUCATION FUND, INC.                   Telephone: (202) 508-4776
65 E. Wacker Place, Suite 2000
Chicago, Illinois 60601                   KIRSTEN MAYER*
Telephone: (312) 663-4413                 *Kirsten.Mayer@ropesgray.com*
                                          JESSICA L. SOTO*
M. CURREY COOK*                           *Jessica.Soto@ropesgray.com*
*ccook@lambdalegal.org*                   ROPES & GRAY LLP
OMAR GONZALEZ-PAGAN*                      Prudential Tower
*ogonzalez-pagan@lambdalegal.org*         800 Boylston Street
LAMBDA LEGAL DEFENSE AND                 Boston, MA 02199-3600
   EDUCATION FUND, INC.                   Telephone: (617) 951-7753
120 Wall Street, 19th Floor
New York, New York 10005                  ETHAN M. WEINBERG*
Telephone: (212) 809-8585                 *Ethan.Weinberg@ropesgray.com*
                                          ROPES & GRAY LLP
KAREN L. LOEWY*                           1211 Avenue of the Americas
*kloewy@lambdalegal.org*                  New York, NY 10036-8704
LAMBDA LEGAL DEFENSE AND                 Telephone: (212) 596-9688
   EDUCATION FUND, INC.
1776 K Street, N.W., 8th Floor            *Counsel for All Plaintiffs*
Washington, DC 20006-2304
Telephone: (202) 804-6245                 *Admitted pro hac vice

AVATARA SMITH-CARRINGTON*
*asmithcarrington@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
   EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, Texas 75219
Telephone: (214) 219-8585