United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

SANTA CRUZ LESBIAN AND GAY
COMMUNITY CENTER d/b/a THE
DIVERSITY CENTER OF SANTA CRUZ,
*et al.*,

              Plaintiffs,

      v.

DONALD J. TRUMP, in his official
capacity as President of the United States, *et al.*,

              Defendants.

Case No.  20-cv-07741-BLF

**ORDER GRANTING IN PART
PLAINTIFFS' MOTION FOR A
NATIONWIDE PRELIMINARY
INJUNCTION**

[Re:  ECF 51]

Plaintiffs are a number of non-profit community organizations and consultants serving the lesbian, gay, bisexual, and transgender ("LGBT") community and people living with the human immunodeficiency virus ("HIV").  Many of their clients are people of color, women, and LGBT people.[1]  Plaintiffs provide advocacy and training to health care providers, local government agencies, local businesses, and their own employees about systemic bias, racism, anti-LGBT bias, white privilege, implicit bias, and intersectionality.  This training, Plaintiffs believe, is fundamental to their mission of breaking down barriers that underserved communities face in receiving health care.  Plaintiffs bring this suit to challenge the constitutionality of Executive Order 13950, which they contend has unlawfully labeled much of their work as "anti-American propaganda."

---

[1] The Court adopts the terminology used in Plaintiffs' brief, which refers to "LGBT" communities and "LGBT" people.  *See* Mot. at 2, ECF 51.  The Court notes that some of the declarations filed in support of Plaintiffs' motion use the more expansive terms "LGBTQ+" and "LGBTI."  *See, e.g.*, Papo Decl. ¶ 1, ECF 51-1; Brown Decl. ¶ 7, ECF 51-5.  The Court intends no disrespect to any individual or organization by using the term "LGBT" rather than "LGBTQ+" or "LGBTI" in this order.

Executive Order 13950 was signed by President Donald J. Trump on September 22, 2020 ("Executive Order"). See Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020). It prohibits the United States Uniformed Services, federal agencies, and federal contractors from promoting a list of "divisive concepts" in workplace trainings. *Id*. at 60683, 60685-87. The Executive Order also directs agency heads to identify grant programs for which grants may be conditioned on the recipient's certification that it will not use federal funds to promote the "divisive concepts." *Id*. at 60686-87.

Plaintiffs claim that the Executive Order requires them to censor or cease the trainings that are fundamental to their missions on pain of losing federal funding in the form of contracts and grants, in violation of the Free Speech Clause of the First Amendment. They also claim that the Executive Order is so vague that it does not provide notice of what speech is subject to penalty, in violation of the Due Process Clause of the Fifth Amendment. Plaintiffs sue President Trump and several federal agencies and officials ("the Government"), seeking declaratory and injunctive relief from the Executive Order.

Shortly after commencing suit, Plaintiffs filed the present motion for a nationwide preliminary injunction, asking the Court to enjoin all Defendants except President Trump from enforcing the Executive Order. The Court has considered the motion, the Government's opposition, Plaintiffs' reply, briefs filed by three sets of *amici curiae*, and the oral arguments presented at the hearing on December 10, 2020. For the reasons discussed below, Plaintiffs' motion is GRANTED IN PART.

## I.    BACKGROUND

### *OMB Director's Issuance of September 4, 2020 Memorandum*

On September 4, 2020, the Director of the Office of Management and Budget ("OMB") issued a Memorandum for the Heads of Executive Departments and Agencies with the subject line "Training in the Federal Government." Sept. 4 Mem., M-20-34. The Memorandum advises that, pursuant to the President's directive, all federal agencies are to stop using taxpayer dollars to fund "divisive, un-American propaganda training sessions." *Id*. at 1. It directs agencies to "identify all contracts or other agency spending related to any training on 'critical race theory,' 'white

privilege,' or any other training or propaganda effort that teaches or suggests either (1) that the United States is an inherently racist or evil country or (2) that any race or ethnicity is inherently racist or evil." *Id.* Additionally, the September 4 Memorandum directs agencies to "identify all available avenues within the law to cancel any such contracts and/or to divert Federal dollars away from the un-American propaganda training sessions." *Id.*

### President Trump's Issuance of Executive Order 13950

On September 22, 2020, President Trump issued Executive Order 13950. *See* Exec. Order, 85 Fed. Reg. 60683. The Executive Order contains ten sections. *See id.* Because an understanding of the Executive Order's scope is necessary to give context to Plaintiffs' request for injunctive relief, the Court briefly summarizes each of the sections as follows.

Section 1, "Purpose," begins with references to several important events in the United States' history, including the Battle of Gettysburg, the Selma-to-Montgomery marches, and Martin Luther King, Jr.'s "I Have a Dream" speech. *See* Exec. Order, 85 Fed. Reg. 60683. According to the Executive Order, the "belief in the inherent equality of every individual" that motivated those events is being undermined by a "malign ideology" grounded in the notion that the United States is racist and sexist. *Id.* The Executive Order seeks to counter that ideology by prohibiting the promotion of certain "divisive concepts" in diversity trainings provided by the United States Uniformed Services, federal agencies, and federal contractors, or paid for with federal grant funds. *See id.* at 60684-85.

Section 2, "Definitions," defines the term "divisive concepts" as well as the terms "race or sex stereotyping," "race or sex scapegoating," and "senior political appointee." Exec. Order, 85 Fed. Reg. at 60685. As used in the Executive Order, "divisive concepts" are "the concepts that (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her race or sex; (7) an

3

individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race." *Id.*

"Divisive concepts" also is defined to include "any other form of race or sex stereotyping or any other form of race or sex scapegoating." Exec. Order, 85 Fed. Reg. at 60685. The Executive Order uses the term "race or sex stereotyping," to mean "ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex." *Id.* "Race or sex scapegoating" is defined to mean "assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex. It similarly encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others." *Id.*

Section 3, "Requirements for the United States Uniformed Services," directs that the United States Uniformed Services "shall not teach, instruct, or train" their members "to believe any of the divisive concepts" identified in Section 2. Exec. Order, 85 Fed. Reg. at 60685.

Section 4, "Requirements for Government Contractors," requires that all government contracts include certain express provisions.[2] Exec. Order, 85 Fed. Reg. at 60685-86. The contractor must agree that, during the performance of the contract, "[t]he contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating." *Id.* at 60685. Most of the "divisive concepts" identified in Section 2 are listed as examples of "race or sex stereotyping" and "race or sex scapegoating." *Id.*

---

[2] These requirements do not apply to "contracts exempted in the manner provided by section 204 of Executive Order 11246." 85 Fed. Reg. at 60685. Section 204 of Executive Order 11246 grants the Secretary of Labor authority to exempt a contracting agency from federal nondiscrimination requirements under certain circumstances, such as when it is in the national interest. Exec. Order 11246, 30 Fed. Reg. 12319. Neither side argues that Section 204 exemptions have any bearing on this case.

at 60685-86.  In the event of a contractor's noncompliance with these provisions, the "contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts."  *Id*.  Moreover, the contractor must include the same provisions "in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor, so that such provisions will be binding upon each subcontractor or vendor."  *Id*.

Section 5, "Requirements for Federal Grants," directs the heads of all agencies to "review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use Federal funds to promote" certain "divisive concepts" identified in Section 2.  Exec. Order, 85 Fed. Reg. at 60686-87. Agency heads are required to submit a report to the OMB Director listing programs on which these restrictions may be imposed.  *Id*.

Section 6, "Requirements for Agencies," contains guidance to agency heads regarding implementation of the Executive Order.  Exec. Order, 85 Fed. Reg. at 60687.

Section 7, "OMB and OPM Review of Agency Training," requires that "all training programs for agency employees relating to diversity or inclusion shall, before being used, be reviewed by" the Office of Personnel Management ("OPM") for compliance with the Executive Order.  Exec. Order, 85 Fed. Reg. at 60687-88.

Section 8, "Title VII Guidance," directs the Attorney General to assess whether workplace training that teaches the concepts identified in Section 2 may give rise to liability under Title VII of the Civil Rights Act of 1964.  Exec. Order, 85 Fed. Reg. at 60688.

Section 9, "Effective Date," provides that the Executive Order "is effective immediately, except that the requirements of section 4 of this order shall apply to contracts entered into 60 days after the date of this order."  Exec. Order, 85 Fed. Reg. at 60688.

Section 10, "General Provisions," contains guidance for construing the Executive Order. Exec. Order, 85 Fed. Reg. at 60688-89.

*OMB Director's Issuance of September 28, 2020 Memorandum*

On September 28, 2020, the OMB Director issued a Memorandum for the Heads of

United States District Court
Northern District of California

Executive Departments and Agencies with the subject line "Ending Employee Trainings that Use Divisive Propaganda to Undermine the Principle of Fair and Equal Treatment for All." Sept. 28 Mem., M-20-37. That Memorandum provides guidance for implementing the Executive Order, directing federal agencies to review all 2020 trainings related to diversity and inclusion "to determine whether they teach, advocate, or promote the divisive concepts" identified in Section 2 of the Executive Order. *Id*. at 2. The September 28 Memorandum indicates that keyword searches may help identify prohibited trainings, suggesting searches for the terms "critical race theory," "white privilege," "intersectionality," "systemic racism," "positionality," "racial humility," and "unconscious bias." *Id*. It also directs that "[a]s Federal awarding agencies are conducting their review of programs to identify those for which the agency may lawfully impose the condition described in Section 5 of the E.O., they must look at all Federal grant and cooperative agreement programs, not just those for the purposes of providing training." *Id*. at 3.

*OFCCP's Guidance*

The Office of Federal Contract Compliance Programs ("OFCCP") has posted a list of frequently asked questions ("FAQs") regarding the Executive Order on the Department of Labor ("DOL") website. *See* DOL FAQs, https://www.dol.gov/agencies/ofccp/faqs/executive-order-13950, last accessed December 16, 2020. The DOL FAQs advise that, "The Executive Order sets forth the policy of the United States 'not to promote race or sex stereotyping or scapegoating' and prohibits federal contractors from inculcating such views in their employees in workplace diversity and inclusion trainings." *Id*.

Among the FAQs is, "Does Executive Order 13950 prohibit unconscious bias or implicit bias training?" DOL FAQs, https://www.dol.gov/agencies/ofccp/faqs/executive-order-13950, last accessed December 16, 2020. The response given is: "Unconscious or implicit bias training is prohibited to the extent it teaches or implies that an individual, by virtue of his or her race, sex, and/or national origin, is racist, sexist, oppressive, or biased, whether consciously or unconsciously." *Id*. The response goes on to state that, "Training is not prohibited if it is designed to inform workers, or foster discussion, about pre-conceptions, opinions, or stereotypes that people – regardless of their race or sex – may have regarding people who are different, which could

6

United States District Court
Northern District of California

1    influence a worker's conduct or speech and be perceived by others as offensive." *Id.*

2         Another FAQ is, "How can I file a complaint alleging unlawful training programs?" DOL

3    FAQs, https://www.dol.gov/agencies/ofccp/faqs/executive-order-13950, last accessed December

4    16, 2020. The response includes a telephone "hotline for reporting race and sex stereotyping and

5    scapegoating," as well as an email address where complaints may be sent. *Id.*

6         On October 22, 2020, the OFCCP published a Request for Information ("RFI") in the

7    Federal Register, requesting "comments, information, and materials from Federal contractors,

8    Federal subcontractors, and employees of Federal contractors and subcontractors concerning

9    workplace trainings involving prohibited race or sex stereotyping or scapegoating." RFI, 85 Fed.

10   Reg. 67375-02.

11        *Plaintiffs' Missions and Work*

12        Plaintiff Santa Cruz Lesbian and Gay Community Center d/b/a The Diversity Center of

13   Santa Cruz ("the Diversity Center") is a nonprofit that provides a variety of services to LGBT

14   communities in and around Santa Cruz, California. Papo Decl. ¶¶ 1-3, ECF 51-1. It receives

15   pass-through federal funding through Santa Cruz County to provide outreach and services to

16   prevent the sexual exploitation of LGBT teens. *Id.* ¶ 4. It also provides diversity trainings to

17   clients, including federal contractors and federal grantees. *Id.* ¶ 11. Those trainings cover issues

18   relating to systemic racism and intersectionality, as well as structural racism, sexism, and anti-

19   LGBT bias. *Id.* ¶ 10. "The Diversity Center also performs internal training of its staff, volunteers,

20   and board members with a focus on race equity and inclusion." *Id.* ¶ 7.

21        Plaintiff Los Angeles LGBT Center ("the Center") is a nonprofit located in Los Angeles,

22   California. Cummings Decl. ¶ 1, ECF 51-7. It provides a variety of health care services to

23   members of LGBT communities. *Id.* ¶¶ 1, 6. It is a federal contractor, subcontractor, grantee, and

24   subgrantee. *Id.* ¶ 8. "Many of the Center's federally-funded grants require the Center to

25   acknowledge, address, and combat systemic racism in health care services and public health

26   programming." *Id.* "The Center trains its own staff to identify and acknowledge disparities in

27   underlying health conditions, cultural and historical barriers to care, and to combat implicit bias

28   that could interfere with patient-provider interactions, the ability of patients to receive equitable

access to care, and patient outcomes." *Id.* ¶ 9.  The Center also has received federal funding to perform external trainings.  *Id.* ¶ 10.

Plaintiff Ward Carpenter, M.D., is a director of Los Angeles LGBT Center.  *See* Carpenter Decl. ¶ 1, ECF 51-9.  In that role, he oversees work funded by federal grants.  *Id.* ¶ 5.  Many of those grants are directed to reducing health disparities based on race, LGBT status, and other factors.  *Id.* ¶ 6.  In Dr. Carpenter's view, that work can succeed only if the Center's staff receives training in the effect of racism and bias on the communities the Center serves.  *Id.* ¶ 7.

Plaintiff AIDS Foundation of Chicago ("AFC") is a nonprofit based in Chicago, Illinois, that provides services to people living with and vulnerable to HIV.  *See* Davis Decl. ¶¶ 1-5, ECF 51-2.  AFC is a federal grantee and subgrantee, and it manages local, state, and federal funds for an array of HIV/AIDS-related services.  *Id.* ¶ 8.  AFC also participates in a rental subsidy program partially funded by the U.S. Department of Housing and Urban Development ("HUD").  *Id.* ¶ 9.  Through federal grant funds, AFC assists chronically homeless people find permanent housing, and manages delivery of HIV rental subsidies to low income people with HIV and other chronic conditions.  *Id.*  As part of its mission, AFC provides internal trainings, external federally funded trainings, and policy advocacy work addressing structural racism, HIV and aging, engaging with transgender clients, and similar topics.  *Id.* ¶ 14.  In the opinion of AFC's President and CEO, recognition of the disproportionate impact that HIV has on Black, Latinx, transgender, and cisgender people, and addressing biases and structural inequities at the root of those disparities, is critical to AFC's mission.  Peller Decl. ¶¶ 1, 8, ECF 51-3.

Plaintiff Bradbury-Sullivan LGBT Community Center ("Bradbury-Sullivan Center") is a nonprofit dedicated to securing the health and well-being of LGBT people in the Greater Lehigh Valley, in Pennsylvania.  *See* Shanker Decl. ¶¶ 1-3, ECF 51-4.  The Bradbury-Sullivan Center provides training to educators, health care professionals, and government agencies, among others. *Id.* ¶ 4.  The trainings address disparities within the LGBT community based on race, gender, or age.  *Id.* ¶ 10.  In the opinion of the nonprofit's director, it would be impossible to conduct those trainings without using concepts such as "intersectionality," "unconscious bias," or "systemic racism."  *Id.*  "Approximately a third of the Bradbury-Sullivan Center's budget consists of federal

United States District Court
Northern District of California

1   funding, including funding from the Centers for Disease Control and Prevention, the National

2   Institutes of Health, the National Endowment for the Humanities, and the National Council on the

3   Arts.  *Id.* ¶ 7.  "Some of these funds are federal grants that are pass-through funds administered by

4   state or local governments, such as the Pennsylvania Department of Health."  *Id.*

5        Plaintiff NO/AIDS Task Force d/b/a CrescentCare ("CrescentCare") is a nonprofit located

6   in New Orleans, Louisiana.  Riener Decl. ¶ 1, ECF 51-6.  It provides health care, social services,

7   housing, and legal services to members of the service industry, the LGBT community, the

8   immigrant community, and communities of color.  *Id.* ¶¶ 2, 7.  CrescentCare receives federal

9   funding directly and indirectly via federal programs.  *Id.* ¶ 7.  Certain grants require CrescentCare

10  to provide proof of training of staff in cultural knowledge, attitudes, and beliefs of the patient

11  population.  *Id.* ¶ 10.  One grant requires proof of annual "cultural humility trainings" for staff.  *Id.*

12  CrescentCare also provides trainings to staff in "concepts such as cultural humility, identifying

13  interpersonal and institutional bias, and internalized oppression" in order to deepen the empathy of

14  staff for the individuals served.  *Id.* ¶ 13.  In addition, CrescentCare intentionally combats implicit

15  bias and acknowledges structural racism through hiring staff from specific communities that it

16  serves.  *Id.* ¶ 14.

17       Plaintiff Services and Advocacy for GLBT Elders ("SAGE") is a nonprofit headquartered

18  in New York, where it operates five senior centers and is building LGBT-welcoming housing.

19  Meyer Decl. ¶ 4.  It is the country's largest and oldest organization dedicated to improving the

20  lives of LGBT older people.  *Id.* ¶ 3.  SAGE receives federal funding directly and indirectly

21  through federal programs.  *Id.* ¶ 8.  SAGE also contracts with state and local entities receiving

22  federal funding.  *Id.*  SAGE provides internal and external trainings regarding the systemic

23  structural problems of racism, homophobia, biphobia, and transphobia, as well as discrimination

24  and implicit bias.  *Id.* ¶¶ 13, 16.  SAGE's National Resource Center on LGBT Aging launched a

25  national training program that trained more than 21,000 professionals in all fifty states by the end

26  of 2020.  *Id.* ¶ 6.

27       Plaintiff B. Brown Consulting, LLC ("Brown Consulting") is a federal subcontractor based

28  in Michigan.  Brown Decl. ¶ 2, ECF 51-5.  It receives pass-through federal funding through a

subcontract with the National Prison Rape Elimination Act Resource Center.  *Id.*  As part of that contract, Brown Consulting develops and uses a training curriculum for those seeking to become certified Prison Rape Elimination Act ("PREA") auditors, that is, individuals who determine whether juvenile and adult detention facilities are compliant with PREA standards.  *Id.* ¶¶ 7-9. The contract also covers training and technical assistance to adult and youth correctional and detention facility staff.  *Id.* ¶ 10.  In addition to that work, Brown Consulting develops and delivers trainings to nonprofits, law enforcement, and other state and local agencies.  *Id.* 11.  Generally, those trainings address sexual orientation, gender identity and gender expression, stereotypes around race, racism within the LGBT community, implicit bias, and similar topics.  *Id.* ¶¶ 2, 12.

> *This Lawsuit*

Plaintiffs filed the present lawsuit on November 2, 2020, seeking declaratory and injunctive relief with respect to the Executive Order.  *See* Compl., ECF 1.  Plaintiffs allege that as part of their work they have conducted trainings for their own employees and for third-party clients that address many of the concepts that may be prohibited by the Executive Order, but they are uncertain of the reach of the Executive Order.  *See id.* ¶¶ 150, 166.  Plaintiffs wish to continue such trainings.  *See id.*  However, the penalties imposed for violating the Executive Order allegedly "chill the Plaintiffs from engaging in such trainings for fear of lost contracts or funding." *Id.* ¶ 153.  The chilling effect of the Executive Order is exacerbated by its vagueness, Plaintiffs claim, because they do not know which of their activities are prohibited.  *Id.* ¶ 166.  "Because of this uncertainty," Plaintiffs allege, "they are justifiably fearful of conducting any activities that might threaten their direct or indirect federal funding, in spite of these activities' centrality to their missions and their ability to serve vulnerable and marginalized communities."  *Id.*

The complaint contains two claims.  Claim 1 asserts that the Executive Order violates Plaintiffs' rights under the Free Speech Clause of the First Amendment, "because it impermissibly chills the exercise of the Plaintiffs' constitutionally protected speech, based on the content and viewpoint of their speech."  Compl. ¶ 147.  Claim 2 asserts that the Executive Order violates Plaintiffs' rights under the Due Process Clause of the Fifth Amendment, and is void for vagueness, "because it infringes on Plaintiffs' constitutionally protected right to free speech and provides

United States District Court
Northern District of California

1  inadequate notice of the conduct it purports to prohibit." *Id.* ¶ 167.  Pursuant to both claims,

2  Plaintiffs "challenge the Executive Order and any agency action seeking to implement it both

3  facially and as applied to them." *Id.* ¶¶ 144, 155.

4        *The Present Motion*

5        Plaintiffs now seek preliminary injunctive relief pending litigation of their claims.  In

6  addition to the briefing submitted by the parties, the Court has received and accepted briefing by

7  three sets of *amici curiae*.  The first *amici* brief was filed by "8 Institutions of Higher Education,"

8  including Boston University, Brandeis University, Brown University, Dartmouth College, Harvard

9  University, Stanford University, Tufts University, and University of Michigan ("8 Institutions

10  *Amici*").  *See* 8 Institutions *Amici* Brief, ECF 69.  The 8 Institutions *Amici* assert that they conduct

11  critical research that its funded by federal grants and contracts, and that the Executive Order

12  "jeopardizes this federally-supported work by putting universities to an untenable choice between

13  refraining from protected and important speech on the one hand, and, on the other, risking loss of

14  grant funds, debarment from future federal contracts, and unspecified, ominous 'other sanctions.'"

15  *Id.* at 4.

16        The second *amici* brief was filed by "The City of Seattle and 20 Cities and Counties"

17  ("City of Seattle *Amici*").  *See* City of Seattle *Amici* Brief, ECF 71-1.  As recipients of federal

18  funding, the City of Seattle *Amici* do not know whether the Executive Order prevents them from

19  continuing trainings on concepts such as unconscious and systemic bias, which are essential to

20  their efforts to promote racial justice and gender justice.  *See id.* at 1.  The City of Seattle *Amici*

21  also express concern that if organizations serving marginalized communities lose federal funding,

22  there will be an increase in demand for government-provided services, which will place significant

23  burdens on the City of Seattle *Amici*.  *See id.*

24        The third supporting brief was filed by the New Teacher Center ("NTC"), "a California

25  public benefit corporation dedicated to reducing the achievement gap in low-income and racially

26  diverse schools."  NTC *Amicus* Brief, ECF 76-1.  NTC works with many of the nation's largest

27  school districts and foundations, training teachers to manage implicit and systemic bias in order to

28  provide a full educational opportunity for systemically underserved students.  *See id.* at 2.  NTC

United States District Court
Northern District of California

states that its mission depends on grappling with issues such as systemic bias, unconscious bias, implicit bias, and historically based privilege.  *See id.*  In NTC's view, the Executive Order will chill school districts from engaging NTC.  *See id.* at 5.

## II.    LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Alternatively, an injunction may issue where "the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor," provided that the plaintiff can also demonstrate the other two *Winter* factors.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011) (citation and internal quotation marks omitted).

## III.    DISCUSSION

Before turning to Plaintiffs' showing on the *Winter* factors, the Court addresses the scope of Plaintiffs' challenge to the Executive Order.  As initially framed in the motion, it appears that Plaintiffs seek to enjoin the Executive Order in its entirety.  The proposed order submitted with the motion provides, "Defendants are hereby enjoined from enforcing Executive Order 13950. . . ."  Proposed Order ¶ 1, ECF 51-10.  The Government points out that Plaintiffs have constitutional standing to challenge only those sections of the Executive Order that apply to them.  *See Get Outdoors II, LLC v. City of San Diego, Cal.*, 506 F.3d 886, 892 (9th Cir. 2007) (holding that a plaintiff who challenged the constitutionality of an ordinance restricting billboards had "standing to challenge only those provisions that applied to it").

At the hearing, the Court questioned whether Plaintiffs have standing to challenge certain sections of the Executive Order.  In particular, the Court expressed reservations about Plaintiffs' standing to challenge Section 3, relating to the United States Uniformed Services, or Section 6, relating to federal agencies' direct training of their own personnel.  The Court engaged counsel in a lengthy colloquy, parsing the Executive Order section by section and inviting comment on each. At the conclusion of the hearing, Plaintiffs narrowed their request for injunctive relief to only two

1    of the Executive Order's ten sections:  Section 4, addressing federal contracts, and Section 5,

2    addressing federal grants.  Plaintiffs have submitted an amended proposed order providing,

3    "Defendants are hereby enjoined from implementing or enforcing Sections 4 and 5 of Executive

4    Order 13950. . . ."  Am'd Proposed Order ¶ 1, ECF 79-1.

5         The Government contends that Plaintiffs lack standing to challenge any aspect of the

6    Executive Order, including Sections 4 and 5, because they cannot show injury in fact.

7    Alternatively, the Government argues that Plaintiffs cannot establish a likelihood of success on the

8    merits of their claims, or any of the other *Winter* factors.  Finally, the Government urges the Court

9    to limit any injunctive relief to the parties before it rather than issuing a nationwide injunction.

10   Plaintiffs assert that they have standing to challenge the Executive Order and that they are entitled

11   to preliminary injunctive relief under *Winter*.  They also argue that a nationwide injunction is

12   appropriate under the specific facts of this case.

13        The Court addresses these issues in turn, below.  Because constitutional standing is a

14   threshold jurisdictional issue, the Court begins by addressing Plaintiffs' standing to challenge

15   Sections 4 and 5 of the Executive Order.  *See Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020)

16   (holding that the jurisdictional question of standing precedes analysis on the merits).  The Court

17   next evaluates Plaintiffs' showing on the *Winter* factors.  Finally, the Court discusses Plaintiffs'

18   request for nationwide injunctive relief.

19        **A.    Standing**

20        "[T]he 'irreducible constitutional minimum' of standing consists of three elements."

21   *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S.

22   555, 560 (1992)).  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable

23   to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable

24   judicial decision."  *Id*. (citing *Lujan*, 504 U.S. at 560-61).  "The plaintiff, as the party invoking

25   federal jurisdiction, bears the burden of establishing these elements."  *Id*.

26        The Ninth Circuit has held expressly that a plaintiff "must make a clear showing of each

27   element of standing" at the preliminary injunction stage.  *Yazzie*, 977 F.3d at 966 (quotation marks

28   and citation omitted).  Where multiple plaintiffs seek injunctive relief, standing must be

United States District Court
Northern District of California

13

established for at least one.  *Id.* & n.3; *see also Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) ("As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing.").  Accordingly, Plaintiffs in this case may establish standing by demonstrating that at least one of them can make a clear showing that the *Lujan* requirements are satisfied.  That showing must be made as to the particular sections of the Executive Order challenged, that is, as to Sections 4 and 5.  *See Get Outdoors II*, 506 F.3d at 892 ("Get Outdoors II must still show, however, that it meets the *Lujan* requirements for each of the provisions it wishes to challenge as overbroad.").

### 1. Injury in Fact

Plaintiffs must show an injury in fact that constitutes "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quotation marks and citation omitted).  "Because constitutional challenges based on the First Amendment present unique standing considerations, plaintiffs may establish an injury in fact without first suffering a direct injury from the challenged restriction."  *Id.* (quotation marks, citation, and alteration omitted).  "In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences."  *Id.* (quotation marks and citation omitted).  "In such pre-enforcement cases, the plaintiff may meet constitutional standing requirements by demonstrating a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."  *Id.* (quotation marks, citation, and alteration omitted).  "To show such a realistic danger, a plaintiff must allege[ ] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder."  *Id.* (quotation marks and citation omitted).  "The touchstone for determining injury in fact is whether the plaintiff has suffered an injury or threat of injury that is credible, not 'imaginary or speculative.'"  *Id.* at 786.

Courts consider three related inquiries to determine whether pre-enforcement plaintiffs

1    have shown a credible threat of adverse governmental action sufficient to establish standing.  *See*

2    *Lopez*, 630 F.3d at 786.  The first inquiry is whether the plaintiffs have shown a reasonable

3    likelihood that the government will enforce the challenged law against them.  *Id.*  The second

4    inquiry is whether the plaintiffs have established that they intend to violate the challenged law.  *Id.*

5    The third inquiry is whether the challenged law is applicable to the plaintiffs, either by its terms or

6    as interpreted by the government.  *Id.*

                    **a.       Reasonable Likelihood of Enforcement**

7

8         With respect to the reasonable likelihood of enforcement, the government's preliminary

9    efforts to enforce a speech restriction may constitute strong evidence that pre-enforcement

10   plaintiffs face a credible threat of adverse government action.  *Lopez*, 630 F.3d at 786.  The

11   threatened action need not be a prosecution.  *See id.*  Courts have found standing where the

12   plaintiff showed harm flowing from the government's designation of films as political

13   propaganda.  *See id.*

14        In the present case, Plaintiffs have submitted evidence showing that a substantial portion of

15   their funding comes from federal contracts and grants.  For example, Plaintiff Los Angeles LGBT

16   Center is a federal contractor, subcontractor, grantee, and subgrantee, and it receives

17   approximately 80% of its funding from federal programs.  Cummings Decl. ¶ 8, ECF 51-7.

18   Plaintiff AFC receives 79% of its funding, exceeding $25 million, from federal grants.  Davis

19   Decl. ¶ 10, ECF 51-2.  The other entity Plaintiffs also depend on federal funding in the form of

20   contracts and grants.  *See, e.g.,* Shanker Decl. ¶ 7, ECF 51-4; Reiner Decl. ¶ 7, ECF 51-6; Meyer

21   Decl. ¶ 8, ECF 51-8.  The Executive Order make clear that, apart from a narrow class of contracts

22   subject to exceptions not applicable here, *all* federal contracts will include the restrictions set forth

23   in Section 4.  The Government's intent to enforce Section 4 against all federal contractors is

24   evidenced by the the fact that it set up a telephone "hotline for reporting race and sex stereotyping

25   and scapegoating," as well as an email address where complaints may be sent.  DOL FAQs,

26   https://www.dol.gov/agencies/ofccp/faqs/executive-order-13950, last accessed December 16,

27   2020.  Additional evidence is found in the RFI published in the Federal Register by OFCCP,

28   requesting "comments, information, and materials from Federal contractors, Federal

United States District Court
Northern District of California

                                                    15

subcontractors, and employees of Federal contractors and subcontractors concerning workplace trainings involving prohibited race or sex stereotyping or scapegoating." RFI, 85 Fed. Reg. 67375-02. Further, the September 28, 2020 OMB Memorandum directs agencies to review all 2020 trainings related to diversity and inclusion to determine whether they "teach, advocate, or promote the divisive concepts" and it provides a sweeping list of key words to search to identify prohibited trainings. Sept. 28 Mem., M-20-37.

Section 5 of the Executive Order, governing grant funds, does not expressly impose similar restrictions on grant recipients. However, the provision directs agency heads to identify programs for which grants may be conditioned on such restrictions. Guidance issued by the OMB Director strongly suggests that the Government intends to impose the restrictions outlined in Section 5 on as many future grants as possible, as the September 28 Memorandum instructs awarding agencies to "look at all Federal grant and cooperative agreement programs, not just those for the purposes of providing training." Sept. 28 Mem. at 3, M-20-37.

Given the evidence of Plaintiffs' dependence on federal contracts and grants, and of the Government's intent to enforce Sections 4 and 5 of the Executive Order against all federal contracts and grants, respectively, the Court finds that Plaintiffs have shown a reasonable likelihood that Sections 4 and 5 will be enforced against them.

The Government cites *Lopez* for two propositions that do not fit the facts of the present case. First, the Government points out that "general threats by officials to enforce those laws which they are charged to administer do not create the necessary injury in fact." *Lopez*, 630 F.3d at 787 (quotation marks, citation, and alteration omitted). *Lopez* cited a decision in which "the sheriff's statement that 'all of the laws of San Diego, State, Federal and County, will be enforced within our jurisdiction' was insufficient to create a justiciable case." *Id.* (citation omitted). Here, Plaintiffs have presented evidence that the Government has manifested a clear commitment to enforcing restrictions on federal contracts and grants, and that Plaintiffs are likely to be subject to that enforcement.

Second, the Government asserts that Plaintiffs' allegations of a subjective chill to their free speech rights does not create the necessary injury in fact. *Lopez* illustrated that point by

United States District Court
Northern District of California

1  discussing a case in which multiple plaintiffs challenged a law that criminalized teaching

2  communism. *Lopez*, 630 F.3d at 787. "[T]hree of the plaintiffs, who had not alleged that they

3  have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution

4  is remotely possible, but merely that they felt inhibited in advocating political ideas or in teaching

5  about communism, did not have standing." *Id.* (quotation marks and citation omitted). Here,

6  Plaintiffs have presented evidence showing that enforcement of the Executive Order against them

7  is likely.

### b.   Intent to Violate

9      The Ninth Circuit stated in *Lopez* that "pre-enforcement plaintiffs who failed to allege a

10 concrete intent to violate the challenged law could not establish a credible threat of enforcement."

11 *Lopez*, 630 F.3d at 787. Because something more than a hypothetical intent is required, the Ninth

12 Circuit held that plaintiffs must articulate a "concrete plan" to violate the challenged law by

13 providing details about their future speech. *Id.* The Government contends that Plaintiffs have not

14 articulated a "concrete plan" to violate the Executive Order, and thus they have not established

15 standing to challenge it.

16     The Court finds the Government's argument on this point to be unpersuasive. Some years

17 after *Lopez* issued, the Supreme Court clarified that "[n]othing in this Court's decisions requires a

18 plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact

19 violate that law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014). The Supreme

20 Court found it sufficient that "petitioners' intended future conduct is arguably proscribed by the

21 statute they wish to challenge." *Id.* at 162 (quotation marks, citation, and alterations omitted).

22     As set forth at length in the Background section, above, Plaintiffs have submitted

23 declarations making clear that they consider it imperative to their missions to offer internal and

24 external trainings that arguably promote the "divisive concepts" prohibited by Section 4 and

25 referenced by Section 5 of the Executive Order. Those trainings include education regarding

26 systemic racism and sexism, implicit bias, white privilege, intersectionality, and similar concepts.

27 *See* Riener Decl. ¶¶ 11-13 ("[I]t is absolutely necessary that our staff receive training on systemic

28 racism, sexism and implicit bias as these concepts relate to health care disparities for the patients

1    we serve."); Davis Decl. ¶¶ 14-16 ("Structural racism is at the heart of the disparities that AFC

2    witnesses."); *see also* Brown Decl. ¶¶ 12, 15-19; Cummings Decl. ¶¶ 9-10; Meyer Decl. ¶¶ 6-7;

3    Papo Decl. ¶¶ 9-10; Shanker Decl. ¶¶ 10, 12.  It is clear from these declarations that Plaintiffs'

4    trainings are likely to be flagged as "teaching" or "implying" the divisive concepts as described in

5    the Government's own interpretation of the reach of the Executive Order in the DOL FAQs, where

6    it explains "unconscious or implicit bias training is prohibited to the extent it teaches or implies

7    that an individual, by virtue of his or her race, sex, and/or national origin, is racist, sexist,

8    oppressive, or biased, whether consciously or not."  DOL FAQs, https://www.dol.gov/agencies/

9    ofccp/faqs/executive-order-13950, last accessed December 16, 2020.

10    Based on this evidence, the Court has no difficulty concluding that Plaintiffs have satisfied

11    this requirement.

12                          **c.      Applicability to Plaintiffs**

13    "[P]laintiffs' claims of future harm lack credibility when the challenged speech restriction

14    by its terms is not applicable to the plaintiffs, or the enforcing authority has disavowed the

15    applicability of the challenged law to the plaintiffs."  *Lopez*, 630 F.3d at 788.  Neither of those

16    circumstances is present here.  All of the entity plaintiffs are federal contractors and/or federal

17    grantees, and thus they are subject to enforcement of Sections 4 and 5 of the Executive Order.  The

18    Government has not disavowed the applicability of Sections 4 and 5 to Plaintiffs.  To the contrary,

19    the Government has issued guidance, and taken concrete steps, making clear that it intends to

20    impose the Executive Order's restrictions on federal contractors and grantees who conduct

21    trainings such as those offered by Plaintiffs.  The September 28 Memorandum issued by the OMB

22    Director specifically directs agencies to identify entities that promote the prohibited "divisive

23    concepts" by doing keyword searches for the terms "critical race theory," "white privilege,"

24    "intersectionality," "systemic racism," "positionality," "racial humility," and "unconscious bias."

25    Sept. 28 Mem., M-20-37.  As Plaintiffs' counsel commented at the hearing, those keyword

26    searches may as well have been designed to target Plaintiffs.

27    Based on the foregoing, the Court concludes that Plaintiffs have satisfied the injury in fact

28    requirement for constitutional standing, as they have established a realistic danger of sustaining a

United States District Court
Northern District of California

18

direct injury as a result of the Executive Order's operation or enforcement.

### 2.      Fairly Traceable

The threatened injury arises from, and thus is fairly traceable to, Sections 4 and 5 of the Executive Order.

### 3.      Redressable

The threatened injury stemming from enforcement of the Executive Order against Plaintiffs is redressable by injunctive relief precluding such enforcement.  The Government argues that Plaintiffs cannot "demonstrate that some hypothetical future training cancellation is traceable to the Order or certain to be redressed by an injunction."  Opp. at 7, ECF 68.  In addition, the Government contends that even if the Court were to grant injunctive relief, "nothing would stop agencies from cancelling trainings as they did before the Order issued," or "force the government to hire any of these Plaintiffs to train the federal workforce on divisive concepts."  *Id.*  While the Government's assertions are true, they are beside the point.  Enjoining enforcement of Sections 4 and 5 of the Executive Order would redress the threat that restrictions on federal contracts and grants would impair Plaintiffs' ability to promote concepts necessary to their missions and work.

### 4.      Conclusion

The Court concludes that Plaintiffs have established all three of the *Lujan* requirements for constitutional standing to seek injunctive relief in this case.

### B.      *Winter* Factors

The Court next turns to Plaintiffs' showing on the *Winter* factors governing preliminary injunctive relief.  *See Winter*, 555 U.S. at 20.

### 1.      Likelihood of Success on the Merits

The Court first addresses Plaintiffs' likelihood of success on their First Amendment claim, and then it addresses the likelihood of success on their Due Process claim.

### a.      Claim 1 – Violation of Free Speech Clause

In Claim 1, Plaintiffs allege that the Executive Order violates their rights under the Free Speech Clause of the First Amendment, "because it impermissibly chills the exercise of the Plaintiffs' constitutionally protected speech, based on the content and viewpoint of their speech."

19

1   Compl. ¶ 147.  Plaintiffs also allege that the Executive Order penalizes them for engaging in

2   protected First Amendment activity, by leveraging the federal funding that is necessary to their

3   missions and work.  *Id.* ¶ 153.

4        The parties disagree on the legal standards applicable to this claim.  In their motion,

5   Plaintiffs argue that it is "bedrock principle underlying the First Amendment . . . that the

6   government may not prohibit the expression of an idea simply because society finds the idea itself

7   offensive or disagreeable," and that the Government's attempt to do so by way of the Executive

8   Order is subject to "the most exacting scrutiny."  *Texas v. Johnson*, 491 U.S. 397, 412, 414 (1989)

9   (quotation marks and citation omitted).  The Government disputes application of strict scrutiny,

10  asserting that it has broad discretion to regulate the conduct of federal contractors and federal

11  grantees.

12            **i.**      **Federal Contractors**

13       With respect to Plaintiffs' claims based on Section 4 of the Executive Order, the

14  Government argues that its power to regulate federal contractors' speech is generally coextensive

15  with its power over the speech of federal employees, and thus that Plaintiffs' claim is governed by

16  the *Pickering* balancing test applicable to federal employees.  *See Pickering v. Board of Ed. of*

17  *Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968).  Plaintiffs do not concede

18  that the *Pickering* test applies, but in their reply they assert that even if it does, they are likely to

19  prevail on the merits of their claim.  The Court concludes based on this limited record that "the

20  Pickering balancing test, adjusted to weigh the government's interests as contractor rather than as

21  employer," likely determines the extent of Plaintiffs' protection with respect to their First

22  Amendment claim grounded in Section 4 of the Executive Order.  *See Bd. of Cty. Comm'rs,*

23  *Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 673 (1996).

24       "*Pickering* and the cases decided in its wake identify two inquiries to guide interpretation

25  of the constitutional protections accorded to public employee speech."  *Garcetti v. Ceballos*, 547

26  U.S. 410, 418 (2006).  "The first requires determining whether the employee spoke as a citizen on

27  a matter of public concern."  *Id.*  "If the answer is no, the employee has no First Amendment cause

28  of action based on his or her employer's reaction to the speech."  *Id.*  "If the answer is yes, then

the possibility of a First Amendment claim arises." *Id.*  "The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.*  "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Id.*  When the government restricts the speech of an independent contractor rather than an employee, any differences in the parties' relationships may be considered during the *Pickering* balancing.  *See Umbehr*, 518 U.S. at 678 ("We therefore see no reason to believe that proper application of the *Pickering* balancing test cannot accommodate the differences between employees and independent contractors.").

At the first step of the *Pickering* balancing test, determining whether the employee spoke as a citizen on a matter of public concern, courts consider the scope of the employee's job responsibilities.  *See Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 (9th Cir. 2008).  "[S]tatements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Id.* at 1127 n.2 (quotation marks, citations, and alterations omitted).  Under Section 4 of the Executive Order, a federal contractor must agree not to "use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating," including enumerated "divisive concepts." Exec. Order, 85 Fed. Reg. at 60685.

On its face, this restriction on the contractor's training of its *own* employees applies regardless of whether the federal contract has anything to do with diversity training or the identified "divisive concepts," and is untethered to the use of the federal funds.  Moreover, the restricted speech, addressing issues of racism and discrimination, goes to matters of public concern.  *See Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 926-27 (9th Cir. 2004) ("Disputes over racial, religious, or other such discrimination by public officials are not simply individual personnel matters.  They involve the type of governmental conduct that affects the societal interest as a whole – conduct in which the public has a deep and abiding interest."); *Pool v. VanRheen*, 297 F.3d 899, 908 (9th Cir. 2002) ("Pool has demonstrated a career-long

21

commitment to race and gender equality, and her personal job concerns were allegedly intertwined with race and gender equality in public law enforcement. Therefore, on balance, we find that the Letter covered a matter of public concern."). Accordingly, the Court finds that Plaintiffs are likely to prevail in satisfying the first step of *Pickering*.

At the second step of *Pickering*, which requires balancing the Government's interests against Plaintiffs' free speech interests, the Court again finds that Plaintiffs are likely to prevail. As noted above, Section 4 of the Executive Order restricts a federal contractor's ability to use its own funds, to train its own employees, on matters that potentially have nothing to do with the federal contract. Although the Government has a legitimate interest in controlling the scope of diversity training in the federal workforce and can limit the expenditure of federal funds, that interest can be protected by narrowing the scope of this preliminary injunction. Thus, the Government's interest is outweighed by the effect of the impermissible reach of the Executive Order on Plaintiffs' freedom to deliver the diversity training and advocacy that they deem necessary to train their own employees and the service providers in the communities in which they work, using funds unrelated to the federal contract.

Accordingly, the Court concludes that Plaintiffs are likely to prevail on their First Amendment claim grounded in Section 4 of the Executive Order.

### ii.     Federal Grantees

As to Plaintiffs' First Amendment claim grounded in Section 5 of the Executive Order, the Government contends that it has broad authority to govern use of federal grant funds. *See Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way."). Plaintiffs do not dispute the Government's characterization of its grant authority generally, but they correctly assert that the Government cannot condition grant funding on a speech restriction that is outside the confines of the grant program. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*AID*"), 570 U.S. 205, 218 (2013). Plaintiffs claim that imposition of an impermissible speech restriction is the purpose of Section 5.

1      As discussed above, Section 5 of the Executive Order directs agency heads to review all

2   grant programs to determine which grants may be conditioned on the recipient's certification that

3   federal funds will not be used to promote concepts that the Executive Order characterizes as

4   "divisive."  Exec. Order, 85 Fed. Reg. at 60686-87.  Conditioning federal grants in this manner

5   clearly would constitute a content-based restriction on protected speech.  Most obviously, the

6   condition restricts workplace training, and "[t]here can be little question that vocational training is

7   speech protected by the First Amendment."  *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,

8   961 F.3d 1062, 1069 (9th Cir. 2020).  As Plaintiffs point out, however, the sweep of the condition

9   goes beyond barring workplace training promoting the "divisive" concepts to barring *any*

10   promotion of the "divisive" concepts using federal funds.  Based on Plaintiffs' evidence of their

11   community advocacy and training, Section 5's prohibition on "promoting" the "divisive concepts"

12   unlawfully impairs their speech rights.

13      The *amici curiae* brief filed by 8 Institutions of Higher Education provides an additional

14   valuable perspective on the impact of Section 5.  Federal funding is crucial to university research,

15   "providing over 60 percent of these institutions' research budgets."  *See* 8 Institutions *Amici* Brief

16   at 4, ECF 69.  Federal funding has "yielded groundbreaking work on healthcare, supercomputing,

17   psychology, artificial intelligence, and products used by the United States military."  *Id.* at 5.

18   Most of that funding has little or nothing to do with the "divisive concepts" the Executive Order

19   targets.  *Id.* at 12.  However, the restrictions described by Section 5 of the Executive Order appear

20   to require universities that accept federal grants to curtail promotion of those concepts through

21   teaching, training, and discussion.  The 8 Institutions of Higher Education argue persuasively that

22   "[s]cholars need to be able to give voice to, and indeed 'endorse,' opposing views in order for

23   intellectual progress to occur.  The Order inhibits this advancement – which is a core component

24   of *amici*'s missions."  *Id.* at 15.

25      The Government's intent to restrict the free speech rights of federal grantees, even in

26   circumstances where the speech in question has nothing to do with the purposes of the grant, is

27   evidenced by the OMB Director's September 28 Memorandum.  *See* Sept. 28 Mem. at 3, M-20-

28   37.  That Memorandum expressly directs agency heads to identify all grant programs on which the

1    agency may impose the speech restrictions described in Section 5, including grant programs

2    unrelated to providing workplace training.  *See id.*

3            Requiring federal grantees to certify that they will not use grant funds to promote concepts

4    the Government considers "divisive," even where the grant program is wholly unrelated to such

5    concepts, is a violation of the grantee's free speech rights.  *See AID*, 570 U.S. at 218.  Like the

6    statute struck down in *AID*, Section 5 of the Executive Order authorizes, as a condition of federal

7    funding, a speech restriction that by its nature "cannot be confined within the scope of the

8    Government program."  *See id.* at 221.  While Section 5 merely directs agency heads to identify

9    the grant programs on which the unconstitutional condition may be imposed, the record evidence

10   leaves no doubt that such identification is merely the first step in actually imposing the condition

11   on as many grant programs as possible.

12           The Court concludes that Plaintiffs have shown a likelihood of success on their First

13   Amendment claim grounded in Section 5.  At the very least, Plaintiffs present serious questions

14   going to the merits of that claim.  Under the alternative formulation of the preliminary injunction

15   standard, Plaintiffs may obtain injunction relief with respect to Section 5 if they demonstrate that

16   the balance of hardships tips sharply in their favor, and establish the other two *Winter* factors.  *See*

17   *Alliance for the Wild Rockies*, 632 F.3d at 1131-32.  Plaintiffs do make that showing, as discussed

18   below.

19                           **b.       Claim 2 – Violation of Due Process Clause**

20           Plaintiffs argue, and the Court agrees, that Sections 4 and 5 of the Executive Order are so

21   vague that it is impossible for Plaintiffs to determine what conduct is prohibited.  For example,

22   Section 4 requires a contractor to agree not to "inculcate in its employees" certain concepts,

23   including the concept that "an individual, by virtue of his or her race or sex, is inherently racist,

24   sexist, or oppressive, whether consciously or unconsciously."  Exec. Order, 85 Fed. Reg. at 60685.

25   Section 5 directs agency heads to identify programs for which grants may be conditioned on the

26   recipient's certification that it will not use federal funds to "promote" certain concepts, among

27   them the same concept identified above that "an individual, by virtue of his or her race or sex, is

28   inherently racist, sexist, or oppressive, whether consciously or unconsciously."  Exec. Order, 85

United States District Court
Northern District of California

1    Fed. Reg. at 60686.

2         As set forth in Plaintiffs' declarations and discussed above, training on unconscious bias is

3    critical to Plaintiffs' missions and their work.  *See, e.g.*, Shanker Decl. ¶ 10 ("Training health care

4    professionals, and others, on implicit bias, systemic racism, sexism, and intersectionality helps

5    health care professionals to provide better and more affirming care to their LGBT patients."), ECF

6    51-4; Brown Decl. ¶ 14 ("It is impossible for me to conduct trainings given the nature of my work,

7    and the clients who hire me to perform this work for them, if I have to do so with a list of banned

8    terms and concepts, such as intersectionality, unconscious bias, or systemic racism. . . ."), ECF 51-

9    5; Carpenter Decl. ¶ 16 ("As health care providers, we also must explicitly acknowledge and

10   confront the role of implicit bias among health care workers as a contributor to medical mistrust

11   and health disparities and inequities.  Implicit or unconscious biases are embedded stereotypes

12   about groups of people that are automatic, unintentional, deeply engrained, universal, and able to

13   influence behavior."), ECF 51-9.  Plaintiffs do not know whether they can continue with this

14   critical training, or if it runs afoul of Sections 4 and 5.  *See* Shanker Decl. ¶ 13; Brown Decl. ¶ 15;

15   Carpenter Decl. ¶ 18.

16        The ambiguity regarding the conduct prohibited by Sections 4 and 5 is only exacerbated by

17   the DOL FAQs.  With respect to training on unconscious bias, the FAQs state that "[u]nconscious

18   or implicit bias training is prohibited to the extent it *teaches or implies* that an individual, by virtue

19   of his or her race, sex, and/or national origin, is racist, sexist, oppressive, or biased, whether

20   consciously or unconsciously."  DOL FAQs, https://www.dol.gov/agencies/ofccp/faqs/executive-

21   order-13950, last accessed December 16, 2020.   However, such training is not prohibited "if it is

22   designed to *inform* workers, or foster discussion, about pre-conceptions, opinions, or stereotypes

23   that people – regardless of their race or sex – may have regarding people who are different, which

24   could influence a worker's conduct or speech and be perceived by others as offensive."  *Id*.  The

25   line between teaching or implying (prohibited) and informing (not prohibited) "is so murky,

26   enforcement of the ordinance poses a danger of arbitrary and discriminatory application."  *Hunt v.*

27   *City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011).  "[T]his lack of clarity may operate to

28   inhibit the exercise of freedom of expression because individuals will not know whether the

United States District Court
Northern District of California

25

1    ordinance allows their conduct, and may choose not to exercise their rights for fear of being . . .

2    punished." *Id.* at 713.

3         In making this determination, the Court acknowledges that "[d]ue process does not require

4    impossible standards of clarity." *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (quotation

5    marks and citation omitted).  But, as the Ninth Circuit found in *Arce*, the statute there under

6    review provided ample exceptions, limitations and safeguards to ensure that a person of ordinary

7    intelligence had "fair notice of what conduct is prohibited."  *Id.* at 988 ("[W]e find that the phrases

8    here in issue sufficiently give notice as to what conduct is prohibited and do not inherently invite

9    arbitrary enforcement.").  No such guardrails exist here and, to the contrary, the Government's

10   own interpretation of the reach of the Executive Order provides even more uncertainty about the

11   scope of prohibited conduct.

12        At the hearing, the Government's counsel asserted that Plaintiffs' arguments based on the

13   DOL FAQs may not be considered, because those arguments would go to an as-applied challenge

14   and Plaintiffs raise only a facial challenge.  In evaluating a facial challenge, the government's

15   "authoritative interpretation of its guidelines and ordinances" may be considered by the Court.

16   *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1035 (9th Cir. 2006); *see

17   also Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("In evaluating

18   respondent's facial challenge, we must consider the county's authoritative constructions of the

19   ordinance, including its own implementation and interpretation of it.").  Thus, the Government's

20   authoritative constructions of the Executive Order set forth in the FAQs published by the OFCCP,

21   the OMB Memoranda, and the RFIs published in the Federal Register may be considered by the

22   Court in evaluating Plaintiffs' facial challenge to the Executive Order.

23        The Government suggests that any vagueness in the Executive Order is acceptable because

24   Section 7 places the burden of determining the contours of permissible federal agency training on

25   OPM.  *See* Exec. Order, 85 Fed. Reg. at 60687-88.  Section 7 provides that "training programs for

26   *agency employees* relating to diversity or inclusion" must be approved by OPM.  *Id.* (emphasis

27   added).  It does not appear that OPM approval is contemplated with respect to a federal

28   contractor's training of its own employees as restricted in Section 4, or a grantee's use of federal

United States District Court
Northern District of California

26

1    funds as addressed in Section 5.  Moreover, that type of prior restraint carries a heavy presumption

2    against constitutional validity.  *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976).

3        In conclusion, the Court finds wholly unpersuasive the Government's assertions that

4    Sections 4 and 5 of the Executive Order are clear or that any ambiguities may be easily resolved.

5    The Court finds that Plaintiffs have demonstrated a likelihood of success on their Due Process

6    claim challenging Sections 4 and 5 of the Executive Order as void for vagueness.[3]

7                    **2.    Irreparable Harm**

8        "Irreparable harm is relatively easy to establish in a First Amendment case."  *CTIA - The*

9    *Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 851 (9th Cir. 2019).  "[A] party

10   seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury

11   . . . by demonstrating the existence of a colorable First Amendment claim."  *Id.* (quotation marks

12   and citation omitted).  The Government contends that Plaintiffs have not made out a colorable

13   First Amendment claim, and it correctly notes that the mere assertion of a First Amendment claim

14   is not sufficient to establish irreparable injury.  *See id.*  As discussed above, however, Plaintiffs

15   have done more than merely assert a First Amendment claim, they have established a likelihood of

16   success on the merits.

17       In addition, Plaintiffs' declarations provide substantial evidence that the restrictions on

18   speech imposed by Sections 4 and 5 of the Executive Order, in conjunction with the vagueness of

19   those restrictions, has chilled Plaintiffs' exercise of their free speech rights.  *See* Cummings Decl.

20   ¶¶ 11-12, ECF 51-7 (describing chilling effect of Executive Order on staff members).  Moreover,

21   Plaintiffs have lost opportunities and income as a result of others' understanding of the effect of

22

23   [3] Plaintiffs' counsel argued at the hearing that the Executive Order also is unconstitutionally
     overbroad, citing *United States v. Stevens*, 559 U.S. 460, 473 (2010).  As framed in the complaint,
24   Plaintiffs' Due Process claim challenges the Executive Order only on the ground that it is void for
     vagueness, not on the ground of overbreadth.  *See* Compl. ¶ 167 ("The Executive Order violates
25   Plaintiffs' constitutionally protected right to free speech and provides inadequate notice of the
     conduct it purports to prohibit.").  Plaintiffs do not raise overbreadth in their briefing on this
26   motion.  The Court therefore finds it inappropriate to address overbreadth in this order.  However,
     as discussed above, Plaintiffs have demonstrated a likelihood of success on their Due Process
27   challenge brought on the ground of vagueness.

28

the Executive Order.  *See* Davis Decl. ¶ 22, ECF 51-2; Meyer Decl. ¶ 14, ECF 51-8.  The

frustration of Plaintiffs' ability to carry out their core missions is itself irreparable harm.  *See Valle*

*del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (finding that ongoing harms to the

plaintiffs' organizational missions as a result of challenged statute established likelihood of

irreparable harm); *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D. Cal.

2018) (finding that organizations had established a likelihood of irreparable harm based on their

showing of significant and serious ongoing harms to their organizational missions).

Accordingly, the Court finds that Plaintiffs have established a likelihood of irreparable

harm absent issuance of injunctive relief.

### 3.      Balance of Equities / Public Interest

"Where the government is a party to a case in which a preliminary injunction is sought, the

balance of the equities and public interest factors merge."  *Roman v. Wolf*, 977 F.3d 935, 940-41

(9th Cir. 2020).  As discussed above, Plaintiffs have demonstrated a likelihood of success in

proving violations of their constitutional rights.  "[I]t is always in the public interest to prevent the

violation of a party's constitutional rights."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir.

2012) (quotation marks and citation omitted).  Moreover, as the Government itself acknowledges,

the work Plaintiffs perform is extremely important to historically underserved communities.  *See*

Opp. at 1, ECF 68 ("The government in no way discounts the important work that many of the

Plaintiffs perform in delivering care to members of historically underserved communities.").

Plaintiffs' ability to carry out their missions is impaired by the Executive Order.

On the other side of the scale, the Government argues that it has the right to choose how it

speaks to its own workforce and has an obligation to ensure proper expenditure of federal dollars.

*See* Opp. at 22, ECF 68.  There is no doubt that the Government controls its message to its own

workforce, and not only do Plaintiffs acknowledge this, but the Court has narrowed the scope of

the preliminary injunction to exclude Section 3, Requirements for the United States Uniformed

Services, and Section 6, Requirements for Agencies.

The Government offers two other arguments that are flatly wrong.  First, the Government

argues that Plaintiffs, as contractors governed by the Executive Order, "would remain free to

inculcate race and sex stereotypes into their own workforce (if not otherwise prohibited by law) – just not in the narrow context of workforce trainings during performance of that contract."  Opp. at 23.  But the Executive Order clearly bans Plaintiffs from training their own employees in any of the panoply of "divisive concepts" identified in Section 4(a), and it prohibits grantees from using federal funds to "promote" the "divisive concepts" identified in Section 5, even in areas far removed from workplace training, such as basic research.

Second, the Government creates a false comparison to place itself in a favored position.  The Government suggests that "the public interest in combating race and sex stereotyping in the federal and contractor workforces far outweighs Plaintiffs' competing interest in performing workplace training that furthers race a sex stereotypes and scapegoating."  Opp. at 23.  The Court agrees with Plaintiffs that the Government's argument is a gross mischaracterization of the speech Plaintiffs want to express and an insult to their work of addressing discrimination and injustice towards historically underserved communities.  That this Government dislikes this speech is irrelevant to the analysis but permeates their briefing.

On balance, the Court finds that Plaintiffs' interest in a narrowed injunction, preventing violation of their constitutional rights under Sections 4 and 5 of the Executive Order, outweighs the legitimate competing interests raised by the Government.  Further, the Court finds that this balance tips "sharply" in Plaintiffs' favor, as required to support the Court's finding in Section III.B.1.b.ii, above, that Plaintiffs have demonstrated the existence of serious questions going to the merits of their First Amendment challenge to Section 5.  *See Alliance for the Wild Rockies*, 632 F.3d at 1131-32.  Plaintiffs have shown a significant adverse impact on their organizations and clients, and the Court finds that the public interest is served by reducing barriers to health care and other critical services for all communities.  The Government has not raised any persuasive argument that a preliminary injunction would prejudice it or harm the public interest.

### C.     Entitlement to Preliminary Injunctive Relief

Based on this record, the Court concludes that Plaintiffs are entitled to preliminary injunctive relief.  As discussed above, the Court finds that Plaintiffs have satisfied all of the *Winter* factors with respect to their challenges to Sections 4 and 5 of the Executive Order under

both the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment.  Moreover, with respect to their First Amendment challenge to Section 5, the Court makes an alternate finding that Plaintiffs have have shown at least the existence of serious questions going to the merits and that the balance of hardships tips sharply in their favor.

The Government argues that Plaintiffs' motion does not provide a basis to enjoin the Executive Order as a whole, and it asserts that any injunctive relief should be limited to Section 4(a), governing federal contractors, and nothing more.  For the reasons discussed herein, the Court agrees with the Government that relief must be consistent with "the general rule" requiring "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quotation marks and citation omitted).  It is for that reason that the Court has limited the relief granted to Sections 4 and 5 of the Executive Order.  Although the Government suggests that enjoining Section 4(a) would be sufficient to grant Plaintiffs complete relief, the Government does not explain why that is so when Sections 4(b) and (c) provide means for enforcing Section 4(a). Section 5 addresses grantees, and as discussed above, Plaintiffs have demonstrated entitlement to injunctive relief as to Section 5 as well as Section 4.

In addition, the Government asserts that this Court lacks power to enjoin President Trump. Generally, courts lack "jurisdiction of a bill to enjoin the President in the performance of his official duties."  *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality opinion) (quotation marks and citation omitted).  Some courts have suggested that the President may be enjoined in narrow circumstances.  *See, e.g., Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282, 291 (D. Mont. 2019) (stating that courts have authority to grant injunctive relief when "the President has no authority to act in the first place").  This Court need not determine whether it could issue a preliminary injunction against the President in this case, because Plaintiffs expressly disclaim any request to enjoin President Trump.  The Complaint seeks "[p]reliminary and permanent injunctions enjoining Defendants other than the President from implementing and enforcing the Executive Order."  Compl. Prayer at 50, ECF 1.  Plaintiffs reiterate that position in their reply.  *See* Reply at 15, ECF 70.

The Government also suggests that a class action suit would be a more appropriate vehicle for Plaintiffs' claims. This suggestion ignores the unique facts of this case, in which Plaintiffs cannot carry out their missions unless employers and funders are freed from the restrictions of the Executive Order. Such employers and funders are not similarly situated to Plaintiffs and therefore could not be represented by Plaintiffs in class action.

The Court concludes that Plaintiffs are entitled to a preliminary injunction with respect to Sections 4 and 5 of the Executive Order.

### D.       Reach of the Preliminary Injunction

Plaintiffs ask the Court to issue a nationwide preliminary injunction, arguing that they will be deprived of complete relief if the Court issues an injunction that is limited to the parties in the case and does not extend to third parties that contract with or fund Plaintiffs, who are themselves Government contractors and grantees. The Government contends that a nationwide injunction would be impermissibly broad, and that any injunctive relief should be limited to Plaintiffs themselves.

"Crafting a preliminary injunction is 'an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents.'" *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) (quoting *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017)). "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward." *Id.* (quotation marks and citation omitted). Although federal district courts have authority to grant nationwide injunctions, "such broad relief must be necessary to give prevailing parties the relief to which they are entitled." *Id.* (quotation marks and citation omitted).

As Plaintiffs point out, an injunction limited to Plaintiffs would not afford them complete relief. Permitting Plaintiffs to provide training regarding "divisive concepts," or to promote those concepts, would do Plaintiffs little good if their sources of employment and funding remain subject to the Executive Order. Plaintiffs have presented evidence that within two months after President Trump signed the Executive Order, the primary sponsor of a conference sponsored by Plaintiff AFC withdrew almost $6,000 in funding, stating that it felt compelled to do so by the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Executive Order.  *See* Davis Decl. ¶ 22, ECF 51-2.  In the same time frame, the organizer of a

2    webinar in which Plaintiff SAGE was scheduled to participate cancelled the program, citing to the

3    Executive Order and the two related OMB Memoranda.  *See* Meyer Decl. ¶ 14, ECF 51-8.

4    Injunctive relief is necessary to allow third parties to hire and/or fund Plaintiffs without fear of

5    violating the Executive Order.  This case therefore is factually distinguishable from *Azar*, in which

6    the Ninth Circuit determined that the nationwide preliminary injunction issued by the district court

7    was overly broad because an injunction limited to the plaintiffs themselves would afford them

8    complete relief.  *See Azar*, 911 F.3d at 584 ("[A]n injunction that applies only to the plaintiff

9    states would provide complete relief to them.").

10           Moreover, Plaintiffs are located across the country and serve widely dispersed populations.

11   *See* Papo Decl. ¶ 5 (Plaintiff Diversity Center serves Santa Cruz, California and surrounding area),

12   ECF 51-1; Davis Decl. ¶ 1 (Plaintiff AFC serves Chicago, Illinois), ECF 51-2; Shanker Decl. ¶ 3

13   (Plaintiff Bradbury-Sullivan Center serves the Greater Lehigh Valley, Pennsylvania), ECF 51-4;

14   Brown Decl. ¶ 1 (Plaintiff Brown Consulting located in Michigan), ECF 51-5; Riener Decl. ¶ 2

15   (Plaintiff CrescentCare serves New Orleans, Louisiana area), ECF 51-6; Cummings Decl. ¶ 1

16   (Plaintiff Los Angeles LGBT Center serves Los Angeles, California), ECF 51-7; Meyer Decl. ¶ 4

17   (Plaintiff SAGE is headquartered in New York, New York), ECF 51-8.  The Ninth Circuit held in

18   a recent case that the district court had not abused its discretion in issuing a nationwide

19   preliminary injunction where – as here – the plaintiff organizations did "not operate in a fashion

20   that permits neat geographic boundaries."  *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242,

21   1282-83 (9th Cir. 2020).  This Court likewise finds in the present case that an injunction limited to

22   the Northern District of California, or otherwise geographically limited, would be neither feasible

23   nor sufficient to afford Plaintiffs complete relief.  Accordingly, the Court concludes that a

24   nationwide injunction is warranted.

25           The Government argues that even if the Court is inclined to grant injunctive relief, doing

26   so on a nationwide scale would be inappropriate because it would impact another case challenging

27   the Executive Order, *Nat'l Urban League, et al. v. Trump*, 20-cv-3121 (D.D.C. filed Oct. 29,

28   2020).  The Government cites Supreme Court authority for the proposition that "[a]llowing only

one final adjudication would deprive this Court of the benefit it receives from permitting several

courts of appeals to explore a difficult question before this Court grants certiorari." *United States*

*v. Mendoza*, 464 U.S. 154, 160 (1984).  The Government's reliance on *Mendoza* is misplaced, as

the relief granted by the present order is not a "final adjudication" but rather preliminary

injunctive relief.  As of the filing of this order, counsel for the government defendants have not

appeared in that case, nor have the plaintiffs in that case sought a preliminary injunction.  Under

these circumstances, the Court is not persuaded that the pendency of *Nat'l Urban League*

precludes it from granting a preliminary injunction here.

In reaching this conclusion, this Court is mindful of the Ninth Circuit's most recent

decision involving nationwide injunctive relief, *City & Cty. of San Francisco v. United States*

*Citizenship & Immigration Servs.* ("*USCIS*"), --- F.3d ----, No. 19-17213, 2020 WL 7052286 (9th

Cir. Dec. 2, 2020).  *USCIS* involved challenges to a rule ("the Rule") issued by the Department of

Homeland Security ("DHS"), providing that "[f]oreseeable participation for an aggregate of

twelve months" in certain non-cash federal government assistance programs within a three-year

span "renders an immigrant inadmissible as a public charge and ineligible for permanent resident

status." *USCIS*, 2020 WL 7052286, at *3.  In a "cascade of litigation," numerous states and

municipalities filed suit to challenge the Rule, asserting that its immediate effect would be to

discourage immigrants from participating in such assistance programs, which would result in

increased demands on state and local governments.  *Id.* at *3-4.  District courts across the country

issued "a chorus of preliminary injunctions holding the Rule to be contrary to law and arbitrary

and capricious under the Administrative Procedure Act (APA)."  *Id.* at 3.  Injunctions were issued

by courts in the Northern District of California ("Northern District"), the Eastern District of

Washington ("Eastern District"), the Northern District of Illinois, the Southern District of New

York, and the District of Maryland.  *Id.* at *3-4.

The Ninth Circuit addressed appeals from the injunction issued in this District, which was

limited to the territory of the plaintiffs, and the injunction issued in the Eastern District, which

applied nationwide.  *USCIS*, 2020 WL 7052286, at *3.  The Ninth Circuit affirmed the Northern

District's injunction, vacated that portion of the Eastern District's injunction making it applicable

nationwide, and otherwise affirmed the Eastern District's injunction.  *Id.* at 15.  The Ninth Circuit reasoned that "[w]hatever the merits of nationwide injunctions in other contexts," such an injunction was not appropriate in the case before it, "because the impact of the Rule would fall upon all districts at the same time, and the same issues regarding its validity have been and are being litigated in multiple federal district and circuit courts."  *Id.*

The circumstances of the present case are markedly different from those addressed in *USCIS*.  There has been no "cascade of litigation" or "chorus of preliminary injunctions" regarding the Executive Order.  As discussed above, only one other suit challenging to the Executive Order has been filed, and the plaintiffs in that suit have not sought a preliminary injunction.  *See Nat'l Urban League, et al. v. Trump*, 20-cv-3121 (D.D.C. filed Oct. 29, 2020).  In fact, as of the date of this order, the defendants in that suit have not yet appeared.  *See id.*  Thus, the Ninth Circuit's bases for vacating the nationwide preliminary injunction in *USCIS* simply do not apply on the facts of this case.

The Court finds that a nationwide preliminary injunction is necessary to afford Plaintiffs complete and meaningful relief.

## IV.   ORDER

It is HEREBY ORDERED that:

(1)   Plaintiffs' motion for a nationwide preliminary injunction enjoining all Defendants, except President Trump, from enforcing Executive Order No. 13950 is GRANTED IN PART as to Sections 4 and 5, and otherwise is DENIED.

(2)   The Court has issued a separate order setting forth the particulars of the preliminary injunction concurrently with the present order.

(3)   This order terminates ECF 51.

Dated:  December 22, 2020

BETH LABSON FREEMAN
United States District Judge